Stephen K. Christiansen (6512)
Randall S. Everett (18916)
CHRISTIANSEN LAW, PLLC
311 South State Street, Ste. 250
Salt Lake City, Utah 84111
Telephone: 801.716.7016
Facsimile: 801.716.7017
steve@skclawfirm.com
randy@skclawfirm.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| KATE GRANT,<br><br>                             Plaintiff,<br><br>vs.<br><br>KEVIN LONG; MILLCREEK COMMERCIAL PROPERTIES, LLC; COLLIERS INTERNATIONAL; BRENT SMITH; SPENCER TAYLOR; BLAKE MCDOUGAL; and MARY STREET,<br><br>                             Defendants. | **COMPLAINT**<br><br>**JURY DEMANDED**<br><br><br>Civil No. 2:23-cv-00936<br>Judge _____ |

## PARTIES

### Defendants

1.      Defendant Colliers International ("Colliers") is an international real estate, valuation, consulting, and investment services company.

2.      There are 4 Colliers offices located in Utah.

3.      Colliers' acts that are the subject of this lawsuit were performed in close association with Millcreek Commercial Properties, LLC (sometimes hereafter "Millcreek" or "Millcreek Commercial") and have a nexus with Utah.

4. Defendant Millcreek Commercial is a Utah limited liability company with its principal place of business in Salt Lake City, Utah.

5. Kevin G. Long ("Long") is an individual residing in Utah.

6. Long was the Principal Broker and COO of CBC Advisors, a real estate professional services and investment company acquired by Colliers International ("Colliers") in 2017.

7. After Colliers' acquisition of CBC Advisors, Long worked as a broker for Colliers.

8. Long founded Millcreek Commercial and affiliated commercial real-estate investment funds, including non-party Millrock Investment Fund 1.

9. Long was "President of Millcreek with Colliers." His current position is that of President of Millcreek Commercial.

10. At all material times, Long was an employee and agent of Millcreek.

11. At all material times, Long was an employee and agent of Colliers.

12. Brent Smith ("Smith") is an individual residing in Utah.

13. At all material times, Smith was an employee and agent of Millcreek.

14. Blake McDougal ("McDougal") is an individual residing in Utah.

15. At all material times, McDougal was an employee and agent of Millcreek.

16. At all material times, McDougal was an employee and agent of Colliers.

17. Spencer Taylor ("Taylor") is an individual residing in Utah.

18. At all material times, Taylor was an employee and agent of Millcreek.

19.     At all material times, Long, Taylor, and McDougal acted as close business associates of one another, including through joint marketing, communications, social media, and transactional commission payments.

20.     At all material times, Millcreek and Colliers acted as close business associates of one another, including through joint marketing, communications, social media, and transactional commission payments.

21.     Collectively, Millcreek, Colliers, Long, Taylor, and McDougal are referred to herein as the "Millcreek/Colliers Parties."

22.     Defendant Mary Street ("Street") is an individual residing in Utah.

23.     At all material times, Street has been involved with Millcreek and Colliers as a close business associate and principal actor in the management and operation of the Naperville Property described herein.

24.     Street was employed at Colliers until 2023 and worked for them at all material times when the Tenant In Common ("TIC") interests discussed herein were beginning to be sold.

25.     Street allegedly manages upwards of 32 of the TIC interests on behalf of Millcreek and Colliers.

26.     Street is also a licensed real estate broker and continuing education instructor in Utah.

27.     Street has continued assisting Kevin Long in the management of the TIC interests through the present time.

**Plaintiff**

28.     *Kate Grant* is a resident of Colorado at the time she purchased what was represented to her to be a TIC ownership in the Naperville Property.

29.     On information and belief, the domiciles of each of the Defendants are diverse from the domicile of Plaintiff inasmuch as Plaintiff is domiciled in Colorado and none of the Defendants are.

## JURISDICTION AND VENUE

30.     Under 28 U.S.C. §§ 1331 and 1332 and 15 U.S.C. § 78aa, this Court has original subject matter jurisdiction over the claims alleged in this action arising under the laws of the United States, including specifically the Plaintiff's claims asserted under 15 U.S.C. § 78j(b) (including S.E.C. Rule 10b-5 promulgated thereunder and codified at 17 C.F.F § 240.10b-5), 15 U.S.C. § 78t(a), and 15 U.S.C. § 77l, as well as independent diversity jurisdiction.

31.     The Court has supplemental jurisdiction over the claims asserted herein under state law pursuant to 28 U.S.C. § 1367 because such claims are so related to the claims arising under the laws of the United States that they form part of the same case or controversy under Article III of the United States Constitution.

32.     Venue is appropriate in this forum under 28 U.S.C § 1391(b)(2) and 15 U.S.C. § 78aa.

33.     In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, used the means and instruments of interstate commerce, including mail, telephone, and internet communications.

## THE MILLCREEK COLLIERS TIC PROGRAM

### Overview of the Millcreek/Colliers TIC Program

34.     Over the last several years, Millcreek Commercial and its agents have conspired with third parties in a sophisticated scheme to fraudulently induce vulnerable, often elderly investors and those looking towards retirement to purchase TIC investments in commercial

properties located throughout the United States at grossly inflated prices (the "Millcreek/Colliers TIC Program").

35.     Millcreek marketed TIC interests in real properties at multiple locations, including Naperville, Illinois (the "Naperville Property"); Romeoville, Illinois; Pine Bluff, Arkansas; Blytheville, Arkansas; Alpharetta, Georgia; Kennesaw, Georgia; Draper, Utah, and Keller, Texas.

36.     Millcreek Commercial's affiliate, non-party Millrock Investment Fund 1, which is managed and operated by Kevin Long, contracted with developers to make renovations, improvements, and construction on the buildings at the Naperville Property located at 2975 Showplace Dr. Naperville, IL 60564, the location at issue in this complaint.

37.     The Millcreek/Colliers Parties represented that they had already secured for each property a paying tenant with sufficient revenue to service their long-term lease.

38.     The tenants were identified as Advance Care Medical, Inc. ("ACM") and Healthcare Solutions Holdings Inc. ("HSH").

39.     HSH is a Delaware corporation with its principal place of business in Glen Cove, New York.

40.     HSH is a wholly owned subsidiary of Healthcare Solutions Management Group.

41.     Healthcare Solutions Management Group, Inc. ("HSMG") is a Delaware corporation with its principal place of business in Glen Cove, New York.

42.     Joshua Constantin ("Constantin") is an individual residing in Louisiana.

43.     Justin Smith ("Smith") is an individual residing in Ohio.

44.     Constantin acted as the Head of Commercial Real Estate for HSH at all material times.

45.     At all material times, Smith acted as HSMG's Chief Executive Officer.

46. While not named as defendants in this lawsuit, collectively, HSH, HSMG, Constantin, and Smith are referred to herein as the "HSH Parties."

47. The HSH Parties are not parties in this action; allegations regarding them are included as context for claims against Defendants.

48. The HSH Parties or their affiliates entered long-term leases to operate the Romeoville, Pine Bluff, Blytheville, Alpharetta, Kennesaw, and Naperville Properties as urgent care or advanced care medical centers.

49. Either the HSH Parties or their affiliates entered long-term leases with the properties associated with Millcreek/Colliers to operate each property, including the Naperville Property, as advanced medical care centers ("ACMs").

50. These leases were bundled with the sale of TIC interests in each property.

51. Millcreek represented that this would result in investors receiving a return on their investment in the range of 6-9% over each lease term.

52. Millcreek represented that this would result in a steady stream of income along the way.

53. The Millcreek/Colliers Parties represented that the rent payments on the lease were backed by two failsafe mechanisms to protect investors from potential losses.

54. The first of these was a corporate guarantee backing the lease.

55. The corporate guarantor for the Naperville leases was HSH and/or HSMG.

56. The second of these was represented by Millcreek to be a bond issued by Lloyd's of London, the world's leading insurance/reinsurance market, when in reality they were bonded by another company that is not Lloyd's of London.

57.     To locate potential investors and induce their investments, Millcreek Commercial and its agents relied on a network of referring parties, including real estate agents, financial planners, attorneys, qualified intermediaries, and 1031 exchange agents, to locate and refer potential investors to them.

58.     While not named as defendants in this lawsuit, these referring parties are described collectively herein as "Advisors," and allegations regarding them are added to provide context to Plaintiff's claims.

**The Millcreek/Colliers Parties Jointly Target Retirement Investors**

59.     From 2013 to 2016, Kevin Long was the Principal Broker and COO of CBC Advisors, a real estate company.

60.     Kevin Long worked with Brandon Fugal at CBC Advisors.

61.     Long and Fugal, at CBC Advisors, worked with Lew Cramer at Colliers.

62.     Lew Cramer went on to become Chief Executive Officer of the Utah division of Colliers.

63.     In 2017, Colliers acquired Long's company, CBC Advisors.

64.     Fugal went on to become Chairman of the Utah division of Colliers after the acquisition.

65.     After the acquisition, Long worked as a broker for Colliers.

66.     Long was the Senior Vice President of the Utah division of Colliers, as shown in this email signature from communications with Plaintiff below:

**Kevin G. Long**

Senior Vice President
**Direct +1 801 947-8324** | Mobile +1 801 400-2080
Main +1 801 610-1300 | Fax +1 801 947-8301
kevin.long@colliers.com

**Colliers International – Utah | Millcreek Commercial**
2100 Pleasant Grove Blvd | Suite 200
Pleasant Grove, UT 84062 | United States

www.millcreekcommercial.com
www.colliers.com

 

67.     Long was also Executive Vice President of the Utah division of Colliers, as shown in his email signature from communications with Plaintiff below:

**Kevin G. Long**

Executive Vice President
**Direct +1 801 947-8324** | Mobile +1 801 400-2080
Main +1 801 610-1300 | Fax +1 801 947-8301
kevin.long@colliers.com

**Colliers International – Utah | Millcreek Commercial**
2100 Pleasant Grove Blvd | Suite 200
Pleasant Grove, UT 84062 | United States

www.millcreekcommercial.com
www.colliers.com

 

68.     In 2017, Long founded Millcreek Commercial, LLC and affiliated commercial real estate funds, including Millrock Investment Fund 1 of Utah ("Millrock").

69.     Long was "President of Millcreek with Colliers," as shown in this excerpt from his personal LinkedIn page:



Kevin Long
President, CEO and Co-Founder of Millcreek Commercial

### Experience



**President of Millcreek Commercial with Colliers International | Utah**
Millcreek Commercial
Jun 2017 - Present · 6 yrs 1 mo
Salt Lake City, UT

70.     Long represented that Millcreek and Colliers worked in partnership with each other, as shown in this excerpt from the Millcreek/Colliers website:

In his previous position, Scott was the Executive Vice President of Sales and Marketing for the largest provider of Real Estate partial ownership projects in the United States. Through his efforts, he developed an impeccable reputation and a nationwide client base. The alliance between the Rutherfords and Millcreek Commercial will enable Millcreek to become the preeminent provider of tenant-in-common real estate in the US. Millcreek Commercial utilizes Colliers International as their brokerage partner and Old Republic Title to ensure the chain of title on every transaction. These two global partners provide Millcreek Commercial with an unsurpassed national platform.

71.     At all material times, Defendants Kevin Long, Blake McDougal, Spencer Taylor, and other agents of Millcreek Commercial and Colliers were close business associates, including through joint marketing, communications, social media, and transactional commission payments.

72.     In or about 2020, Millcreek Commercial and its agents, Taylor, and McDougal, under Long's leadership, began marketing and selling TIC interests in real property, including the Naperville Property.

73.     Defendants Long, McDougal, Taylor, and Street are only registered to sell real estate in the state of Utah.

74.     Defendants Long, McDougal, Taylor, and Street are not registered with the state of Illinois to sell real estate.

75. Long, McDougal, Taylor, and Street are not registered with FINRA (the Financial Industry Regulatory Authority) to sell securities.

76. The TIC interests sold by the Millcreek/Colliers TIC Program, including the Naperville Property, were not registered as securities by filing a registration statement, nor were they exempt by an exempt offering under the 1933 Securities Act.

77. The Millcreek/Colliers Parties marketed TIC interests to potential buyers who wished to take advantage of the IRS Section 1031 exchange program.

78. A 1031 exchange permits those who sell business or investment property to postpone paying tax on the gain if the funds are reinvested in a "like-kind exchange"—i.e., property of the same nature or character as the sold property.

79. 1031 exchanges must take place over a constrained time frame by law.

80. The new property must be purchased within 180 days from the date the original property is sold.

81. Millcreek "markets to middle-class retirement investors," as shown in this excerpt from the Frequently Asked Questions page of Millcreek's website:

### What is the exit strategy?

Each co-owner has a separate deeded interest in the property and can buy and sell their interests as real estate independent of other owners. Every NNN leased investment, whether purchased as a Tenant In Common or as the sole owner, should be purchased as part of a long term investment strategy. But, as Robert Burns wrote, even "the best laid plans… can go awry". Because Millcreek Commercial Properties keeps minimums low and markets to middle class retirement investors we anticipate securing multiple retirement account investors in our properties. These investors have been coached to utilize a roll-up strategy whereby they leave their cash in their retirement account and compound their investment when additional shares of their investment property become available. There are no minimums on exchanges within a property.

Millcreek will facilitate these deed modifications and charge no marketing fees. If after your shares are offered to your partners and you still have a portion of your investment left to sell on the open market, Millcreel will market your property on our sales platform for a discounted listing fee of 3%. We are committed to maintaining the best resale program in the industry.

82.     The tax-deferral advantages of a 1031 exchange appeal to retirees, particularly when such an exchange promises large monthly returns on which they could rely during their final years.

83.     Millcreek marketed that "Millcreek Commercial generates passive income for you."

84.     The Millcreek/Colliers Parties typically bundled long-term, triple net leases with the sale of TIC interests; these triple net leases were likely more closely related to absolute net leases rather than actual triple net leases.

85.     Long and Millcreek/Colliers represented that the owners of the TIC interests would not be responsible for any management fees or other expenses related to the property and the tenant; however, the owners have had to pay a 2% management fee for the upkeep of the property that the tenant should have paid.

86.     Millcreek/Colliers offered TIC interests in properties that already had leases in place with tenants.

87.     The lease connected with each TIC property was designed to be the income stream for the Millcreek/Colliers Parties' targeted investors.

88.     Millcreek marketed their properties to "leave the headaches of being a landlord behind."

89.     Millcreek also coaxed possible investors by saying, "[r]est assured that our portfolio is rock solid. We rigorously vet every property that we offer", as shown in this excerpt from Millcreek's website, on a page called "1031 Exchange":

# Exchanging Hassle For Happiness.

Tenant issues, fixing toilets, and painting walls is hard work. Have you ever considered owning quality commercial real estate? With our passive lease structure, you can leave the headaches of being a landlord behind. We deliver fully managed properties with better returns than your current real estate investment, giving you more time to do the things you love. Our co-ownership model makes it possible for any investor to utilize and 1031 exchange to buy into high quality commercial real estate. Rest assured that our portfolio is rock solid. We rigorously vet every property that we offer.

90.     Typically, a tenant was identified and acquired by the Developer Parties as defined herein.

91.     In or about 2020, the Millcreek/Colliers Parties, under Long's direction, began marketing the Naperville Property.

92.     Millcreek represented that the Naperville Property was a newly constructed building completed in 2020.

93.     According to Millcreek's marketing, the Naperville Property was under a long-term lease to a single tenant.

94.     The Plaintiff in this action purchased TIC interests for the desired purpose of deferring capital gains tax and obtaining an income-generating property.

95.     As part of Plaintiff's purchase of TIC interests in the Naperville Property, Colliers acted as the broker and received commission payments on each purchase.

**The Advisor Parties' Role in the Millcreek/Colliers TIC Program**

96.     Before learning of Millcreek's TIC offerings, Plaintiff did not know much about the 1031 exchange process, so she sought guidance from investment and real estate advisors or 1031 exchange specialists.

97.     The Advisors are not parties in this action, but allegations regarding them are included as context for claims against Defendants.

98.     Plaintiff had never heard of Millcreek beforehand.

99.     Advisors recommended a TIC investment through the Millcreek/Colliers TIC Program and assured the would-be owner that Millcreek had great TIC investment opportunities.

100.    Each of the Advisors pointed out that Millcreek had partnered with Colliers with respect to the TIC investments in the Millcreek/Colliers TIC Program.

101.    Each of the Advisors counseled the respective Plaintiff with whom they were dealing that a TIC investment through Millcreek partnered with Colliers would provide the kind of professional, safe, reliable, low-risk, and well-vetted investment that Plaintiff was seeking.

102.    None of the Advisors disclosed that they would receive a commission or similar compensation from the Millcreek/Colliers Parties for the referral.

**The Millcreek/Colliers TIC Program Sales Pitch**

103.    Plaintiff communicated directly with representatives of Millcreek, including Long, Taylor, and McDougal.

104.    Additionally, Long and McDougal were Colliers employees at the time they sold TIC investments to Plaintiff.

105.    Huff, the Millcreek representative with whom Plaintiff primarily spoke, strongly recommended she invest in one of a portfolio of TIC properties sold by Millcreek.

106.     Plaintiff was informed that a Millcreek TIC was a great investment because Millcreek always "hand-select[s] the best properties," as shown in this excerpt from Millcreek's promotional materials:

**Removing Barriers to Investing in Commercial Real Estate**
First, we **hand-select** the **best** properties. Each property is thoroughly examined and vetted. It must meet at least three of these four criteria:

107.     Plaintiff was told that "[i]n terms of commercial real estate, a 'bad investment' could equal a property that goes under, an unreliable tenant, or a property that requires extensive responsibility on the part of the investor. Millcreek Commercial brings experience to the table by identifying and purchasing profitable properties that will benefit the portfolios of investors", as shown in this excerpt  from Millcreek's website:

## Choosing a bad investment

Another fear in the commercial real estate investment world may include choosing a bad investment. In terms of commercial real estate, a "bad investment" could equal a property that goes under, an unreliable tenant, or a property that requires extensive responsibility on part of the investor. Millcreek Commercial brings experience to the table by identifying and purchasing profitable properties that will benefit the portfolios of investors. One key way that Millcreek Commercial avoids a "bad investment" from the beginning is through purchasing properties with "recession resilience", or in other words, properties that have tenants who thrive in any economic environment.  The types of properties included in Millcreek Commercial's portfolio include pharmacies, convenience stores, and medical centers.

108. Plaintiff was told that with every property, investors could "enjoy a quality property that has been identified and vetted by seasoned professionals", as stated in this excerpt from the Millcreek website:

> After identifying the property, Millcreek will ensure that the property meets three of four requirements: single tenant, long-term lease, investment grade, and triple-net leased. In addition, Millcreek Commercial will travel to the property for a personalized inspection of the property, building, and the surrounding area. Millcreek Commercial's years of experience in identifying profitable properties allows investors to avoid having to fear getting stuck with a "bad investment". Their expertise can help investors enjoy a quality property that has been identified and vetted by seasoned professionals.

109. Moreover, the Millcreek/Colliers Parties represented that they had already secured "the tenant of your dreams" for the Naperville Property.

110. According to the Millcreek/Colliers Parties, the tenant had already signed a 20-year lease with 2% annual increases and an average return on investment of 6-9% over that period.

111. Millcreek represented the lease on each of its TIC properties in Naperville was triple-net ("NNN") – meaning the tenant, not the owner, would be responsible for paying taxes, paying insurance, and maintaining the property.

112.    However, the leases represented by the lease agreement appeared more closely related to an absolute net lease, which includes capital improvements to the property with everything included in a triple net lease.

113.    Millcreek stated that "Millcreek Commercial ensures that any commercial property has a corporate guarantee to protect investors. Investors with Millcreek Commercial properties can rest assured that they will not lose money, but rather benefit from a steady stream of passive income," as shown in this excerpt from an article from Millcreek Commercial titled "Investing Isn't Scary":

> Millcreek Commercial ensures that any commercial property has a corporate guarantee to protect investors. Investors with Millcreek Commercial properties can rest assured that they will not lose money, rather benefit from a steady stream of passive income.

114.    Accordingly, the Millcreek/Colliers Parties stated the lease was "backed by strength" by HSMG, the guarantor on the lease and a member of the HSH Parties.

115.    Millcreek represented that HSMG working "in cooperation' with Millcreek" was developing a nationwide network of surgery centers.

116.    The Millcreek/Colliers Parties represented that the prestigious Lloyd's of London insurance entity insured the lease.

117.    The Millcreek/Colliers Parties thus assured Plaintiff that Lloyd's of London would pay a year of rent payments even if the tenant defaulted in the first two years of a lease.

118.    The Millcreek/Colliers Parties meant to imply, and Plaintiff, in fact, inferred that the involvement of Lloyd's of London meant that reputable and reliable vetting and evaluation of the lease had been performed in connection with the issuance of the bond.

119.    However, Defendants did not provide Plaintiff a copy of the bond from Lloyd's of London, and, in fact, the bond was from another company that is not associated in any way with Lloyd's of London.

120.     The Millcreek/Colliers Parties told Plaintiff that they could rest assured that the investment would be "safe, stable, [and] secure," as shown in this excerpt from marketing materials provided by Millcreek:

**Invest with Us**

At Millcreek Commercial, we take the benefits of investing in commercial real estate to the next level. Our "all-gain, no-pain model" produces monthly passive income, requires zero heavy-lifting, and tax-protects our co-owners.

Invest with us today and access premium commercial real estate that is a safe, secure, and stable place to put your hard-earned dollars to work.

121.     The Millcreek/Colliers Parties represented that "every Millcreek Commercial transaction is treated with the same care and attention to detail that would occur in a typical $10 million commercial investment real estate transaction", as per this excerpt from Millcreek's Frequently Asked Questions page on their website:

## How is a purchase executed?

Every Millcreek Commercial transaction is treated with the same care and attention to detail that would occur in a typical $10 million commercial investment real estate transaction. After you have reviewed the Offering

122.     According to Millcreek Commercial, the Naperville Property passed its "relative test."

123.     The "relative test," as Millcreek explained in its marketing materials, was whether "we would sell [the property] to our mother, grandmother, best friend, or son."

124.     Millcreek Commercial stated that "[o]ur acquisition team only purchases properties that our principals want to hold in our portfolios," as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

**4. Philosophy and Core Values**

Our acquisition team only purchases properties that our principals want to hold in our portfolios. We purchase these properties debt free and then invite others to join us as Tenant In Common owners. Every property must pass the relative test – we would sell this to our mother, grandmother, best friend or son.

125.     Millcreek stated that "we typically stay in our deals for the long term […] This commitment provides our partners with the added assurance that we believe in and are committed to our products", as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

**5. Long Term Partners**

Millcreek Commercial typically stays in our deals for the long term. There are situations where we could sell all of a syndication, but our business model is for one of our partners or family member to stay in a deal for the long term. This commitment provides our partners added assurance that we believe in and are committed to our products.

126.     The Millcreek/Colliers Parties represented that they had done many such deals before.

127.     The Millcreek/Colliers Parties told Plaintiff that Millcreek "utilizes Colliers International as [its] brokerage partner."

128.     The Millcreek/Colliers Parties represented to the Plaintiff that the Millcreek/Colliers partnership extended internationally because Colliers was Millcreek's "global partner," as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

**2. A National Platform**

Millcreek Commercial utilizes Colliers International as their brokerage partner and Old Republic Title to ensure the chain of title on every transaction. These two global partners along with Kevin's expansive network, provide Millcreek Commercial with an unsurpassed national platform.

129.     The Millcreek/Colliers TIC Program's representatives communicated with Plaintiff using their official Colliers email addresses.

130.     Colliers' logo was prominently placed right next to Millcreek's logo on every page of the Naperville Property Offering Memorandum.

131.     Colliers' logo was also prominently displayed on emails and marketing materials used by Long and other Millcreek Commercial agents.

132.     Below is the front page of the Millcreek/Colliers' parties Offering Memorandum for TIC investments in the Naperville Property. Attached to this complaint is the full Offering Memorandum for reference.



133.     Below is the heading of the second page of the Offering Memorandum for the Naperville Property, again prominently featuring the logos of both Millcreek and its partner, Colliers International.



MILLCREEK COMMERCIAL | Colliers | Advance Care Medical | Naperville, IL

**Property Information**

| | |
|---|---|
| Tenant | Advance Care Medical |
| Location | 2975 Showplace Dr., Naperville, IL 60564 |
| Property Type | Freestanding, Medical |
| Building Size | 3,500 Square Feet |
| Purchase Price | $5,078,231.42 |
| Cap Rate | 6.00% |

Advance Care's mission and business strategy is to provide better, more consistent, comprehensive care solutions by vertically integrating urgent care facilities with ancillary services and new technologies. The intended outcome is to provide a broader continuum of patient care at a lower cost and generate significantly higher operating margins.

**Naperville, IL**

Naperville Crossings is situated at the Northwest Corner of Route 59 and 95th Street in the heart of South Naperville's retail corridor. Lot sits as an outparcel to AMC Showplace 16 which boasts over 750,000 visitors per year. Tapestry of Naperville, a 300-unit residential project, is adjacent to center. There is ample parking available and multiple points of access via Route 59 or 95th Street.

**About Tenant In Common**

Tenant in common or TIC ownership allows two or more people to hold an ownership interest in a property. Each property owner or business entity holds its own separate stake in the property and receives a deed. Their interests do not have to be equal.

This Millcreek Commercial property has the following characteristics:

• Property is offered debt-free
• Long-term, corporate-guaranteed lease
• Satisfies IRS requirements for 1031 exchanges

Office | 801.899.1943
www.MILLCREEKCOMMERCIAL.com

**Lease Information**

| | |
|---|---|
| Lease Guarantor | Healthcare Solutions Holdings Inc |
| Initial Lease Term | 20 years |
| Rent Increases | 2% increases every year |
| Renewal Options | Two 5-year options |
| 20 Yr. Avg. Return | 7.25% |

| Year | Gross Rent | Net Rent | Cap Rate |
|---|---|---|---|
| 2021 | $323,866.85 | $ 317,389.46 | 6.00% |
| 2022 | $330,344.19 | $ 323,737.25 | 6.12% |
| 2023 | $336,951.07 | $ 330,212.00 | 6.24% |
| 2024 | $343,690.09 | $ 336,816.24 | 6.36% |
| 2025 | $350,563.89 | $ 343,552.56 | 6.48% |
| 2026 | $357,575.17 | $ 350,423.61 | 6.6% |
| 2027 | $364,726.68 | $ 357,432.09 | 6.73% |
| 2028 | $372,021.21 | $ 364,580.73 | 6.86% |
| 2029 | $379,461.63 | $ 371,872.34 | 6.99% |
| 2030 | $387,050.87 | $ 379,309.79 | 7.13% |
| 2031 | $394,791.88 | $ 386,895.99 | 7.27% |
| 2032 | $402,687.72 | $ 394,633.91 | 7.42% |
| 2033 | $410,741.48 | $ 402,526.58 | 7.57% |
| 2034 | $418,956.30 | $ 410,577.12 | 7.72% |
| 2035 | $427,335.43 | $ 418,788.66 | 7.87% |
| 2036 | $435,882.14 | $ 427,164.43 | 8.02% |
| 2037 | $444,599.78 | $ 435,707.72 | 8.18% |
| 2038 | $453,491.78 | $ 444,421.87 | 8.34% |
| 2039 | $462,561.61 | $ 453,310.31 | 8.51% |
| 2040 | $471,812.85 | $ 462,376.52 | 8.68% |

Millcreek Commercial | 2100 S Pleasant Grove Blvd. Ste 200, Pleasant Grove, UT

134.    On the front page of the Offering Memorandum, Millcreek, and Colliers further

state:

The Tenant in Common (TIC) interests sold by Millcreek Commercial Properties constitute interests in real property. They do not constitute securities. Consequently, federal and state laws regulating the sale of securities do not apply with respect to the sale of TIC interests, and purchases of TIC interests will not be entitled to the protection afforded to purchasers of securities under federal and state securities laws. Nothing in the attached offering documents should be construed as an offer or a solicitation of an offer to buy or sell securities.

135.     Plaintiff relied on each of the representations set forth herein when she purchased a TIC interest in the Naperville Property.

**The Developer Parties' Role**

136.     American Development Partners ("ADP") is a Tennessee company with its principal place of business in Franklin, Tennessee.

137.     Emanuel Butera ("Butera") is an individual residing in Tennessee.

138.     At all material times, Butera acted as the owner and operator of ADP.

139.     SARC USA, Inc. is a Missouri limited liability company with its principal place of business in Dexter, Missouri.

140.     Steve Caton ("Caton") is an individual residing in Illinois.

141.     At all material times, Caton acted as the president of SARC USA, Inc.

142.     While not named as defendants in this lawsuit, collectively, ADP, Butera, SARC USA, Inc., and Caton, are referred to herein as the "Developer Parties."

143.     The Developer Parties are not parties in this action, but allegations regarding them are included as context for claims against Defendants.

144.     Millcreek or its affiliates entered a series of contracts with one or more of the Developer Parties wherein the Developer Parties would develop and make renovations, improvements, and construction on the Naperville Property

145.     Investors have requested itemized budgets for the tenant improvements to the real property, which they have never received.

146.     In approximately 2018, "Millcreek Commercial Properties [partnered] with American Development Partners to develop $50 million in single-tenant triple-net lease assets throughout the US."

147. "Millcreek [served] as the capital partner for American Development, which [would] build multiple single-tenant properties, including two facilities for Healthcare Solutions Holdings."

148. Long stated: "They [ADP] have an extensive background in single tenant net lease product across the US. We spent months exploring a venture together. We have come together and are excited about the synergy that these two companies bring together for the American public."

149. Millcreek contracted ADP to develop the single-tenant Naperville Property.

## MISREPRESENTATIONS AND OMISSIONS

### Misrepresentations and Omissions to All Plaintiff

150. Long, Taylor, and McDougal provided written marketing materials, including materials in electronic form, to the Plaintiff.

151. This included the Offering Memorandum for the Naperville Property and property descriptions on their website.

152. These materials are referred to herein as the "Marketing Materials."

153. The Millcreek/Colliers Parties developed the Marketing Materials with input from the Developer Parties and the HSH Parties, and the Developer Parties and HSH Parties were aware of and approved, either expressly or tacitly, all the content of the Marketing Materials.

154. Taylor and McDougal reviewed and were made aware of the information contained in the Marketing Materials.

155. Taylor and McDougal distributed the Marketing Materials to Plaintiff with whom they had contact by means including but not limited to:

   a. Emailing the Marketing Materials.

      b.     Directing Plaintiff to the Marketing Materials through the Millcreek

website and sharing links to marketing materials.

**Misrepresentations in Marketing Materials to Plaintiff**

156.    The Marketing Materials provided by the Millcreek/Colliers Parties represented

that the tenant (HSH) was a publicly traded medical company focused on providing clinicians

with state-of-the-art diagnostic and therapeutic tools, as shown in this excerpt from the

Naperville Offering Memorandum:

### Backed By Strength

Healthcare Solutions Holdings, Inc. "HSH" is a publicly-traded medical service and device company focused on providing clinicians with state-of-the-art diagnostic and therapeutic tools. HSH's mission is to provide clinicians with broader access to the most advanced technologies in the Healthcare Industry. Technology proliferation drives progressive methods of testing patients, leading to superior patient outcomes.

157.    With respect to this misrepresentation, Plaintiff alleges as follows:

158.    The representation is false because HSH is a shell company with little or no

revenue, business operations, or assets.

159.    This representation concerned an issue of material fact in that it altered the mix of

information available to Plaintiff in making her investment decision, including, specifically,

information concerning the financial solvency of the tenant company.

160.    The Millcreek/Colliers Parties knew or should have known that HSH Parties did

not have the capital or the cash flow to service rent payments on leases at the Naperville

Property.

161.    The Marketing Materials provided by Millcreek/Colliers represented that HSH

"will capture revenue and margins that have historically been 'lost,'" resulting in "significantly

enhanced operating margins."

162.    With respect to this misrepresentation, Plaintiff alleges as follows:

163. This representation is false because HSH is a shell company without the genuine business operations necessary to capture any meaningful revenue or margins at all.

164. This representation concerned an issue of material fact in that it altered the mix of information available to Plaintiff in making her investment decisions, specifically, the tenant company's financial status.

165. Millcreek/Colliers Parties knew or should have known that HSH was patently unable to make good on this representation.

166. The Marketing Materials provided by Millcreek/Colliers represented that "ACM, in cooperation with HSH, will sign a 20-year NNN lease with 2% rent escalations annually", as shown in this excerpt from the Naperville Offering Memorandum:

### The Tenant of Your Dreams

Millcreek Commercial is developing properties specifically for Advance Care Medical. ACM, in cooperation with Healthcare Solutions Holdings, Inc. (HSH), meets our pillars for success. With each property, ACM will sign a 20-year NNN lease with 2% rent escalations annually, all backed by an HSH corporate guarantee and insured by Lloyds of London.

167. With respect to this misrepresentation, Plaintiff alleges as follows:

168. This representation is false because HSH did not have the financial ability to commit to a 20-year NNN lease with 2% rent escalations annually.

169. This representation concerned an issue of material fact in that it altered the information available to Plaintiff in making their investment decisions, specifically, the investment's risk profile and the tenant's viability.

170. Millcreek/Colliers Parties knew or should have known that HSH did not have the financial ability to commit to and service 20-year NNN leases with 2% annual rent escalations.

171. The Marketing Materials provided by Millcreek/Colliers represented that the lease on the Naperville Property was "backed by an HSH corporate guarantee."

172. With respect to this misrepresentation, Plaintiff alleges as follows:

173.    This representation was false because neither HSH nor any of the HSH Parties had the financial capability to fulfill this obligation.

174.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiff in making their investment decisions, specifically, the tenant's financial viability and the risk profile of the investment.

175.    Millcreek/Colliers Parties knew or should have known that HSH was incapable of providing a reliable corporate guaranty.

176.    The Marketing Materials provided by Millcreek/Colliers represented that the leases bundled with the Naperville Property were "insured by Lloyds of London."

177.    With respect to this representation, Plaintiff alleges as follows:

178.    This representation was false because Lloyd's of London never insured the lease for the Naperville Property.

179.    This representation concerned an issue of material fact in that it altered the mix of information available to Plaintiff in making their investment decisions, including, specifically, the risk profile of their investment.

180.    The Millcreek/Colliers Parties knew or should have known that HSH did not secure this bond from Lloyd's of London.

**Omissions of Material Fact to the Plaintiff**

181.    Millcreek made the following omissions of material fact:

182.    This omission concerned an issue of material fact in that it altered the information available to Plaintiff in making their investment decisions, specifically, the Millcreek/Colliers risk profile in the Naperville Property.

183.     Millcreek omitted to disclose that public SEC filings stated that HSH underwent a reverse merger to go public.

184.     This omission concerned an issue of material fact in that it altered the information available to Plaintiff in making her investment decisions, specifically, the financial stability and viability of the tenant and its affiliate entities.

185.     Millcreek omitted to disclose that public SEC filings stated that HSH's supposed assets disclosed as part of their reverse merger appear to be merely loans.

186.     This omission concerned an issue of material fact in that it altered the information available to Plaintiff in making her investment decisions, specifically, the financial stability and viability of the tenant and its affiliate entities.

187.     Millcreek omitted to disclose that the tenant was late to pay rent as early as December 2021.

188.     This omission concerned an issue of material fact in that it altered the mix of information available to Plaintiff in making her investment decisions, specifically, the tenant's reliability and financial viability.

189.     The Millcreek/Colliers Parties omitted to disclose that the tenant was late on rent and continued to represent to potential buyers that the tenant was a "tenant of your dreams."

190.     This omission concerned an issue of material fact in that it altered the mix of information available to Plaintiff in making her investment decisions, specifically, the tenant's reliability and financial viability.

191.     Millcreek omitted to timely disclose that its affiliate entity Millrock, or other undisclosed and unknown entities and individuals, not Millcreek Commercial itself, held TIC interests in the Naperville Property and would sell their TIC interests to Plaintiff.

192.    This omission concerned an issue of material fact in that it altered the information available to Plaintiff in making her investment decisions, including Millcreek's risk profile in its own TIC investments.

193.    Millcreek omitted to include financial reports about HSH in the due diligence materials for the Naperville Property. These financial reports were neither provided on an annual nor semi-annual basis.

194.    This omission concerned an issue of material fact in that it altered the mix of information available to Plaintiff in making her investment decisions, specifically, HSH's financial viability. It also encouraged Plaintiff to rely on Millcreek's other false representations about the financial strength of HSH.

195.    Upon information and belief, the Millcreek/Colliers Parties made other misrepresentations and omissions regarding material facts to induce Plaintiff's investment, which will be further uncovered and alleged in the discovery process in this action.

**Misrepresentations and Omissions Regarding the Naperville Property**

196.    The Marketing Materials given to Plaintiff made a series of untrue and misleading misrepresentations to induce investments into the Naperville Property.

197.    The Marketing Materials provided by Millcreek/Colliers represented that the TIC interests sold as part of the Millcreek/Colliers TIC Program were not securities under federal law, as shown in this excerpt from the Offering Memorandum from the Naperville Property:

The Tenant in Common (TIC) interests sold by Millcreek Commercial Properties constitute interests in real property. They do not constitute securities. Consequently, federal and state laws regulating the sale of securities do not apply with respect to the sale of TIC interests, and purchases of TIC interests will not be entitled to the protection afforded to purchasers of securities under federal and state securities laws. Nothing in the attached offering documents should be construed as an offer or a solicitation of an offer to buy or sell securities.

Office: 801.899.1943 | www.**MILLCREEKCOMMERCIAL**.com

Millcreek Commercial | 2100 S Pleasant Grove Blvd. Ste 200, Pleasant Grove, UT

198.    With respect to this misrepresentation, Plaintiff alleges as follows:

199.    The representation is false because the TIC interests are securities under federal law and under applicable state laws.

200.    The representation concerned an issue of material fact in that it altered the mix of information available to Plaintiff in making her investment decisions, including specifically, information concerning Defendants' qualifications, trustworthiness, and the legal nature of the investment.

201.    The Millcreek/Colliers Parties knew or should have known that the TIC investments they sold were securities under federal law and applicable state laws.

202.    The Marketing Materials provided by the Millcreek/Colliers Parties represented that the tenant's business strategy is to "vertically integrate urgent care facilities with ancillary services and new technologies" with the outcome of "providing a broader continuum of patient care at a lower cost and generate significantly higher operating margins," as shown in this excerpt from the Offering Memorandum from the Naperville Property:

**Property Information**

| | |
|---|---|
| Tenant | Advance Care Medical |
| Location | 2975 Showplace Dr., Naperville, IL 60564 |
| Property Type | Freestanding, Medical |
| Building Size | 3,500 Square Feet |
| Purchase Price | $5,078,231.42 |
| Cap Rate | 6.00% |

Advance Care's mission and business strategy is to provide better, more consistent, comprehensive care solutions by vertically integrating urgent care facilities with ancillary services and new technologies. The intended outcome is to provide a broader continuum of patient care at a lower cost and generate significantly higher operating margins.

203.    With respect to this misrepresentation, Plaintiff alleges as follows:

204.    This representation is false because the tenant named on the lease is not a registered entity at all, and neither HSH nor HSMG has the revenue or business operations necessary to service a 20-year lease on the Naperville Property.

205.    This representation concerned an issue of material fact in that it altered the mix of information available to Plaintiff in making her investment decisions, including, specifically, information regarding the reliability and financial viability of the tenant.

206.    The Millcreek/Colliers Parties knew or should have known that the tenant did not have the capital or the cash flow to sign a 20-year lease for the Naperville Property.

207.     The Marketing Materials provided by the Millcreek/Colliers Parties represented that the tenant's development of 350 Comprehensive Care Centers will create "the most extensive branded system in the country," as shown in this excerpt from the Naperville Property Offering Memorandum:

**Advance Care Medical**

Largest Network: Development of 350 Comprehensive Care Centers will create the most extensive branded system in the country.

Significant Margins: By vertically integrating, they will capture revenue and margins that have historically been "lost" in the channel to sales, marketing, and third-party providers. This will result in significantly enhanced operating margins.

208.     With respect to this misrepresentation, Plaintiff alleges as follows:

209.     This representation is false because the tenant could not develop 350 care centers or "the most extensive branded system in the country."

210.     This representation concerned an issue of material fact in that it altered the mix of information available to Plaintiff in making her investment decisions, including, specifically, information concerning the reliability and financial viability of the tenant.

211.     The Millcreek/Colliers Parties knew or should have known that the tenant could not develop 350 care centers or "the most extensive branded system in the country."

212.     The Marketing Materials the Millcreek/Colliers Parties provided represented that the Naperville Property's fair market value was as much as $5 million.

213.     With respect to this misrepresentation, Plaintiff alleges as follows:

214.     This representation was false because the actual value of the property was, on information and belief, substantially less than $5 million.

        a.      This representation concerned an issue of material fact, in that it altered the information available to Plaintiff in making her investment decisions, specifically, the actual market value of the property they were investing in.

215.     The Millcreek/Colliers Parties knew or should have known that the actual value of

the Naperville property was substantially lower than $5 million.

216. The Marketing Materials provided by the Millcreek/Colliers Parties represented that the Naperville Property Lease Guarantor was Healthcare Solutions Holdings Inc, as shown in this excerpt from the Naperville Property Offering Memorandum:



## Lease Information

| | |
|---|---|
| Lease Guarantor | Healthcare Solutions Holdings Inc |
| Initial Lease Term | 20 years |
| Rent Increases | 2% increases every year |
| Renewal Options | Two 5-year options |
| 20 Yr. Avg. Return | 7.25% |

217. This representation was misleading because HSH is a shell company with insufficient revenue and business operations and was incapable of acting as a lease guarantor with the financial burden of repayment responsibility in case the tenant defaults.

218. This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiff in making her investment decisions, including, specifically, the risk profile of her investment.

219. The Millcreek/Colliers Parties failed to disclose that the corporate guarantor for the Naperville Property lease was not financially capable of providing a corporate guarantee.

220. This representation concerned an issue of material fact in that it altered the mix of information available to Plaintiff in making her investment decisions, including, specifically,

information regarding the security of her investment.

221.     The Millcreek/Colliers Parties failed to disclose that the tenant on the Naperville Property lease was not a legitimate business entity.

222.     This representation concerned an issue of material fact in that it altered the mix of information available to Plaintiff in making her investment decisions, including, specifically, information regarding the viability of the tenant.

223.     The Millcreek/Colliers Parties failed to disclose that the bond included in their due diligence folder was incomplete and, therefore, invalid.

224.     This representation concerned an issue of material fact in that it altered the mix of information available to Plaintiff in making her investment decisions, including, specifically, information regarding the security of her investment.

225.     The Millcreek/Colliers Parties failed to disclose that if the tenant defaulted after a Certificate of Occupancy had been issued, the Plaintiff may be subject to paying taxes, maintenance fees, insurance, and fees related to renting.

226.     This representation concerned an issue of material fact in that it altered the mix of information available to Plaintiff in making her investment decisions, including, specifically, information regarding the cost of her investment.

227.     Defendants made at least the following omissions of material fact to Plaintiff as they induced Plaintiff's investment in the Naperville Property:

> a.     They failed to disclose to Plaintiff the significant commissions they would receive for Plaintiff's purchase in the Naperville Property.
>
> b.     They failed to disclose that the market value lease per square foot of the Naperville Property was less than $92.53.

     c.       They failed to disclose that the represented value of the Naperville

                Property fluctuated several times.

     d.       They failed to provide access to the due diligence materials until a few

                days before Plaintiff was closing on the Naperville Property.

     e.       They failed to provide financial statements or reports for the tenant in

                Naperville's due diligence materials.

## **PLAINTIFF INVESTED IN THE MILLCREEK TIC PROGRAM**

228.    Relying on the misrepresentations, omissions, and general deception of the

Millcreek/Colliers Parties, their Advisors, the HSH Parties, the Developer Parties, and their

principals, Plaintiff invested in the Naperville Property.

229.    Plaintiff invested a total of $153,570.03 in the Naperville Property.

**Commissions**

230.    In connection with the Plaintiff's purchases in the Naperville Property,

commissions and similar compensation payments were made to third parties in each transaction.

231.    Plaintiff did not know about these commissions and similar compensation

payments until she saw the settlement statements for her transaction.

**Plaintiff's Final Ownership Percentages and Total Investments**

232.    According to her closing documents, Plaintiff has the following ownership

percentage and total investments in the Naperville Property:

     a.       3.0241% ownership of the Naperville Property with an investment of

                $153,570.03.

# FAILURE OF THE NAPERVILLE PROPERTY INVESTMENT

## The Tenant Defaults, the Guaranty and the Bond Fail

233.    For months after her purchase, Plaintiff did not suspect anything had gone wrong with her TIC investments.

234.    She received payments that she was told were rent payments, and she believed that the tenant either had or imminently would occupy the buildings in Naperville.

235.    In or about early October 2022, the TIC owners of the Naperville Property, including Plaintiff, were informed by the self-proclaimed lease administrator (Mary Street of Mountain West Commercial Real Estate) that the tenant at the Naperville Property had defaulted.

236.    Street, at all relevant times, has acted as an unlicensed real estate broker regarding the Naperville Property because she is not and has never been licensed in Illinois.

237.    Street knew or should have known her actions were not permitted under Illinois law.

238.    The tenant defaulted on all seven of the properties in the Millcreek/Colliers TIC Program that involved the tenant.

239.    Long, Millcreek, Colliers, and the other Millcreek/Colliers Parties knew or should have known that the HSH-affiliated tenant named on each lease agreement was an unregistered entity.

240.    Long, Millcreek, Colliers, and the other Millcreek/Colliers Parties knew or should have known that the HSH Parties were shell companies with insufficient revenue or business operations and were unable to service their rent obligations under the lease.

241.    What Millcreek had billed as the "tenant of your dreams" became the tenant of the Plaintiff's nightmares.

242.     Long further informed Plaintiff and other owners of the Naperville Property that HSH and HSMG—the corporations that purportedly had backed the tenant with a guarantee on the lease—were unable or unwilling to make good on that guarantee.

243.     Long, Millcreek, Colliers, and the other Millcreek/Colliers Parties knew or should have known that HSMG was a shell company with insufficient revenue or business activities and was unable to fulfill its obligations on the guaranty.

244.     Long further informed Plaintiff and other owners of the Naperville Property that there was no bond from Lloyd's of London guaranteeing the leases at those properties.

245.     Long, Millcreek, Colliers, and the other Millcreek/Colliers Parties knew or should have known that no bond from Lloyd's of London had been issued backing the leases at the Naperville Property.

246.     Millrock did not retain any ownership until Millcreek Capital initiated a capital call, at which time Millrock re-acquired an interest in the Naperville Property and so now similarly situated to the Naperville Property owners, including Plaintiff.

247.     Under a triple-net lease like the ones bundled with the Naperville Property, the tenant pays for taxes, maintenance costs, and insurance; if it is found by a trier of fact that this is an absolute net lease, capital improvements would be included in tenant costs.

248.     After the tenant defaulted, Plaintiff at Naperville Property was burdened with the need to pay for taxes, maintenance, and insurance.

**Plaintiff Discovers the Naperville Property Value is Overinflated**

249.     Plaintiff was further shocked and dismayed to discover that the Naperville Property was actually worth significantly less than what Defendants had represented.

250.     In the Offering Memorandum the Millcreek/Colliers Parties gave to Plaintiff

during the sales process, the value of the Naperville Property was represented to be $5 million.

251.    On information and belief, the market value of the Naperville Property was significantly less than that at the time.

252.    Upon learning of the default, the TIC owners were looking for another tenant when the owners learned that the property was valued at $30 per square foot rather than the $90 or more that was advertised.

253.    Upon Plaintiff's learning of the issues with the previous tenant, Plaintiff sought to sell her TIC Interest in the Naperville Property.

254.    She relied on Mary Street, Kevin Long, and Brent Smith to assist in this process pursuant to the TIC Agreement. They all refused to assist him, which led to a decrease in the value of Plaintiff's investment. When neither Street, Long, nor Smith provided any assistance to Plaintiff, she engaged Michael Wesley with Edgemark Commercial Real Estate Services to assist her in trying to sell her portion of the Naperville Property.

255.    Street, Long, and Smith have either evaded Plaintiff's requests to sell her interest to another owner or encouraged her to keep her investment within the Naperville property.

**Plaintiff Discovers the Naperville Lease Rate is Overinflated**

256.    Long assured the Naperville Property owners, including Plaintiff, that Millcreek could simply find a new tenant.

257.    However, Plaintiff discovered that the Naperville Property lease rate was substantially overvalued compared to accurate market rates.

258.    Depending on the specific representations made by the Millcreek/Colliers Parties, the represented rent per square foot in the lease bundled with the sale of the Naperville Property was approximately $90 per square foot.

259. Kevin Long and the Millcreek/Colliers parties represented that the rent was based on a broker price opinion ("BPO") from two separate brokers. This representation turned out to be false.

260. Realistic actual market rates for leasing the Naperville Property were approximately $30 per square foot.

261. Long knew or should have known that re-tenanting the Naperville Property with the same lease rate that the HSH parties had agreed to would be impossible.

262. Not only was Plaintiff stuck without a tenant and with endless empty promises from the Millcreek/Colliers Parties, but due to the overinflated rent rate and property value, finding a new tenant to occupy the Naperville Property or selling their TIC ownerships was simply not feasible.

263. Plaintiff lost the expected value of her investment—a reliable tenant, a 20-year lease backed by a guaranty and a bond, a monthly stream of income, the value of the Naperville Property itself, the scheduled rent increases over the term of the lease, the 6-9% capitalization rate over the term of the lease, and the "safe, secure, and stable" investment Plaintiff was promised.

**Plaintiff Discovers the Naperville Investment Included the Purchase of Expensive Personal Property for the New Tenant.**

264. Upon learning of the default of the tenant, Plaintiff discovered that her investment in real property was, in reality, partially an investment in personal property for the tenant.

265. Plaintiff was led by Defendants to believe that her investment consisted only of the real property advertised by Millcreek/Colliers and Kevin Long.

266. After the eviction of HSH as a tenant, Kevin Long found a new tenant to fill the

vacancy in the Naperville Property but insisted on a "capital call" from Plaintiff and the other tenants in common.

267. This "capital call" required $1,275,000 from the owners.

268. Plaintiff's proportionate contribution was $38,557.28, which she refused to pay.

269. The TIC Agreement does not permit nor mention anything about purchasing personal property as a part of this investment.

270. Plaintiff did not agree to pay additional capital for a new tenant's personal property and objected to her ownership percentage being decreased because of her non-participation.

271. Plaintiff's ownership interest was diluted by this capital call, and it is alleged on information and belief that Long and Millcreek have been issuing capital calls to buy back the TIC properties across the country without paying the market value.

272. The claims alleged herein are alleged alternatively, hypothetically, and/or inconsistently under Rule 8(d) of the Federal Rules of Civil Procedure, to the extent necessary.

# FIRST CAUSE OF ACTION

### *(Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 Thereunder Against All Defendants)*

273. The foregoing allegations are realleged and incorporated herein.

274. Investment in TIC interests in the Naperville Property was a security as defined in 15 U.S. Code § 77b (a)(1) in that it involved investment in a common enterprise with the success of the venture dependent primarily upon the efforts of others, namely, the HSH Parties as tenants, guarantor, and affiliated entities.

275. Defendants made untrue statements of material fact and omitted material facts necessary to make the statements not misleading, as alleged above, in violation of Rule 10b-5.

276. The material misrepresentations and omissions were made in connection with the offer to sell a security.

277. Such material misrepresentations and omissions include, in addition to those previously alleged and incorporated herein:

    a. The risk analysis of the Naperville Property,

    b. The average capitalization rate of 5-9%% over the initial 20-year lease term,

278. That Millcreek Commercial retained, and would continue to retain, an ownership interest in the Naperville Property,

279. That the tenant was a "dream tenant,"

280. That the guarantor was a solvent company,

281. That there was a Lloyd's of London-backed bond in place in case of tenant and guarantor default,

282. That Millcreek's TIC offerings did not constitute securities, and federal and state laws regulating the sale of securities did not apply.

283. Defendants all made the material misrepresentations and omissions either through verbal or written correspondence with Plaintiff or through the Marketing Materials.

284. Defendants' material misrepresentation and omissions were made through the means or instruments of communication in interstate commerce or the mails— including telephone lines, the internet, email transmissions over the internet, and the United States Postal Service.

285. Defendants acted knowingly in making material misrepresentations and omissions or should have known but acted with severe recklessness as to their truth.

286. The foregoing misrepresentations and omissions were not only material, but the information was critical to Plaintiff's evaluation of whether to purchase interests in the Naperville Property. The Plaintiff would not have invested had She known the true facts.

287. Plaintiff justifiably relied on the foregoing misrepresentations and omissions.

288. The statutory safe harbor and bespeaks caution doctrine that applies to forward-looking statements under certain circumstances does not apply to this action because no meaningful cautionary statements were made regarding material risks and facts known by Defendants.

289. The foregoing misrepresentations and omissions caused the owners to suffer extensive damages in an amount to be proven at trial, entitling Plaintiff to all applicable relief provided for by law.

290. Plaintiff is further entitled to an award of pre- and post-judgment interest, attorney's fees as provided by contract or law, costs, and such further relief as the Court may deem appropriate under the circumstances.

## SECOND CAUSE OF ACTION

### *(Sale of Unregistered Securities Against All Defendants)*

291. The foregoing allegations are realleged and incorporated herein.

292. Investment in TIC interests in the Naperville Property was a security as defined in 15 U.S.C. § 77b (a)(1) in that it involved investment in a common enterprise with the success of the venture dependent primarily upon the efforts of others, namely, the HSH Parties.

293. The TIC interests in the Naperville Property, which are the subject of this Complaint, were not registered by the filing of a registration statement, nor were they exempt from registration through a recognized exemption to registration under the 1933 Securities Act.

294. During the time in which the Millcreek/Colliers Parties marketed TIC interests in the Naperville Property, they made use of means or instruments of communication in interstate commerce or the mails—including telephone lines, the internet, email transmissions over the internet, and the United States Postal Service—for the purpose of offering, selling, and delivering interests in the Naperville Property, in violation of Sections 5(a) and 5(c) of the Securities Act (15 U.S.C. § 77e(a) and (c)).

295. Pursuant to Section 12(a)(1) of the Securities Act (15 U.S.C § 77l (a)(1)), by reason of Defendants' violation, Defendants are liable to Plaintiff in an amount equal to the consideration paid for such security with interest thereon, less the amount of any income received thereon upon tender of such security. For purposes of this Cause of Action only, Plaintiff hereby tenders her investment interests in the Naperville Property to Defendants upon receipt of the amount specified in this paragraph, as may be proven at trial.

296. In the alternative, Plaintiff is entitled to an award of damages in an amount to be proven at trial and all other applicable relief provided by law.

297. In either case, Plaintiff is further entitled to an award of pre- and post-judgment interest, attorney's fees as provided by contract or law, costs, and such further relief as the Court may deem appropriate under the circumstances.

### THIRD CAUSE OF ACTION

***(Control Person Liability Under the Securities Exchange Act Against
Long/Rutherford/Bell/Huff/McDougal/Taylor/Weber)***

298. The foregoing allegations are realleged and incorporated herein.

299. Millcreek Commercial and Colliers International, named as Defendants in Plaintiff's First and Second Causes of Action, are liable under Chapter 2B of Title 15 of the United States Code, the Securities Exchanges Act of 1934, and are referred to in this Cause of Action as the "Liable Persons."

300. At all times relevant to this Complaint, the Defendants identified in this Third Cause of Action controlled the Liable Persons, as follows:

301. Defendants were officers, directors, agents, or other control people of entities that are Liable Persons.

302. Defendants had authority over the Liable Persons as employers, supervisors, or persons with the ability to affect the terms of the Liable Person's employment or livelihood.

303. Defendants exercised actual control over the Liable Persons through authority, economic influence, contractual rights, or the use of dominant bargaining power or position.

304. Liable Persons willingly submitted to and complied with the instruction, direction, or authority of Defendants.

305. Defendants participated in the business operations of the Liable Persons generally.

306. Defendants had power over the specific transactions and activities at issue in this Complaint.

307. With respect to their conduct and control of the Liable Persons relating to the matters addressed in the First Cause of Action, Defendants did not act in good faith, and the acts of Defendants did directly or indirectly induce the acts of the Liable Persons.

308. Pursuant to Section 20(a) of the Securities Exchange Act (15 U.S.C. § 78t (a)), Defendants are jointly and severally liable with and to the same extent as the Liable Persons, and Plaintiff is therefore entitled to a Judgment against Defendants awarding damages in an amount to be proven at trial, but which is the equivalent of any award determined under any other applicable cause of action.

309. Plaintiff is further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorney's fees as provided by law or contract, and such further relief as the Court may deem appropriate under the circumstances.

## FOURTH CAUSE OF ACTION

### *(State Law Securities Fraud Against All Defendants)*

310. The foregoing allegations are realleged and incorporated herein.

311. The Plaintiff's investment in the Millcreek TIC Properties that is the subject of this Complaint, specifically in the Naperville Property, is within the securities definition under applicable state law provisions.

312. Under applicable provisions of state securities laws,[1] Defendants were required to fully and fairly disclose all material facts that a reasonable investor would consider important in making investment decisions.

---

[1] Applicable state law regarding securities fraud includes at least the following statutes: Illinois, 815 ILCS 5/12; Utah Code § 61-1-1; Colo. Rev. Stat. Ann. § 11-51-501.

313.     In connection with the Defendants' sale and the Plaintiff's purchase of investments in the Naperville Property, Defendants made untrue statements of material fact; omitted to state material facts necessary to make the statements made, considering the circumstances under which they were made, not misleading; or otherwise engaged in conduct that worked fraud or deceit upon the Plaintiff in violation of applicable provisions of state law.

314.     The defendants violated the applicable laws knowing they failed to make a full and fair disclosure to the Plaintiff and with negligence and reckless indifference to what they knew or should have know.

315.     Plaintiff did not know that Defendants' misrepresentations were false and were unaware of the material facts that Defendants omitted to disclose concerning their purchase of securities.

316.     By reason of Defendants' violations of applicable state statutes governing securities fraud, Plaintiff is entitled to a judgment awarding the applicable statutory remedies, which may be measured by the total amount of Plaintiff's investment plus interest at applicable rates, less the value of what Plaintiff received from the investment, together with all other applicable relief provided by law.

317.     Plaintiff is further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorney's fees as provided in the applicable statutes, and such further relief as the Court may deem appropriate under the circumstances.

### FIFTH CAUSE OF ACTION

*(State Law Securities Violation/Sale by Unlicensed Broker or Investment Adviser Against All Defendants)*

318.     The foregoing allegations are realleged and incorporated herein.

319.    The investments in Millcreek TIC Properties that are the subject of this Complaint, specifically in the Naperville Property are within the definition of securities under applicable provisions of state law.

320.    Defendants functioned as securities agents in selling the investment in Millcreek TIC Properties to the Plaintiff.

321.    Defendants' conduct violates provisions of applicable state law[2] which requires securities agents to be licensed.

322.    By reason of Defendants' unlicensed participation in the sale of securities to the Plaintiff, Plaintiff is entitled to a judgment awarding the applicable statutory remedies, which may be measured by the total amount of Plaintiff's investment plus interest at applicable rates, less the value of what Plaintiff received from the investment, together with all other applicable relief provided by law.

323.    Plaintiff is further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees as provided in the applicable statutes, and such further relief as the Court may deem appropriate under the circumstances.

---

[2] Applicable state law regarding the licensing of securities agents includes at least the following statutes: Illinois, 815 ILCS 5/12; Utah, Utah Code § 61-1-3; Colo. Rev. Stat. Ann. § 11-51-401.

## SIXTH CAUSE OF ACTION

### (*Materially Aiding State-Law Securities Fraud Against Long/Rutherford/Bell/McDougal/Taylor/Weber)*

324. The foregoing allegations are realleged and incorporated herein.

325. The Defendants identified in the Plaintiff's Fourth and Fifth Causes of Action are liable to Plaintiff under the applicable state statutes described above and are referred to in this Cause of Action as the "Liable Persons."

326. At all times relevant to this Complaint, the Defendants identified in this Cause of Action materially aided the Liable Persons in violating the applicable state securities laws by conduct including but not limited to the following:

327. Defendants were officers, directors, agents, or other control people of Liable Persons' entities and authorized, ratified, endorsed, or participated in the conduct constituting the violation.

328. As part of their employment or business or commercial activity and in exchange for payment or other compensation, Defendants provided information, services, labor, or funds that significantly advanced the Liable Persons' unlawful conduct or purposes with respect to Plaintiff.

329. Defendants otherwise engaged in conduct materially aiding the Liable Persons in accomplishing the unlawful sale of securities to Plaintiff.

330. Defendants did not act in good faith, and Defendants knew or recklessly disregarded the facts in carrying out their conduct relating to the sale of securities to Defendants.

331.   Pursuant to applicable state law relating to those who materially aid securities violations,[3] Defendants are jointly and severally liable with and to the same extent as the Liable Persons, and Plaintiff is therefore entitled to a Judgment against Defendants awarding damages in an amount to be proven at trial, but which is the equivalent of any award determined under Plaintiff's Fourth and Fifth Causes of Action, together with all other applicable relief provided by law.

332.   Plaintiff is further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorney's fees under contract or at law, and such further relief as the Court may deem appropriate under the circumstances.

## SEVENTH CAUSE OF ACTION
### *(Common Law Fraud Against All Defendants)*

333.   The foregoing allegations are realleged and incorporated herein.

334.   Defendants made false statements about vital facts regarding the Naperville Property, including the representations within the Marketing Materials and the representations made to the Plaintiff.

335.   Defendants made the statements knowing that they were false.

336.   Alternatively, Defendants made the statements recklessly and without regard for their truth.

337.   Defendants intended that Plaintiff would rely on the statements.

338.   Plaintiff reasonably relied on the statements by investing in the Naperville Property.

---

[3] Applicable state law regarding liability of those who materially aid in a securities transaction includes at least the following: Illinois, Il. Code 815 ILCS 5/14; Utah, Utah Code §61-1-1; Colo. Rev. Stat. Ann. § 11-51-501.

339. As a result of Defendant's conduct, Plaintiff has suffered damages in an amount to be proven at trial.

340. Because Defendants' conduct was intentional, knowing, reckless, and malicious, and in disregard of Plaintiff's rights, Plaintiff is entitled to punitive or exemplary damages in an amount to be determined by the trier of fact.

## EIGHTH CAUSE OF ACTION

### *(Negligent Misrepresentation Against All Defendants)*

341. The foregoing allegations are realleged and incorporated herein.

342. Defendants had a duty to determine and disclose fully and fairly all facts that materially affected or related to the condition of the Naperville Property, the viability of the investment, and the legitimacy of the tenant and corporate guarantor.

343. Defendants made false representations to Plaintiff as detailed above.

344. Defendants owed a duty of reasonable care to Plaintiff independent of any contractual obligation.

345. Defendants knew such representations were false or were negligent in making such representations.

346. Defendants were negligent in investigating the tenant and the corporate guarantor.

347. Defendants knew or should have known the misrepresentations were false.

348. The Defendants made the misrepresentations to induce Plaintiff into purchasing the Naperville Property for a grossly inflated price.

349. The foregoing misrepresentations and omissions were not only material, but the information was critical to Plaintiff's evaluation of whether to purchase the Naperville Property.

350. Plaintiff would not have invested in the Naperville Property had she known the true facts.

351. Plaintiff justifiably relied on the foregoing misrepresentations.

352. As a result of Defendants' negligence, Plaintiff have been damaged in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

### *(Breach of Fiduciary Duty Against All Defendants)*

353. The foregoing allegations are realleged and incorporated herein.

354. Defendants had or held themselves out as having superior skill, knowledge, training, and experience concerning all aspects of the transactions by which Plaintiff invested in the Naperville Property.

355. Defendants expected that Plaintiff would put trust and confidence in Defendants and affirmatively invited and encouraged Plaintiff to rely on their judgment and skill regarding her TIC investment in the Naperville Property.

356. The TIC investment structure and IRS rules made Plaintiff the weaker party, with unique vulnerabilities, including, *inter alia*, Plaintiff's age, experience, abilities, and disabilities, and the fact that the Plaintiff was prohibited from actively managing her investment.

357. Plaintiff's unique vulnerabilities put her in an unequal bargaining position with Defendants.

358. Defendants owed Plaintiff fiduciary duties of honesty, loyalty, care, and a duty to use his special skills for Plaintiff's benefit.

359. Plaintiff reposed absolute trust and confidence in Defendants to advise, counsel, and protect Plaintiff.

360. Defendants accepted that trust and confidence from Plaintiff.

361. Plaintiff depended on Defendants to do their due diligence into the legitimacy of the tenant and guarantor.

362.     Defendants also had access to superior and exclusive knowledge about the Naperville Property investment opportunity, such as information about the financial performance of the tenants, HSH, HSMG, their affiliate entities, and the flow of funds to and from those entities.

363.     Defendants breached their fiduciary duties to Plaintiff by, *inter alia*, failing to investigate the legitimacy of the tenant and guarantor or concealing their knowledge regarding the same and by making the materially false or misleading representations or omissions alleged above.

364.     Defendants' breach of fiduciary duties directly and proximately caused injury and damages to Plaintiff.

365.     As a result of Defendants' conduct, Plaintiff has been damaged in an amount to be proven at trial.

366.     Because Defendants' conduct was intentional, knowing, reckless, and malicious, and in disregard of Plaintiff's rights, Plaintiff is entitled to punitive or exemplary damages in an amount to be determined by the trier of fact.

## TENTH CAUSE OF ACTION

### *(Conspiracy to Engage in Tortious Conduct Against All Defendants)*

367.     The foregoing allegations are realleged and incorporated herein.

368.     With respect to the tortious conduct alleged herein, the Millcreek/Colliers Parties entered a combination with the HSH Parties and Developer Parties to accomplish the object of the tortious behavior, namely fraudulently inducing Plaintiff's investment in the Naperville Property.

369.     Defendants' agreement to participate in the conspiracy is evident from the acts of each party, as outlined in the Causes of Action above, and was reached expressly in

communications between the parties regarding the Millcreek TIC Program or was tacit or implied in the parties' intent as evidenced by their conduct.

370.     In carrying out the conspiracy, participants in the conspiracy committed one or more unlawful and/or wrongful acts, including the acts described in the Causes of Action above.

371.     By reason of Defendants' participation in the civil conspiracy, Plaintiff has suffered injury for which Defendants are jointly and severally liable and for which Plaintiff is entitled to a judgment against Defendants awarding damages in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiff's total investment, together with interest, less the value of the property that Plaintiff actually received.

372.     Plaintiff is further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorney's fees as provided by law or contract, and such further relief as the Court may deem appropriate under the circumstances.

373.     Because Defendants' conduct was intentional, knowing, reckless, and malicious, and in disregard of Plaintiff's rights, Plaintiff is entitled to punitive or exemplary damages in an amount to be determined by the trier of fact.

## ELEVENTH CAUSE OF ACTION

### *(Aiding and Abetting Tortious Conduct Against All Defendants)*

374.     The foregoing allegations are realleged and incorporated herein.

375.     As set forth in the Causes of Action above, certain Defendants have engaged in conduct constituting a tort for which Plaintiff is entitled to recover damages.

376.     The Millcreek/Colliers Parties knowingly aided and abetted the underlying tortious conduct by distributing sales materials concerning the Millcreek TIC properties, recommending investment in Millcreek TIC properties, selling and closing sales of investment transactions, causing a substantial portion of Plaintiff's investment funds to be diverted to the

payment of excessive commissions or other compensation to the Millcreek/Colliers Parties and the referring Advisors, and making the remaining proceeds of Plaintiff's investments freely available to the Developer Parties and/or the HSH Parties without restriction as to use.

377. The Millcreek/Colliers Parties engaged in such conduct with knowledge of the underlying tortious conduct in that they were intimately familiar with the HSH Parties, their operations, their financial weakness, their failures to pay property taxes, and their failing business based on frequent and ongoing communication with the HSH Parties and their principals, negotiations of loans and other inter-party transactions, and receipt of financial information.

378. The HSH Parties knowingly aided and abetted the underlying tortious conduct by creating the Marketing Materials containing material misrepresentations that enabled the Millcreek/Colliers Parties to induce Plaintiff's investment.

379. The HSH Parties engaged in such conduct with knowledge of the underlying tortious conduct in that they were aware that the Millcreek/Colliers Parties would use false and misleading statements to induce investment.

380. The Developer Parties engaged in such conduct with knowledge of the underlying tortious conduct in that they were aware that the Millcreek/Colliers Parties would use false and misleading statements to induce investment.

381. By reason of Defendants' aiding and abetting the underlying tortious conduct, Plaintiff has suffered injury for which Defendants are jointly and severally liable and for which Plaintiff is entitled to a judgment against Defendants awarding damages in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiff's total investment, together with interest, less the value of the property that Plaintiff actually

received, together with all other applicable relief provided by law.

382.    Plaintiff is further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorney's under contract or law, and such further relief as the Court may deem appropriate under the circumstances.

## TWELFTH CAUSE OF ACTION

### *(Unjust Enrichment of Defendants – All Defendants)*

383.    The foregoing allegations are realleged and incorporated herein.

384.    Plaintiff conferred a benefit on the Defendants by making her investment in Millcreek TIC Properties.

385.    Defendants each received a benefit from Plaintiff in the form of commissions or other compensation paid from the proceeds of the sale transaction; access to and direct use of the identifiable proceeds of the investment; and perpetuation of the overall scheme.

386.    Defendants appreciated, acknowledged, or had knowledge of the benefits incurred upon them as they directly received money from the proceeds of the Plaintiff's TIC investment or otherwise acted in concert to perpetuate the Millcreek TIC Program, obtain and use funds from TIC investors, and divert invested money to purposes not benefiting Plaintiff.

387.    Under the circumstances, equity and justice demand that Defendants not be permitted to retain the benefits conferred upon them by Plaintiff without compensating Plaintiff therefor.

388.    By reason of Defendants' unjust enrichment, Plaintiff is entitled to a judgment awarding an amount to be determined at trial, but which may be measured by the total amount of benefit that Plaintiff have conferred upon Defendants, together with all other applicable relief at law or in equity, including but not limited to a constructive trust requiring to hold funds for Plaintiff's benefit and return them as ordered by the Court.

389.    Plaintiff is further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorney's fees under contract or by law, and such further relief as the Court may deem appropriate under the circumstances.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiff's request for relief is as follows:

1.    An award of actual damages, statutory or multiplied damages under applicable statutes, and punitive or exemplary damages, attorney's fees, and costs in an amount to be proven at trial, plus interest as set forth by applicable statutes or case law, and all other applicable relief by statute, at law, in equity, or otherwise.

2.    Pre-judgment interest, attorney fees, and costs of suit to the extent allowed by applicable law.

3.    If for any reason the 1031 exchanges are deemed to be invalid, for all taxes, interest, fines, and fees caused by Defendants' malfeasance.

4.    Such other relief as may be just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims so triable in this case.

DATED this 29th day of December, 2023.

CHRISTIANSEN LAW, PLLC


_____/s/ Stephen K. Christiansen_____
Stephen K. Christiansen
Randall S. Everett
*Attorneys for Plaintiff*

 

## Advance Care Medical | Naperville, IL



The Tenant in Common (TIC) interests sold by Millcreek Commercial Properties constitute interests in real property. They do not constitute securities. Consequently, federal and state laws regulating the sale of securities do not apply with respect to the sale of TIC interests, and purchases of TIC interests will not be entitled to the protection afforded to purchasers of securities under federal and state securities laws. Nothing in the attached offering documents should be construed as an offer or a solicitation of an offer to buy or sell securities.

Office: 801.899.1943 | www.MILLCREEKCOMMERCIAL.com

Millcreek Commercial | 2100 S Pleasant Grove Blvd. Ste 200, Pleasant Grove, UT

56



Advance Care Medical | Naperville, IL

## Property Information

| | |
|---|---|
| Tenant | Advance Care Medical |
| Location | 2975 Showplace Dr., Naperville, IL 60564 |
| Property Type | Freestanding, Medical |
| Building Size | 3,500 Square Feet |
| Purchase Price | $5,078,231.42 |
| Cap Rate | 6.00% |



Advance Care's mission and business strategy is to provide better, more consistent, comprehensive care solutions by vertically integrating urgent care facilities with ancillary services and new technologies. The intended outcome is to provide a broader continuum of patient care at a lower cost and generate significantly higher operating margins.

## Naperville, IL

Naperville Crossings is situated at the Northwest Corner of Route 59 and 95th Street in the heart of South Naperville's retail corridor. Lot sits as an outparcel to AMC Showplace 16 which boasts over 750,000 visitors per year. Tapestry of Naperville, a 300-unit residential project, is adjacent to center. There is ample parking available and multiple points of access via Route 59 or 95th Street.

## About Tenant In Common

Tenant in common or TIC ownership allows two or more people to hold an ownership interest in a property. Each property owner or business entity holds its own separate stake in the property and receives a deed. Their interests do not have to be equal.

This Millcreek Commercial property has the following characteristics:

· Property is offered debt-free
· Long-term, corporate-guaranteed lease
· Satisfies IRS requirements for 1031 exchanges



Office | 801.899.1943
www.MILLCREEKCOMMERCIAL.com

## Lease Information

| | |
|---|---|
| Lease Guarantor | Healthcare Solutions Holdings Inc |
| Initial Lease Term | 20 years |
| Rent Increases | 2% increases every year |
| Renewal Options | Two 5-year options |
| 20 Yr. Avg. Return | 7.25% |

| Year | Gross Rent | Net Rent | Cap Rate |
|---|---|---|---|
| 2021 | $323,866.85 | $317,389.46 | 6.00% |
| 2022 | $330,344.19 | $323,737.25 | 6.12% |
| 2023 | $336,951.07 | $330,212.00 | 6.24% |
| 2024 | $343,690.09 | $336,816.24 | 6.36% |
| 2025 | $350,563.89 | $343,552.56 | 6.48% |
| 2026 | $357,575.17 | $350,423.61 | 6.6% |
| 2027 | $364,726.68 | $357,432.09 | 6.73% |
| 2028 | $372,021.21 | $364,580.73 | 6.86% |
| 2029 | $379,461.63 | $371,872.34 | 6.99% |
| 2030 | $387,050.87 | $379,309.79 | 7.13% |
| 2031 | $394,791.88 | $386,895.99 | 7.27% |
| 2032 | $402,687.72 | $394,633.91 | 7.42% |
| 2033 | $410,741.48 | $402,526.58 | 7.57% |
| 2034 | $418,956.30 | $410,577.12 | 7.72% |
| 2035 | $427,335.43 | $418,788.66 | 7.87% |
| 2036 | $435,882.14 | $427,164.43 | 8.02% |
| 2037 | $444,599.78 | $435,707.72 | 8.18% |
| 2038 | $453,491.78 | $444,421.87 | 8.34% |
| 2039 | $462,561.61 | $453,310.31 | 8.51% |
| 2040 | $471,812.85 | $462,376.52 | 8.68% |

Millcreek Commercial | 2100 S Pleasant Grove Blvd. Ste 200, Pleasant Grove, UT

**MILLCREEK** COMMERCIAL | Colliers

Advance Care Medical **|** Naperville, IL



## Advance Care Medical

Largest Network: Development of 350 Comprehensive Care Centers will create the most extensive branded system in the country.

Significant Margins: By vertically integrating, they will capture revenue and margins that have historically been "lost" in the channel to sales, marketing, and third-party providers. This will result in significantly enhanced operating margins.

Building a Brand: A key element to their strategy is to acquire reputable family practice to establish themselves in each community they target. Clusters of facilities will provide better access and more consistent care to patients in their system.

New Technologies: They intend to use new technologies and more comprehensive diagnostic capabilities to improve patient care and access and to give their medical teams more tools to provide superior care.

## Backed By Strength

Healthcare Solutions Holdings, Inc. "HSH" is a publicly-traded medical service and device company focused on providing clinicians with state-of-the-art diagnostic and therapeutic tools. HSH's mission is to provide clinicians with broader access to the most advanced technologies in the Healthcare Industry. Technology proliferation drives progressive methods of testing patients, leading to superior patient outcomes.

HSH not only helps physicians deliver better healthcare but also assists them in remaining compliant with industry best practices.

## The Tenant of Your Dreams

Millcreek Commercial is developing properties specifically for Advance Care Medical. ACM, in cooperation with Healthcare Solutions Holdings, Inc. (HSH), meets our pillars for success. With each property, ACM will sign a 20-year NNN lease with 2% rent escalations annually, all backed by an HSH corporate guarantee and insured by Lloyds of London.

**MILLCREEK** COMMERCIAL | Colliers

Advance Care Medical | Naperville, IL



## Naperville, IL

Located 28 miles west of Chicago, Naperville, IL consistently ranks as a top community in the nation in which to live, raise children and retire. This vibrant, thriving city is home to acclaimed public and parochial schools, the best public library system in the country, world-class parks, diverse worship options, an array of healthcare options and an exceptionally low crime rate. Naperville has ready access to a variety of public transportation, housing and employment options. The city's diversified employer base features high technology firms, retailers and factories, as well as small and home-based businesses. With all the amenities of a modern city and all the charm of a small town, Naperville truly is the premiere community in which to live, work and play.

- The current population estimate is **148,000**
- Median Age: **35 years**
- Median Household Income is **$109,512**
- Total Households: **53,408**

- Owner Occupied: **75.4%**
- Renter Occupied: **24.6%**
- Median Home Price: **$377,900**
- Median Rental Rate: **$1,290**

In just half a century, the City of Naperville has grown from a prairie town of fewer than 10,000 people to a bustling city of 148,000 residents that is home to everything from family businesses and a scenic Riverwalk to international corporations and regional transportation networks.

**Millcreek Commercial | 2100 S Pleasant Grove Blvd. Ste 200, Pleasant Grove, UT**

**MILLCREEK** COMMERCIAL | Colliers

Advance Care Medical | Naperville, IL





Millcreek Commercial | 2100 S Pleasant Grove Blvd. Ste 200, Pleasant Grove, UT



Advance Care Medical  |  Naperville, IL

## Lease Abstract

| | |
|---|---|
| Tenant | Advance Care Medical |
| Guarantor | Healthcare Solutions Holdings Inc |
| Address | 2975 Showplace Dr., Naperville, IL 60564 |
| Building Size (SF) | 3,500 SF |
| Year Built | Anticipated completion late 2020 |
| Rent Commencement | Anticipated late 2020 |
| Lease/Rent Expiration | 2040 |
| Lease Term Remaining | 20 Years |
| Annual Base Rent | $ 317,389.46 |
| Rental Increases | 2% annually |
| Renewal Options | Two five-year options |
| Renewal Notice | 6 months |
| Option Increases | Yes |
| Lease Type | Absolute NNN bonded |
| Landlord Responsibilities | Zero |
| Insurance/Taxes/CAM/Utilities | Tenant |
| ROFO | No |
| Estoppel | As needed |
| Default Bond | 1 year of rent payments if in the first 48 months |
| Ownership Interest | Fee simple estate |



### Millcreek Commercial
801.899.1943 | contact@millcreekcommercial.com



Millcreek Commercial  |  2100 S Pleasant Grove Blvd. Ste 200, Pleasant Grove, UT