# EXHIBIT 8

In the Matter of:

# GRANT, et al.

vs

# LONG, et al.

MARY STREET

November 27, 2024



P.O. BOX 3265
SALT LAKE CITY, UT 84110
385.707.7254

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

---

Page 3

```
1    For the Defendant COLLIERS INTERNATIONAL:
2        Andy Wright
         Vanessa Peery
3        DENTONS DURHAM JONES PINEGAR
         111 South Main Street
4        Suite 2400
         Salt Lake City, UT 84111
5        Andy.wright@dentons.com
         Vanessa.peery@dentons.com
6
7    For the Defendant SPENCER TAYLOR:
8        Maria E. Windham
         RAY QUINNEY & NEBEKER P.C.
9        36 South State Street
         Suite 1400
10       Salt Lake City, UT 84111
         Mwindham@rqn.com
11
12   For the Defendant BLAKE MCDOUGAL:
13       Colby Tinney
         MITCHELL BARLOW & MANSFIELD, P.C.
14       9 Exchange Place
         Suite 600
15       Salt Lake City, UT 84111
         Ctinney@mbmlawyers.com
16
17
     Also Present:              Wes Felix
18                              Pia Hoyt
19
                        -ooOoo-
20
21
22
23
24
25
```

---

Page 1

```
         IN THE UNITED STATES DISTRICT COURT
                 DISTRICT OF UTAH


KATE GRANT and KARMANN    )
KASTEN, LLC,              )
                         )
         Plaintiffs,     )
                         ) Case No.
    vs.                  ) 2:23-cv-00936-AMA-CMR
                         )
KEVIN LONG; MILLCREEK     ) Judge: Ann Marie
COMMERCIAL PROPERTIES,    ) McIff Allen
LLC; COLLIERS            )
INTERNATIONAL; BRENT      )
SMITH; SPENCER TAYLOR;    )
BLAKE MCDOUGAL; and       )
MARY STREET,             )
                         )
         Defendants.     )



        DEPOSITION OF:  MARY STREET

           NOVEMBER 27, 2024

        9:33 A.M. TO 2:17 P.M.

   Location:  Law Offices of Strong & Hanni
          102 South 200 East, Suite 800
              Salt Lake City, UT
 Reporter:  Phoebe S. Moorhead, RDR, CRR, UT CCR
  Certified Court Reporter for the State of Utah
```

---

Page 2

```
1            A P P E A R A N C E S
2    For the Plaintiffs:
3        Randall S. Everett
         CHRISTIANSEN LAW, PLLC
4        311 South State Street
         Suite 250
5        Salt Lake City, UT 84111
         Randy@skclawfirm.com
6
7    For the Defendant BRENT SMITH:
8        John Keiter
         KEITER LAW, PC
9        1064 South North Country Boulevard
         Suite 350
10       Pleasant Grove, UT 84062
         John@keiterlaw.com
11
12   For the Defendants KEVIN LONG and MILLCREEK
     COMMERCIAL PROPERTIES:
13
         Rodger Burge
14       PARR BROWN GEE & LOVELESS
         101 South 200 East
15       Suite 700
         Salt Lake City, UT 84111
16       Rburge@parrbrown.com
17
     For the Defendant MARY STREET:
18
         Stuart H. Schultz
19       STRONG & HANNI
         102 South 200 East
20       Suite 800
         Salt Lake City, UT 84111
21       Sschultz@strongandhanni.com
22
23
24
25
```

---

Page 4

```
1              C O N T E N T S
2
3    Deposition of MARY STREET:
4        Examination by Mr. Everett...................  5
         Examination by Mr. Wright..................  153
5        Examination by Mr. Burge...................  156
         Examination by Mr. Schultz.................  163
6
                        -ooOoo-
7
8
9              E X H I B I T S
10
     Exhibit   Description                          Page
11
        59   Street Initial Disclosures...........  14
12      60   Street Interrogatories and
             Discovery Requests...................  20
13      61   Colliers News Releases Regarding
             Street Team..........................  147
14      62   Street Answer to Amended Complaint...  148
        63   E-Mail String........................  99
15
16                      -ooOoo-
17
18          I T E M S   R E Q U E S T E D
19               None
                        -ooOoo-
20
21
22
23
24
25
```

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.973    Page
4 of 61

GRANT, et al. vs.LONG, et al.
MARY STREET - 11/27/2024

5 to 8

Page 5

1               P R O C E E D I N G S
2                     MARY STREET
3    called as a witness herein, having been first duly
4    sworn by the Certified Court Reporter to tell the
5    truth, was examined and testified as follows:
6                     EXAMINATION
7    BY MR. EVERETT:
8        Q.    Great.  So to start off, can you state
9    your full name for the record?
10       A.    Yes.  Mary Wesley Street.
11       Q.    And have you ever had your deposition
12   taken before?
13       A.    I had a very quick one on the phone about
14   a year ago.
15       Q.    Okay.  And what was that related to?
16       A.    It was clients of ours that were suing
17   one another, and so they asked me questions about
18   the transaction.
19       Q.    Okay.  And when you say "ours," who --
20   who is clients of ours?  Just you personally?
21       A.    Yes.
22       Q.    Okay.  Great.  So a few ground rules to
23   lay out here.  Answers must be audible, no head
24   nods, "huh-uhs," "uh-huhs," yes-or-no answers so
25   the recorder can take it down.  Please don't talk

Page 6

1    over each other.  It's human nature to jump in and
2    answer a question.  I'll try and wait for you to
3    finish your answer before I jump in if you can wait
4    for me to finish mine.
5            If you don't understand a question,
6    please let me know.  I'm happy to rephrase.  I'm
7    not trying to have a gotcha moment or anything.
8    Just trying to get information.  If you need a
9    break --
10           MR. SCHULTZ:  Excuse me.  I got two
11   e-mails from you.  Are they different?
12           MR. EVERETT:  They're the same folder.
13   Just -- one is just a direct to the folder; one is
14   a link to the folder in case it got caught in spam.
15           MR. SCHULTZ:  Thanks.
16       Q.    (BY MR. EVERETT)  If you need a break,
17   let us know.  We're happy to -- we don't want to
18   hold you hostage here if you need to go to the
19   bathroom or anything.
20           Are you currently under the influence of
21   any drugs or alcohol?
22       A.    No.
23       Q.    Okay.  Is there any reason you cannot
24   testify truthfully today?
25       A.    No.

Page 7

1        Q.    Okay.  And do you understand that you
2    have been placed under oath to tell the truth as if
3    you were in a court?
4        A.    Yes.
5        Q.    Okay.  Perfect.  All right.  I want to
6    start off with a few background questions to
7    understand who you are.
8            Did you attend college?
9        A.    Yes.
10       Q.    Where did you attend?
11       A.    Georgia State University in Atlanta,
12   Georgia.
13       Q.    And what did you study there?
14       A.    My undergraduate degree is economics.
15   And then my master's work is in history.
16       Q.    And then do you have any professional
17   licenses?
18       A.    Yes.  Okay.  So I hold an associate
19   broker's license, real estate license, in Utah.  I
20   first got a sales agent license and then a broker's
21   license.
22       Q.    Okay.  And do you hold any other
23   professional licenses?
24       A.    Not licenses.  Designations, yes.
25       Q.    Okay.  Can you explain those for me?

Page 8

1        A.    Sure.  So I hold the CCIM Designation,
2    which stands for certified commercial investment
3    member.  And in order to have that designation,
4    you're also a member of the association of -- the
5    National Association of Realtors.
6        Q.    Great.  And how did you get into real
7    estate from what sounds like a nonrelated
8    education?
9        A.    Well, it seemed like a good idea at the
10   time, I would say.  I was actually a national sales
11   manager for WordPerfect Corporation, which was then
12   acquired by Novell.  I was working there when --
13   when that division was sold.  And so I decided to
14   leave -- leave the industry because I was expecting
15   our second child.  And after taking three or four
16   months off, I thought, "I need something to do.
17   I'll get my real estate license."
18       Q.    And when did you first obtain your real
19   estate license?
20       A.    It was March of 1996.
21       Q.    Okay.  So you've been doing this 28 years
22   now?
23       A.    Yes.
24       Q.    Okay.  And where do you currently work?
25       A.    My office location is in Pleasant Grove,

Page 9

1  and my license is at Mountain West Commercial Real
2  Estate.
3      Q.    How long have you worked with them?
4      A.    Since May of 2020.
5      Q.    And who were you with before them?
6      A.    I was with Colliers International.
7      Q.    And what was your role with Colliers?
8      A.    I was an associate broker.
9      Q.    Okay.  And can you help me understand
10  what an associate broker is versus a principal
11  broker?
12     A.    Yes.  So when you -- so to get a broker's
13  license, you have to undergo additional education
14  on top of your sales agent license.
15            You have to have been a sales agent for a
16  number of years, have a portfolio of experience,
17  have letters of recommendation, and complete an
18  additional 180 hours of professional education.
19  Then sit for the exam, pass the exam.  And then you
20  get a broker's license.  And at that point, you can
21  go open your own brokerage, and you would be the
22  principal broker.  Or you can affiliate your
23  license with another real estate brokerage.  And if
24  they don't bring you in as the principal broker,
25  then everyone in that organization that holds a

Page 10

1  broker's license would be called an associate
2  broker.
3            I've also been a branch broker, so
4  there's -- you know, there's different designations
5  for broker types.
6      Q.    Okay.  Perfect.  Thank you.
7            And when you were --
8      A.    Excuse me.
9      Q.    You're fine.
10            When you represent somebody in the
11  purchase or sale of a home, do you primarily
12  represent buyers or sellers?
13     A.    I don't sell houses.
14     Q.    Okay.  What do you sell then?
15     A.    Commercial real estate.
16     Q.    Okay.
17     A.    My specialty is actually land.
18     Q.    Okay.  So when you're -- this may be
19  outside of your expertise if you primarily do land,
20  but if you -- if you don't understand or it's
21  outside of your expertise, just let me know.  But
22  when listing a property for sale, let's say there's
23  a building on that property, what considerations do
24  you take into deciding the price before you sell
25  it?

Page 11

1      A.    So I'm representing the owner of the
2  property who wants to sell.
3      Q.    Mm-hmm.
4      A.    Well, first of all, you have to
5  understand what the goals of the owner are and what
6  they're looking for.  Sometimes what they're
7  looking for has no relation to what the value is.
8  So when you say "how do you determine price," we
9  make recommendations.  We don't set prices for our
10  clients.  So if it were, as you said, a building on
11  a piece of land, I would consider, you know, all
12  the characteristics of the building, square
13  footage, age, type of construction, permitted uses
14  in the zone, which are often really important to
15  determining what the value would be, then location.
16  You know, there's a lot that goes into looking at a
17  property when you're making pricing
18  recommendations.
19            We generally look at -- and I use "we"
20  because I'm part of a team.
21     Q.    Okay.
22     A.    So I -- I don't think of it as just me.
23  Right?  But what we do is we look at properties
24  that are as similar as possible and determine what
25  they sold for and what the conditions of the sale

Page 12

1  were.  And look at the comparables and then also
2  look at an income approach, what would this
3  property rent for?  A replacement cost approach.
4  And we, you know, come up with a full picture to
5  see, you know, what our recommendation would be
6  based on what the client's trying to accomplish.
7      Q.    Okay.  And in what circumstances would
8  the value differ from the actual value of the land?
9            MR. SCHULTZ:  Overly broad.
10            You may answer.
11            THE WITNESS:  Okay.  Say that again for
12  me.
13     Q.    (BY MR. EVERETT)  So you mentioned that
14  sometimes the value that you're trying to sell it
15  for is not necessarily the value of the -- the
16  actual appraisal value of the property.  Are there
17  circumstances where those two would be the same?
18  And why wouldn't they be the same?  I guess I'm
19  trying to -- that's a compound question.  I'm
20  trying -- what I'm trying to get at is when would
21  they be different?  Why would they be different?
22            MR. SCHULTZ:  Same objection.
23            You may answer.
24            THE WITNESS:  They could be different --
25  and it's not unusual for us to work also with

Page 13

1  appraisers.  Sorry.  I keep getting a frog in my
2  throat.
3       Q.   (BY MR. EVERETT)  Do you need a water or
4  anything?
5       A.   I have some.  It's just trying not to
6  drink too much.
7            So there are times when we -- when we do
8  work with appraisers.  Right?  An appraiser may
9  take into consideration, you know, the same things
10 that we are taking into consideration, but the
11 appraised value may be -- more often than not, the
12 appraised value would -- you know, if it does
13 differ, it's going to be because of something that
14 we believe has value that perhaps the appraiser
15 isn't well enough versed in the market to see the
16 value that we recognize.
17           So, for example, he may look at a
18 building on a piece of land and say, "Well, you
19 know, the building is worth 500,000 and the land
20 you could probably get for 500,000 so it's worth a
21 million."
22           And we would look at it and we may say,
23 "Yes, but the zoning has just changed for the
24 adjacent properties.  This property can now be torn
25 down and you can put, you know, a high-rise with a

Page 14

1  bunch of apartments on it."  It has more value
2  because of what it can be used for.  That's one
3  example.
4       Q.   Okay.  Thank you.  That's good to know.
5            All right.  Let's jump into the exhibits
6  here, in your binder there.  Let's jump to -- let's
7  jump to number 59 first, which is a new one, which
8  I will give to you right here.
9       A.   Okay.  So it's not here?
10      Q.   Yeah.  It's not in that binder.
11           (Exhibit-59 marked.)
12           (Discussion off the record.)
13           (Off the record from 9:45 a.m. to
14 9:46 a.m.)
15      Q.   (BY MR. EVERETT)  Mary, do you recognize
16 this document?  Have you seen it before?
17      A.   I don't recall seeing it in this format.
18 I may have, but...
19      Q.   Okay.  Do you understand what this
20 document is?
21      A.   I think so.
22      Q.   Okay.  I will represent to you that it is
23 your initial disclosures that are required under
24 Rule 26 of the rules of civil procedure.  And this
25 is where you have provided us initial information

Page 15

1  that you believe is relevant to the case at hand
2  essentially.
3       A.   Okay.
4       Q.   You can take a second to read over this.
5  Does this adequately represent your knowledge of
6  this dispute?
7            MR. SCHULTZ:  Overly broad.  Vague.
8            THE WITNESS:  I'll need a moment to look
9  through it because I just don't remember.
10      Q.   (BY MR. EVERETT)  No problem.
11      A.   Okay.
12           MR. SCHULTZ:  Just for the record,
13 there's probably been eight supplements to this
14 document with thousands of documents produced.
15           MR. EVERETT:  Yes.  And I have sifted
16 through all thousands of those documents.
17           MR. SCHULTZ:  It's overly broad to ask
18 her if this represents all or not.
19           MR. EVERETT:  That's fair.
20           THE WITNESS:  I would say this is a good
21 summary.
22      Q.   (BY MR. EVERETT)  Great.  So let's start
23 here.  In the first sentence where it says that you
24 have information regarding your -- "Street's
25 formation in 2020 of CAMS to serve as a management

Page 16

1  service."
2       A.   Yes.
3       Q.   What is CAMS Realty?  Or "CAMS," as it
4  states here.
5       A.   So CAMS Realty is a company that I formed
6  in order to be able to do lease administration,
7  tenant-in-common administration, various services
8  related to enforcing leases, always representing
9  landlords, never representing tenants.  And, I
10 mean, I could go into the list of the services we
11 provide if you want me to.
12      Q.   Sure.
13      A.   So when we have a client that has
14 purchased a property and they hire CAMS to help
15 them with it, we review the lease, become
16 comfortable with the lease, establish a segregated
17 bank account in order to be able to hold funds in
18 trust.
19           We collect rent from the tenants.  We
20 then disburse rent to the owners.  We monitor the
21 tenants' performance of their obligations under the
22 lease, making sure that they pay their property
23 taxes, requiring them to provide us with evidence
24 of adequate insurance as required by the lease.
25 Basically, you know, enforcing the terms of the

Case 2:23-cv-00936-AMA-CMR   Document 119-9   Filed 02/27/25   PageID.976   Page
1 of 61

GRANT, et al, vs.LONG, et al.
MARY STREET - 11/27/2024

17 to 20

**Page 17**

1   lease, whatever those -- those terms are.

2        Q.   And without disclosing any privileged

3   information -- you can answer "yes" or "no" to

4   this -- did you rely on any legal opinion when

5   forming CAMS?

6        A.   Yes.

7        Q.   Okay.  Does CAMS serve more than just the

8   Naperville property?

9        A.   Yes.

10       Q.   What properties does it serve?

11       A.   I'm not going to remember all of them,

12  but I have about 28 properties that I work with

13  right now.  Do you want me to try to make a list

14  off memory?

15       Q.   No.  That's okay.  I think we have that

16  information from you -- or at least the other

17  relevant properties from you.

18            And so when CAMS was formed, was it

19  formed with the intent to serve Millcreek

20  Commercial specifically?

21       A.   No.

22       Q.   Was it formed just as a general service

23  company?

24       A.   Yes.

25       Q.   Okay.  Where did you get the idea to form

**Page 18**

1   CAMS as a service company?

2        A.   So I wouldn't say that there was a

3   particular moment when, you know, the grand "aha"

4   happens, but when would have been in 20 -- late

5   2019 and early 2020.

6        Q.   Okay.  And when you formed CAMS -- how do

7   I ask this?  When you formed CAMS, how long after

8   you formed CAMS did you begin working with

9   Millcreek Commercial?

10       A.   So --

11            MR. SCHULTZ:  Vague.  Excuse me.  Vague.

12            Go ahead.

13            THE WITNESS:  So I'm a service provider,

14  right?

15       Q.   (BY MR. EVERETT)  Mm-hmm.

16       A.   And so Millcreek Commercial asked me if I

17  would take in some properties into a portfolio to

18  manage.  I don't remember exactly when that

19  happened, but in 2020.

20       Q.   So as we jump ahead a little bit with the

21  timeline of how things have transpired with the

22  Naperville property specifically, was CAMS involved

23  in finding and obtaining Advance Care Medical as a

24  tenant?

25       A.   No.

**Page 19**

1        Q.   Do you know who was?

2        A.   No.  I couldn't say that I know that this

3   person did it.  No.  I couldn't say who did that.

4        Q.   Okay.  Was CAMS involved in assisting to

5   obtain Neuragenex as a tenant?

6        A.   No.

7        Q.   Do you know who was?

8        A.   I believe that Kevin Long and his

9   associates at Millcreek Commercial had a

10  relationship that somehow brought forth Neuragenex.

11       Q.   Okay.  And you don't recall who that

12  relationship was with?

13       A.   I'm not 100 percent sure, no.

14       Q.   Okay.  All right.  Next let's jump to

15  Exhibit-60.

16            MR. SCHULTZ:  Randy, when you ask -- I'm

17  sorry to interrupt.  But when you ask if CAMS was

18  involved, are you including Mary in that question?

19            MR. EVERETT:  I am, yes.

20            MR. SCHULTZ:  Okay.  Do you understand

21  that?

22            THE WITNESS:  Yes.

23            MR. SCHULTZ:  Okay.

24       Q.   (BY MR. EVERETT)  Let's jump to

25  Exhibit-60.  We can mark this one here.

**Page 20**

1            (Exhibit-60 marked.)

2        Q.   (BY MR. EVERETT)  I tried to make extra

3   copies because I knew Jim Gilson wasn't going to

4   have a computer with him, but he's not here.

5            MR. SCHULTZ:  But then you didn't send it

6   to their computer.

7            MR. EVERETT:  I sent it.  It says "sent"

8   on my computer.

9            (Discussion off the record.)

10       Q.   (BY MR. EVERETT)  All right.  Do you

11  recognize this document, Mary?

12       A.   Yes, I do.

13       Q.   Okay.  And at the time you responded to

14  this -- to these interrogatories and discovery

15  requests, did this -- can you affirm that this is

16  true to the best of your knowledge?

17       A.   Yes.

18       Q.   Let's start with response to number --

19  response to Interrogatory No. 2, Interrogatory No.

20  2 says "Describe all bonds issued for the

21  Naperville property and whether a claim was ever

22  made against such bond."  And your response, you

23  state that there was a performance bond to

24  guarantee that the tenant, Advanced Care Medical,

25  would pay rent for the first two years of the

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.977    Page
8 of 61

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

21 to 24

Page 21

1  lease. My first question here is: What did you
2  mean by a performance bond?
3       MR. SCHULTZ: Just to be clear, it says
4  "She was told there would be a performance bond."
5  So object to the form.
6       Go ahead.
7       THE WITNESS: So this was my first time
8  encountering a performance bond, actually. So I
9  didn't know that one existed. And when the tenant
10 defaulted, you know, owners said to me, "There's
11 supposed to be a bond that guarantees, you know,
12 that the rent is going to be paid."
13      And so, you know, I ask about it. I ask
14 Millcreek, "Do you have a bond?" And they provided
15 me with a copy of the surety bond. And so I called
16 it a performance bond because that seems to make
17 the most sense to me, that it's kind of a guarantee
18 of performance on the part of the tenant.
19      Q.  (BY MR. EVERETT) Okay. Great. And then
20 it says "When the tenant defaulted, Ms. Street
21 requested a copy of the bond document from
22 Millcreek Commercial and what she received -- and
23 sent what she received to the attorney in
24 Illinois."
25      Do you recall what happened when you

Page 22

1  submitted that bond to the attorney? What happened
2  after you submitted that?
3       A.  Well, a lot happened. Can you tell me
4  what you're going for?
5       Q.  Yeah. Well, if you -- just give me --
6  could you give me just a timeline of what happened?
7  So once you gave a bond to the attorney --
8       A.  Yes.
9       Q.  What was the next thing that happened?
10      A.  So I made the attorney aware of the bond
11 and e-mailed her a copy of it and asked her to
12 follow the steps that were outlined in the document
13 to file a claim on the bond. And then I continued
14 to follow up with the attorney and asked her to
15 send me copies of the documents that she was
16 sending and followed up with her. And my
17 understanding from our attorney working for us in
18 Illinois was that she was not getting responses
19 from the bond company. And so, I mean, you know,
20 there's a lot of e-mail that went back and forth
21 about it.
22      Q.  And do you remember who the bond company
23 was?
24      A.  I think they are called Talisman.
25      Q.  Okay. And was there ever a bond that you

Page 23

1  saw that was from Lloyd's of London?
2       A.  No. Nothing that had the name Lloyd's of
3  London on it.
4       Q.  Okay. Let's go to response to
5  Interrogatory No. 3. This question asks to
6  "Describe the relationship between Colliers
7  International and Millcreek Commercial." You
8  stated that you believed "Millcreek Commercial
9  sales agents operated from the Colliers office in
10 Pleasant Grove." What was the basis for this
11 belief?
12      A.  I saw them in the hallway.
13      Q.  Oh, so you worked in the same building as
14 them?
15      A.  Yes.
16      Q.  Okay. And is that when you came to know
17 Kevin Long and his team?
18      A.  No. I've known Kevin Long longer than
19 that, because the commercial real estate community
20 in Utah County is really not that big. Right? I
21 could tell you how I know Kevin Long if you want.
22 I don't --
23      Q.  That would be great, yeah. I have a
24 question about that later, but we can jump to that
25 right now if you're willing.

Page 24

1       A.  Sure. So before joining Colliers, I was
2  the branch broker for an office underneath Cushman
3  & Wakefield. And in 2014, I think it was January
4  of 2014, I was contacted by Kevin Long, who was
5  then the principal broker for a company called
6  Coldwell Banker Commercial. And he asked if I
7  would be interested in coming over and joining
8  Coldwell Banker Commercial. That was the first
9  time I had any interaction with Kevin. I mean, I
10 knew of him because we all kind of know one
11 another, but it was my first interaction with him.
12      As it turns out, everyone in my office
13 decided to leave Cushman & Wakefield and move over
14 to be part of Coldwell Banker Commercial, which was
15 then rebranded as CBC Advisors. And Kevin Long was
16 the principal broker. And then CBC advisors was
17 acquired by Colliers International. And at some
18 point during that transition, I believe, Kevin Long
19 was no longer the principal broker. And I'm
20 struggling to remember who took that position.
21 Steve Bogden became the principal broker.
22      So that's how -- that's how I know Kevin.
23      Q.  Okay. Great. And when -- so you just
24 testified that there was a time where you and many
25 of Kevin's team went over -- were acquired by

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.978    Page
2 of 61

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

25 to 28

Page 25

1  Colliers?  Is that correct?  Did I state that
2  correctly?
3      A.    It's kind of an over -- it's kind of not
4  correct --
5      Q.    Okay.
6      A.    -- to say --
7      Q.    Please help me understand the nature of
8  that transition.
9      A.    Do you understand the -- how -- we've
10  already gone over how brokers can --
11      Q.    Right.  Yes.
12      A.    And sales agents.  And so in 2014,
13  January 2014, the entire group of sales agents and
14  associate brokers that I worked with in -- at
15  Cushman & Wakefield Commerce, they were approached
16  by Coldwell Banker Commercial and, you know,
17  offered an opportunity to move over with all the
18  great benefits that come along with being in this
19  new brokerage, right?  And so everyone moved their
20  license, and then Cushman & Wakefield closed, that
21  Provo office.  Did I --
22      Q.    Yeah.  That makes sense.
23      A.    Okay.  And so it wasn't -- when you say
24  "joining a team," "team" has kind of a different
25  meaning in real estate.  Well, here anyway.  I

Page 26

1  don't know how they do it everywhere.  But here, a
2  team might be -- might be me and my licensed
3  assistant and a couple of junior agents that I work
4  with.  And we focus on projects together.  We may
5  be in the same brokerage as 200 other people, but
6  we're not on the same team.
7      Q.    Okay.
8      A.    So I've never actually been on the Kevin
9  Long Team, if that's what you're trying to get to.
10      Q.    That makes sense.  Yes.  That's helpful.
11  Thank you.
12      A.    Okay.
13      Q.    And when -- when you transitioned to be
14  under Colliers' brokerage license -- did I say that
15  correctly?
16      A.    I transitioned to be under Coldwell
17  Banker Commercial.
18      Q.    Okay.  And then --
19      A.    And then it rebranded as CBC Advisors.
20      Q.    Right.
21      A.    And then that entity was acquired by
22  Colliers.
23      Q.    Okay.  So when you transitioned from CBC
24  Advisors over under Colliers umbrella --
25      A.    Mm-hmm.

Page 27

1      Q.    What was your primary responsibility
2  there?  Just as a broker?  Or were there other
3  responsibilities you took on?
4      A.    So nothing changed in terms of what I did
5  for a living.  The only thing that changed were the
6  logos on our signs and business cards and
7  marketing, because -- and I don't know if I'm using
8  the right phrase when I say "Colliers acquired."
9  There was some -- that is above my pay grade.  So
10  there was -- there was some agreement that CBC
11  Advisors and Colliers would come together and that
12  the Colliers logo would, then, be used.
13      Q.    And were you a W-2 employee under
14  Colliers?
15      A.    No.
16      Q.    You were an independent contractor?
17      A.    Independent contractor.
18      Q.    And when did you terminate your
19  relationship with Colliers?
20      A.    In May of 2020.
21      Q.    Okay.  And was that because you started
22  CAMS Realty?  Or was there another reason?
23      A.    No.  It is because in May of 2020, my
24  team, me and my team and some other sales agents
25  and associate brokers that we worked with at

Page 28

1  Colliers were approached by Mountain West
2  Commercial Real Estate, which is a local -- a local
3  real estate brokerage, not -- you know, not an
4  international brokerage.  They at the time had an
5  office in Salt Lake but were doing significant work
6  in Utah County.  And they approached us and asked
7  us if we would like to become partners in their
8  company and open a new branch office for them in
9  Pleasant Grove.  And so we made the decision, then,
10  to change brokerages.
11      Q.    Great.  Let's jump to Interrogatory
12  No. -- let's go to number 5 and your response
13  there.  This question asks about Millrock Fund 1 or
14  Millrock Investment Fund 1.  Do you know who
15  Millrock Investment Fund 1 is?
16      A.    You mean who the people are?
17      Q.    Who the company is, who the entity is.
18  Like, what is Millrock Investment Fund 1?  Do you
19  know?
20      A.    I can tell you what my understanding of
21  it is.
22      Q.    Perfect.
23      A.    Okay.  My understanding is that Millrock
24  Investment Fund 1 is a group of investors -- I
25  don't know how many they are -- that put money

Page 29

1    together to make investments in real estate.
2        Q.    Okay.  And do you have any relationship
3    with Millrock Investment Fund 1 either personally
4    or professionally with your CAMS Realty?
5        A.    So professionally with Brent Smith, and I
6    don't remember what his title is.  But he is -- he
7    is part of Millrock Investment Fund 1.
8        Q.    And what's the nature of that
9    relationship, you said, professionally?
10       A.    Well, he is an owner in different
11   properties.  He worked closely with Kevin Long.  I
12   believe they -- you know, they were in the same
13   shared office spaces.  So over -- you know, over
14   the past four year, we've talked a lot about the
15   different properties that they have sold and that I
16   then managed.
17       Q.    Okay.  And do you know who the owners of
18   Millrock Investment Fund 1 are?
19       A.    I don't.
20       Q.    Okay.  That's okay.  And in the response,
21   it talks about after a capital call was provided
22   to -- for tenant improvements in the Neuragenex
23   lease, you said that it was your understanding that
24   as of July 5th, 2024, Millrock's fund ownership
25   percentage was 15.8977 percent.

Page 30

1            Is that still an accurate number?
2        A.    Yes.  I believe it is.
3        Q.    And with that capital call -- never mind.
4    Strike that.  We'll come back to that later.
5            Do you know how much Millrock paid for
6    that 15.8977 percent?
7        A.    No.  I have no idea.
8        Q.    Okay.  Do you know if the full amount was
9    paid for that pursuant -- per the value of the
10   property?
11       A.    No, I don't.
12            MR. BURGE:  Objection.  Vague.
13            THE WITNESS:  I'm sorry.  Did I speak
14   over you?
15            MR. BURGE:  No.  I just tried to really
16   sneak it in really fast.
17       Q.    (BY MR. EVERETT)  Yeah.  He just said an
18   objection.
19            MR. BURGE:  Objection.  Vague.
20       Q.    (BY MR. EVERETT)  That I had given a
21   vague question.
22       A.    Oh, okay.
23       Q.    But you're free to answer unless your
24   attorney tells you not to.
25       A.    Okay.

Page 31

1        Q.    Okay.  All right.  Let's jump to Response
2    No. 6.  This is, again, related to the capital
3    call.  But it says you have no knowledge regarding
4    this.  It was my understanding that you had --
5    let's see.  Let me rephrase that.
6            How had you assisted the Naperville --
7    had you assisted the Naperville property in
8    executing that capital call?
9        A.    No.  I mean, people -- I had to circulate
10   e-mails saying "This is the request."  So I'm a
11   facilitator.  Right?  I get information and I pass
12   it on to the owners.
13       Q.    Okay.
14       A.    And so when you say "participate in it,"
15   only to the extent that I was sending information
16   back and forth.  Owners very often ask me questions
17   about things that I don't know anything about.
18   And, you know, in trying to make sure that they're
19   well served, I try to track down answers for them
20   and then convey the information back.
21       Q.    Okay.  And so you -- my understanding,
22   then, is effectively you're a middleman between the
23   owners and Millcreek or Millrock?
24       A.    In a perfect world, I'm the intermediary
25   between the owners and the tenant.

Page 32

1        Q.    Okay.
2        A.    Right?  And when -- when there are
3    issues, then I become an intermediary between the
4    owners and lots of other entities, maybe an
5    attorney that I have to hire or Millcreek to ask a
6    question about like, you know, a performance bond,
7    for example.
8        Q.    Okay.  Great.  Let's look at number 7.
9    This question asks you to describe the Millcreek
10   tenancy-in-common program and how it works.  You
11   indicated that you were not involved with the
12   acquisition and disposition of property by
13   Millcreek.  Have you ever helped Millcreek in a
14   real estate transaction as a broker or a sales
15   agent?
16       A.    No.
17       Q.    Have you ever assisted Millrock in the
18   purchase or sale of property as a broker or a sales
19   agent?
20       A.    No, I haven't.
21       Q.    And to your understanding, what are
22   tenant-in-common properties?
23       A.    The tenancy in common is a type of
24   ownership.  And so when you say "what are
25   tenancy-in-common properties," they are properties

Page 33

1    that are owned, and the owners are owners as
2    tenants in common.
3        Q.   And how does that relate to this
4    investment opportunity that was presented by
5    Millcreek?
6            MR. SCHULTZ:  Lacks foundation.
7            THE WITNESS:  I was going to say that's a
8    pretty broad question.
9        Q.   (BY MR. EVERETT)  Let me rephrase.  So
10   the TIC program that we've referred to here in this
11   interrogatory, is that different than simply a
12   bunch of owners owning property together?
13       A.   It can be.  Or it cannot be.  I mean, it
14   is possible, right?  So as an example, I myself,
15   with two business partners, own a building as
16   tenants in common.  So would you call it a program?
17   No.  Because, you know, we put it together, we
18   said, "Oh, this would be a good way to do it."
19   Right?  So what are you referring to when you say
20   the "tenancy-in-common program"?
21       Q.   Well, when Millcreek offers a -- if
22   Millcreek offers a -- on their website, they've
23   offered these tenancy-in-common investments.  We
24   consider that offering generally as their
25   tenancy-in-common program.

Page 34

1        A.   Okay.
2        Q.   We're trying to understand the nature of
3    that specific program that they have been offering
4    to --
5        A.   Their sales model?
6        Q.   Yes.  Their sales model.  Yes.
7        A.   Okay.  Now, ask me the original question
8    again now that I understand.
9        Q.   Let me see if I can remember it.
10           How is Millcreek's sales model, I guess,
11   different than just a few owners owning property
12   together?
13           MS. WINDHAM:  Object to foundation.
14           MR. SCHULTZ:  Join.
15           THE WITNESS:  Okay.  So I'll explain what
16   I understand, but I don't -- I don't sell the TIC
17   properties and I haven't been involved in the
18   marketing, so everything I'm going to say is based
19   on what I've observed, right?  Or what I've
20   learned.
21           As it's advertised, my understanding is
22   that, you know, an owner -- let's -- let me try to
23   phrase this with an example.  Let's say that you
24   have -- have a person who's a real estate investor
25   and they have sold a duplex because they're tired

Page 35

1    of getting the calls about, you know, having
2    maintenance issues.  Maybe they're, you know,
3    getting older and don't want to have as many things
4    to take care of.  And when they sell their duplex,
5    maybe they only get $300,000.  They would like to
6    buy something that -- to avoid paying capital gains
7    tax, they would like to do a 1031 exchange.
8            So they can do a 1031 exchange into any
9    type of real estate, you know, like-kind exchange.
10   If they buy raw land, they will not have a revenue
11   stream.  And so if they want to replace the revenue
12   stream that they had from the duplex, they may
13   consider buying, you know, an office building or
14   they may consider a retail center.  The problem is,
15   especially in our market now, $300,000 doesn't buy
16   you a -- you know, a large building with a large
17   tenant with a triple net lease.
18           And so the purpose, as I understand it,
19   of marketing the tenant-in-common properties is to
20   give investors who have smaller amounts of money
21   the opportunity to invest in a bigger property with
22   a -- you know, maybe a Walgreens or maybe a Dollar
23   Tree store or maybe a medical clinic.  Right?  And
24   the idea is that you're combining your money in
25   with other owners to own an asset that has a triple

Page 36

1    net lease so that you don't get the phone calls in
2    the middle of the night about maintenance.  Right?
3            And it -- you know, it becomes a
4    replacement investment vehicle for the duplex that
5    you sold.
6        Q.   (BY MR. EVERETT)  Great.  And are these
7    tenancy-in-common sales models, is it -- in your
8    experience, is it common amongst brokerages or
9    people who want to sell or assist in facilitating
10   these?  Or are these a less common investment?
11           MR. SCHULTZ:  Vague.
12           THE WITNESS:  Yeah.  That's kind of broad
13   too.  In commercial real estate, it is more common
14   to have people own properties as tenants in common
15   than it is in residential real estate, for example.
16   It is -- you know, it is -- it's not an uncommon
17   thing in investment real estate, but I would say
18   that it's not as common as joint tenancy.
19       Q.   (BY MR. EVERETT)  Okay.  Do you know if
20   there are any specific demographics of people that
21   are either targeted in the marketing or would
22   benefit most from this tenant-in-common sales
23   model?
24           MR. SCHULTZ:  Overly broad.  Foundation.
25           MR. BURGE:  Join.

Page 37

1          MS. WINDHAM:  Join.
2          MR. WRIGHT:  Join.
3          THE WITNESS:  Well, common sense says
4    that it would be -- investors would be your target
5    market.  Investors who -- you know, investors who
6    are in the middle of trying to identify a property
7    for a 1031 exchange is your perfect market when you
8    are marketing investment properties.
9          Q.   (BY MR. EVERETT)  Are you familiar with
10   the term "accredited investor"?
11         A.   No.  I don't -- that's not something I
12   would normally say.  It's probably one of those
13   professional terms.  I just -- it's not in my
14   vocabulary usually.
15         Q.   Okay.  So you wouldn't know, then, if --
16   to invest in a tenancy-in-common program, there's a
17   requirement to be an accredited investor?
18         MS. WINDHAM:  Objection.  Foundation.
19         MR. SCHULTZ:  Same.  Join.
20         MR. BURGE:  Join.
21         THE WITNESS:  I'm not familiar with that,
22   so that may be a nonUtah thing.  But there's no
23   accreditation for someone who has money that they'd
24   like to invest that I'm aware of.
25         Q.   (BY MR. EVERETT)  Okay.  Perfect.  All

Page 38

1    right.  Let's jump now to Exhibit-7.  Let me see
2    what this is.  Okay.  This is changing gears a
3    little bit here on Exhibit-7.  This -- do you
4    recognize this e-mail thread?
5          A.   I'm getting there.
6          Q.   No problem.  Take your time.
7          A.   It is in the binder behind 7?
8          Q.   It is in the binder.  Yep.  Yes.  Not an
9    e-mail thread.  My apologies.  I jumped to the
10   wrong one.  It's Exhibit-8.  I wrote it down wrong
11   in my outline.
12         MR. BURGE:  The management agreement?
13         MR. EVERETT:  It should be the
14   tenancy-in-common agreement.
15         MR. BURGE:  That's Exhibit-7.
16         MR. EVERETT:  Oh, okay.  Yep.  Okay.  And
17   I'm wrong.  It is Exhibit-7.  You're right.  Okay.
18   Tenancy-in-common agreement.  Sorry.  I turned to
19   the wrong thing.
20         Q.   (BY MR. EVERETT)  Okay.  Have you seen
21   this document before, Mary?
22         A.   I've seen different -- can you tell me
23   which property this pertains to?  I assume it's
24   Naperville.
25         Q.   Yeah.  This is for Naperville, and this

Page 39

1    was -- I believe it was produced by you through
2    your counsel here.
3          A.   Okay.  Yeah, I see the property address.
4          Q.   Yep.
5          A.   Yes.  This is the tenant-in-common
6    agreement for Naperville.
7          Q.   And do you know if each tenancy-in-common
8    agreement that was signed by each owner is
9    identical?
10         A.   They should be.  I don't read every word
11   of every one.  I'm assuming when they enter into
12   their tenancy-in-common agreement, that they have
13   read their agreements.
14         Q.   Let's look down here under number 1,
15   under "Nature of Ownership."
16         A.   Mm-hmm.
17         Q.   The very last sentence says
18   "Notwithstanding any other provision of this
19   agreement, under no circumstances may the number of
20   owners exceed 35."  Do you have any idea why that
21   35 number is in there?
22         A.   My understanding is that that is a
23   requirement under the IRS regulations that pertain
24   to doing 1031 exchanges into tenant-in-common
25   properties.  That's just my understanding, though.

Page 40

1          Q.   Just your understanding is what we need.
2          A.   Okay.
3          Q.   Just the best of your understanding.
4          A.   Okay.
5          Q.   We're not looking for any legal
6    conclusions or anything.
7          Okay.  Let's jump to Section 3.1
8    regarding expenses.  When expenses happen at the
9    property, this states that any expenses incurred
10   with respect to the property shall be the owner's
11   obligation.  How is that facilitated with -- among
12   the owners if there are up to 35 owners?
13         A.   That is one of the services that I
14   provide to the owners.  And so if there is an
15   expense that needs to be covered by an owner --
16   and, you know, speaking specifically to
17   Naperville -- if -- when property taxes come due,
18   there's currently not a tenant in the building,
19   right?  So when property taxes come due, it is an
20   expense that is the responsibility of all the
21   owners.  So I send invoices to the owners for their
22   proportionate share based on their percentage of
23   ownership of that expense.  Then I collect the
24   money from them and then pay the bill.
25         Q.   Great.  And I assume that's the same

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.982    Page
13 of 61

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

41 to 44

Page 41

1  process for improvements and other things like
2  that, like in Section 3.2?
3      A.    In general, yes.  But there's a caveat,
4  because I wasn't involved in the remodel of the
5  property for Neuragenex, which was the replacement
6  tenant after Advanced Care Medical defaulted.
7      Q.    Okay.  Perfect.
8      MR. SCHULTZ:  Document speaks for itself
9  also.
10     Q.    (BY MR. EVERETT)  In Section 6 of this
11 document, it talks about voting.  I'm less
12 concerned about what it says here.  More about how
13 the voting takes place.  Is that something that you
14 facilitate?
15     A.    Yes.
16     Q.    Okay.
17     A.    That's one of my responsibilities.
18     Q.    And how do you facilitate that?
19     A.    I've learned how to use Google poll.  And
20 I've had -- I've taught people how to use Google
21 poll.  So I set up a -- in general, I never
22 circulate a poll without having some conversation
23 ahead of time about it.  And we hold weekly Zoom
24 meetings for the Naperville property.  There will
25 be topics that come up.  For example, let's just

Page 42

1  use property tax.  You know, there will be
2  something -- a bill that comes up that needs to be
3  paid.  We'll discuss it in the Zoom meeting and I
4  will let them know that I'm going to need to
5  circulate a poll because, you know, not paying this
6  on time will result in late fees.  "And if that's
7  really the direction you want to go, I'll do it,
8  but I have to have a majority vote to do that."
9      So we'll have a discussion about it.  I
10 will create the poll.  I'll send it out via e-mail
11 and ask everybody to respond.  And then Google poll
12 allows you to track the responses either within the
13 poll form or attach it to a spreadsheet.  And I
14 usually attach it to a spreadsheet and share not
15 only the poll but the results with the owners.
16     Q.    And is your responsibility only, then, to
17 share the results of the poll?
18     A.    Well, I write the poll.
19     Q.    You write the poll?
20     A.    Yeah.  I create it.  And then I share the
21 results of it, and then I keep track of it.
22     Q.    Okay.  And do you take any actions based
23 on the poll?  Or is that entirely up to the owners
24 to take action?
25     A.    It depends on what the poll is, right?

Page 43

1  So in the instance I just described, if it was "are
2  we going to pay property taxes on time," then if
3  the owners direct me via the poll, if 50 percent or
4  greater says, "Yes, we want to pay the property
5  taxes on time, then my action would be to send them
6  an invoice and say, "In order to pay it on time, I
7  need you to pay your invoice by this date."  And
8  then my action continues by collecting the money
9  and then paying the bill.
10     Q.    Okay.  And money is transferred into a
11 trust type account or something like that?
12     A.    Yes.  Each property that I work with has
13 its own segregated account.  Money being
14 transferred, I collect checks usually.  Some people
15 pay via ACH or wire.
16     Q.    Let's move on to Exhibit-8.  Do you
17 recognize this document?
18     A.    Yes.
19     Q.    Do you know who prepared this document?
20     A.    So I don't know -- I don't know who
21 prepared the original template.  Okay?  But I would
22 have been the one that filled in the blanks on this
23 document.
24     Q.    So you didn't have an attorney draft this
25 for you as a new agreement, then?

Page 44

1      A.    I did not.
2      Q.    And where did you find the template?
3      A.    So --
4      MR. SCHULTZ:  Assumes facts.
5      Go ahead.
6      THE WITNESS:  The template was given to
7  me by Millcreek Commercial because they were
8  originally doing their own -- they were doing what
9  I do in-house themselves with someone.  I don't
10 know -- I don't know who was doing it, but they
11 were doing it.  And then at some point, we started
12 discussions about me forming a company to do this
13 instead of them doing it in-house.  And so I got
14 this template from them at the time that they
15 transitioned, because they had properties that were
16 in progress.  Right?  So they transitioned all that
17 over to me, and that's where this would have come
18 from.  And I've since revised it and had an
19 attorney.  But this one is one that was given to me
20 by Millcreek.
21     Q.    (BY MR. EVERETT)  So with this document
22 in -- along with Exhibit-7, they are dated
23 differently.  And it appears that in Exhibit-7, it
24 was dated the 16th of April.  And the CAMS Realty
25 was dated 16th of March, 2021.  Do you know why the

Page 45

1  lease administration agreement was signed before
2  the tenancy-in-common agreement?
3              MR. SCHULTZ: Assumes facts.
4              THE WITNESS: This tenancy-in-common
5  agreement isn't signed, the one that I have.
6       Q.   (BY MR. EVERETT) Oh, okay.
7       A.   So -- so it says the 16th day of April
8  2021, but this is a template.
9       Q.   Oh, okay.
10      A.   And if this is in the mix of all the tens
11  of thousands of documents I provided, this would
12  have just been the template and not the actual
13  agreement that your client signed.
14      Q.   Perfect.
15      A.   Because I often do not have everybody's,
16  right? I will have a master template for a
17  property, but not have in my possession the
18  document that each person signed.
19      Q.   Okay. Let's jump to Exhibit-54. Not
20  54A. We had a little bit of a mixup last time. It
21  should -- 54 -- just 54 should start with the IPX
22  1031. It got a little confusing during Brent's
23  deposition because I accidentally entered in the
24  same number that Jim Gilson had entered in
25  previously.

Page 46

1              (Discussion off the record.)
2              MS. WINDHAM: Can you clarify for us
3  which --
4              MR. EVERETT: Yeah. It should be
5  MILLCREEK_GRANT 000001 through 57. Is it not in
6  there?
7              MR. WRIGHT: 54 is an e-mail.
8              MR. EVERETT: Oh, okay. Let me check
9  here. My apologies. Let me upload that real
10  quick.
11             MR. WRIGHT: Is it 53?
12             MR. EVERETT: No. It's one that Jim
13  Gilson entered during Kevin Long's deposition, and
14  we accidentally had a 54 during Brent Smith's. And
15  so we renamed it in Brent Smith's deposition. This
16  one should be 54, and the e-mail should be 54A. So
17  let me go and grab that real quick. We can take a
18  break if we need, and I can grab that.
19             (Off the record from 10:28 a.m. to
20  10:39 a.m.)
21      Q.   (BY MR. EVERETT) Let's jump back to
22  Exhibit-8. I've got another couple questions that
23  came to mind as we were in a break.
24      A.   Excuse me. Did you say "8"?
25      Q.   8. Yes. Back to the lease

Page 47

1  administration agreement.
2       A.   Okay. I'm there.
3       Q.   So on Exhibit-8 here, did each owner of
4  the Naperville property have to provide a copy of
5  this agreement to you, a signed executed copy to
6  you?
7       A.   So I actually provide to them, to each of
8  the owners, the agreement for them to sign. And
9  that's a requirement in order for me to be able to
10  work for them, is that I need their authorization
11  to be able to collect money on their behalf and
12  distribute money on their behalf and uphold the
13  lease. So that's what this is. This is --
14             MR. SCHULTZ: When you say "this," what
15  is it?
16             THE WITNESS: This document -- this lease
17  administration agreement. Sorry.
18      Q.   (BY MR. EVERETT) That's okay. And so
19  you have to have unanimous owner consent from this
20  document to begin working on a property?
21      A.   Yes. I tell the owners when I reach out
22  to them that I need them to sign this, which
23  authorizes me to work for them. And I cannot
24  distribute rent to them if I do not have their
25  authorization to do so.

Page 48

1       Q.   And is it a requirement of the owners
2  when they purchase into -- as a tenancy-in-common
3  investment that they sign this? Or can they
4  purchase into it without signing this document?
5       A.   So that's a -- that's a good question,
6  because you're asking me about things that I
7  don't -- I don't know -- I don't know how it's
8  handled. I'm not part of the sales and marketing
9  team. Okay? And I'm -- I don't meet the owners of
10  the Naperville property until after they've
11  purchased the Naperville property. So one of
12  the -- and what I'm about to say, I know from
13  reading the tenant-in-common agreement. So the
14  tenant-in-common agreement is one of the documents
15  they sign when they purchase their interest. That
16  document, it is the -- the tenant-in-common
17  agreement is the rules and regulations and
18  structure for how these owners -- these
19  tenant-in-common owners are going to work together
20  as the owners. And that document is required under
21  IRS regulations for having tenant-in-common
22  ownership in a -- in an exchange property. Right?
23             So one of the requirements of the
24  tenant-in-common agreement is that they have a
25  manager. And so the manager -- so I am approached

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.984    Page

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

49 to 52

Page 49

1  by either Millcreek or, you know, other entities.
2  I have other properties in my portfolio.  So I'm
3  approached by the company that is selling the
4  tenant-in-common investment and asked if I want to
5  take that property into their portfolio and be the
6  manager for it.  And so this is one of the
7  properties that I accepted into my portfolio.
8            And so when an owner buys, they first go
9  through, you know, all of their purchase -- all
10 their purchase agreements and all the documents
11 associated with 1031 exchange.  Right?
12           Then I come in.  I meet them after
13 they've bought, and I sign an agreement with them
14 in order to administer the property on their
15 behalf.  And then the rules of their relationship
16 with me are actually laid out in the
17 tenant-in-common agreement.
18    Q.    Okay.  And --
19    A.    I feel like I talked in a circle.  I'm
20 sorry.
21    Q.    I think we're following.
22    A.    Okay.
23    Q.    You're in a room with a bunch of nerds.
24 So...
25    A.    Okay.

Page 50

1            MR. SCHULTZ:  Hey.
2            MR. EVERETT:  At least I am.
3    Q.    (BY MR. EVERETT)  So with this -- you
4  mentioned you have a portfolio of -- did I
5  understand correctly?  A portfolio of properties
6  you manage?
7    A.    Yes.
8    Q.    Is that correct?  How -- roughly how many
9  properties do you manage?
10   A.    The number varies depending upon, you
11 know, the property.  Right now, I have 28.
12   Q.    Okay.  And are they -- you say -- earlier
13 you testified that those were not all with
14 Millcreek Commercial?
15   A.    That's correct.
16   Q.    What are the other -- what percentage is
17 with Millcreek Commercial?
18           MR. SCHULTZ:  Vague as to "with Millcreek
19 Commercial."
20           THE WITNESS:  I was going to say I have
21 five properties that I manage that came from other
22 sources.  I have stopped taking on new clients
23 because of the vast workload of dealing with
24 tenants in default.  So I have five that did not
25 come through Millcreek Commercial, and I have

Page 51

1  refused to take any more on in the past two years.
2    Q.    (BY MR. EVERETT)  Okay.  So then my
3  understanding is, then, you have roughly 23
4  properties in your portfolio that were either sold
5  or marketed by Millcreek Commercial?
6    A.    Yes.
7    Q.    Okay.
8    A.    And the reason for my confusion is I
9  can't do percentages in my head.  So, sorry.
10   Q.    That's okay.  Great.
11           All right.  Now let's jump to Exhibit-54.
12 And let's go to specifically MILLCREEK_GRANT
13 000018.
14   A.    Okay.
15   Q.    Do you recognize this document?
16   A.    No.  I mean, I know what it is, but it's
17 not -- this document, I haven't seen before.
18   Q.    Okay.  And you were never involved in
19 putting anything like the purchase and sale
20 agreement together for purchasers of the
21 tenancy-in-common investment?
22   A.    Correct.  I do not participate in the
23 sale, and I don't write the contracts.  This is not
24 something that I would do.
25   Q.    Okay.  Do you know if this is the same

Page 52

1  purchase and sale agreement that each TIC investor
2  signs?
3    A.    No.
4    Q.    Do you have any knowledge?
5    A.    I have no idea.
6    Q.    On the -- on page -- on the last page of
7  this agreement -- excuse me -- second-to-last page,
8  right before the exhibits where it says
9  "MILLCREEK_GRANT 000022," it says --
10   A.    Wait.  I'm not there.
11   Q.    Oh, go ahead.  I'm sorry.
12   A.    The last page -- 0022?
13   Q.    Yeah.  Yeah.
14   A.    Okay.
15   Q.    Right there.
16   A.    Okay.
17   Q.    In the signature line under the seller,
18 it says "ADP Millcreek 1 LLC."  Do you know who ADP
19 Millcreek 1 LLC is?
20   A.    I couldn't tell you -- no.  I mean, I
21 honestly don't know who the people are.  No.
22   Q.    Okay.  And do you know if Kevin Long was
23 a manager of ADP Millcreek 1?
24           MR. SCHULTZ:  Foundation.
25   Q.    (BY MR. EVERETT)  Go ahead.

Case 2:23-cv-00936-AMA-CMR   Document 119-9   Filed 02/27/25   PageID.985   Page
52 of 61

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

53 to 56

**Page 53**

1   A.   I couldn't say that I -- that this is
2   something that I personally know.  I see that he
3   signed that way, so, you know --
4       Q.   Great.  And do you know why this -- and
5   if you don't know, that's okay.  I'm just trying to
6   get what you do know.
7       A.   Okay.
8       Q.   Do you know -- do you have any reason to
9   know why this was signed by ADP Millcreek 1 and not
10  Millcreek -- or Millrock Investment Fund 1?
11      MR. SCHULTZ:  Lacks foundation.
12      THE WITNESS:  I don't have any reason to
13  know that.  I could tell -- I mean, I probably
14  shouldn't answer questions that haven't been asked.
15      MR. SCHULTZ:  If you don't know, don't
16  answer.
17      THE WITNESS:  Okay.
18      Q.   (BY MR. EVERETT)  Just keep talking.
19  Okay.
20      All right.  Let's look at this -- in this
21  same exhibit, Bates numbered 25 through 28, it's
22  just the next page over I think.  And you can take
23  a look real quick.  There should --
24      MR. SCHULTZ:  25, did you say?
25      MR. EVERETT:  25 through 28, yeah.

**Page 54**

1       Q.   (BY MR. EVERETT)  Can you take a look at
2   those and tell me if you recognize those?
3       A.   These aren't things I've seen before.  I
4   should say these are not pages that I've seen
5   before.
6       Q.   Okay.  So in your role as lease
7   administrator, you said you collect rents.  And
8   then do you distribute those rents to the owners?
9       A.   Yes.
10      Q.   Are you in charge of that?
11      A.   Yes.
12      Q.   Okay.  This appears to be a rent
13  distribution for 2021, '22, and '23.  So you did
14  not prepare these statements?  Is that what you're
15  saying?
16      A.   I did not.
17      Q.   Okay.  Did you prepare any statements
18  similar to these that showed the amount of rents
19  that were distributed?
20      A.   So I do track the amount of rent that's
21  distributed to each owner on a monthly basis, and I
22  keep it in spreadsheets.  And then that information
23  feeds into the 1099s that are prepared at the end
24  of every year.  So I do prepare documents, but
25  these are not mine.

**Page 55**

1       Q.   Okay.  So another question I've had that
2   I can't seem to understand is:  After the property
3   has been sold to all the owners -- and we
4   understand why you're there.  All the owners have
5   agreed to have you manage the affairs of the
6   property.  Do you know why Millcreek Commercial
7   continues to be involved after the property has
8   been sold?
9       MS. WINDHAM:  Object to form witness.
10      MR. SCHULTZ:  Overly broad.
11      You may answer.
12      THE WITNESS:  It is broad.  It is -- so
13  it is a relationship.  My understanding is that the
14  reason -- and I would do this in my own business.
15  If I have a client that I've worked with in the
16  past, I would like to maintain a good relationship
17  with them because they may be, you know -- they may
18  need services in the future, and so I want them to
19  have a good experience with me and remember me.
20  Right?
21      So my understanding is that they -- they
22  maintain a portal of documents that are related to
23  their clients.  And, for example, if after someone
24  purchases their interest in Naperville, they say,
25  "I can't find my warranty deed" -- okay?  They're

**Page 56**

1   probably going to call me because they have, you
2   know, an going relationship with me because I'm
3   sending them money every month.  Right?
4       Q.   Mm-hmm.
5       A.   And they're probably going to call me and
6   ask me for that.  Or they may say, "I can't find a
7   copy of my purchase and sale agreement."
8       I would say, "I don't have that
9   information, because I wasn't involved in your
10  purchase of the property, but Millcreek maintains a
11  portal for their clients, for you to be able to
12  access all the documents from your purchase from
13  them of the interest."
14      So when you say "why would they," it
15  seems to be good business sense to maintain a
16  relationship with your clients.  They're also
17  providing a service by making the documents
18  available.
19      Q.   Okay.  And do they do anything to your
20  knowledge that's outside of simply making the
21  documents available?
22      A.   I don't know.
23      MR. BURGE:  Objection.  Vague.
24      MS. WINDHAM:  Join.
25      THE WITNESS:  I don't know.

Page 57

1    Q.    (BY MR. EVERETT)  All right.  Next, I'd
2  like to discuss your affiliation and professional
3  relationship with Kevin Long.
4    A.    Mm-hmm.
5    Q.    Just to help me understand with him,
6  Millcreek Commercial Properties, and Millrock
7  Investment Fund 1.  First, you already testified
8  you met Kevin Long in -- did I recall -- 2014?
9    A.    2014.
10   Q.    2014?  Can you expand a little on how you
11 met again?
12   A.    Yes.  So I was the branch broker for
13 Cushman & Wakefield Commerce.  We had about 22
14 agents in our office.  And support staff.  We were
15 located down in the River Woods in Provo.
16        And I received a phone call one day
17 from -- well, it's actually kind of a fun story.  I
18 received a phone call from the -- from the owners
19 of Cushman & Wakefield Commerce.  And they said
20 that they wanted to give me great news.  They had
21 just been -- they merged or were acquired by a
22 bigger company called Northmarq.  And they were
23 giving me the -- you know, the first -- you know,
24 the first -- before it went big public, they were
25 giving me the information.

Page 58

1        And so when I got to -- they asked me to
2  speak to a few of the key agents in our office.  So
3  when I went to work, I pulled a couple of agents
4  into a conference room and said, "Hey, guess what?
5  Our company has been acquired by Northmarq.  And so
6  we're all going to be part of Northmarq now."
7        And they kind of looked at each other and
8  said, "Well, guess what?  We're all leaving to go
9  over to Coldwell Banker Commercial."  And they had
10 not told me because I was the branch broker.  And
11 as the branch broker, I would have had an
12 obligation to tell my management that everybody in
13 the office was leaving.  Right?
14        And so I was actually out of the loop on
15 that information.  And -- but once the folks at
16 Coldwell Banker Commercial knew that I knew, then I
17 got a call from Kevin Long.  And he -- you know, he
18 apologized for everything coming as a surprise and
19 that sort of thing.  I remember the story very well
20 because it was quite stressful at the time.
21        But that's how I met him, and then it
22 would have been, you know, more procedural of
23 transferring my license from Cushman & Wakefield
24 Commerce/Northmarq over to Coldwell Banker
25 Commercial.

Page 59

1    Q.    And then you kind of knew Kevin -- or had
2  a professional relationship generally -- let me
3  rephrase that.  That's a broad --
4        You had a professional relationship with
5  Kevin Long since then essentially.  Is that
6  correct?
7    A.    Yes.
8    Q.    Okay.  And then how did you come to know
9  Millcreek Commercial?  Was that just through Kevin
10 Long?  Or was there another circumstance that made
11 you aware of Millcreek Commercial?
12   A.    So I don't remember when, but at some
13 point, Kevin, with some agents, you know, a small
14 team of agents, his -- his marketing group, they
15 started coming into our sales meetings at -- so now
16 we're all at Colliers.  I don't think this predates
17 Colliers.  But we had -- we had a conference room
18 very much like this, and every week we would have a
19 sales meeting.  And during sales meeting, you can
20 talk about what your new listings are.  You can
21 share information.  You can share market
22 intelligence, all that sort of stuff.
23        And at some point, Kevin came and did a
24 presentation about the program, you know, the
25 acquisition of properties that are net leased,

Page 60

1  either triple net or double net leased properties,
2  and then the resale of them as tenant-in-common
3  properties as investment vehicles.
4        So that's how I became aware of it.  He
5  came into sales meeting to share information about
6  it.
7    Q.    Okay.  And did you meet Brent Smith when
8  Kevin brought Millcreek Commercial to you?  Or did
9  you meet Brent Smith at a different time?
10   A.    No. I didn't know Brent prior to that at
11 all.
12   Q.    And have you had any sort of professional
13 relationship with Brent Smith outside of Millcreek
14 Commercial?
15   A.    Not outside of dealing with properties
16 that, you know, are associated with Millcreek
17 Commercial, no.
18   Q.    Have you ever been associated with
19 Millrock Investment Fund 1 as an owner or as an
20 investor?
21   A.    Me as an owner or investor?  No.  I have
22 not.
23   Q.    Have you ever done work for them as a
24 sales agent or broker?
25   A.    No.  I have not.

Page 61

1    Q.   Do you know who the owners of Millcreek
2  Commercial are?
3            MR. SCHULTZ:  As of right now, you mean?
4    Q.   (BY MR. EVERETT)  Let me narrow it down.
5  Who were the owners of Millcreek Commercial at the
6  time Kate Grant purchased her Naperville interest
7  in 2021?
8    A.   I'm sorry.  I'm giving you this blank
9  stare.
10           MR. SCHULTZ:  Lacks foundation.  Calls
11 for speculation.
12           MR. EVERETT:  I knew that was coming.
13           THE WITNESS:  Do you want me to answer?
14           MR. SCHULTZ:  Yeah.  If you can.
15           THE WITNESS:  Okay.  I don't -- I don't
16 honestly know, but I believe Kevin Long and Brent
17 Smith were owners.  But I don't know if there were
18 other people.
19    Q.   (BY MR. EVERETT)  Okay.  And your
20 interactions were primarily with Brent Smith and
21 Kevin Long?
22    A.   Yes.  And Ileana Stucco, who's their
23 office manager/administrative assistant.  And then
24 later on, John Keiter, when he became affiliated
25 with them.

Page 62

1    Q.   Did you ever do any work with Spencer
2  Taylor or Blake McDougal?
3    A.   Not that I recall.
4    Q.   Okay.
5    A.   When you say "work," I may have talked
6  with them on the phone.
7    Q.   Okay.
8    A.   Like, you know, "Hello.  My name is," but
9  I didn't do any work with them.
10    Q.   Okay.  And have you ever had a role
11 within Millcreek Commercial as an owner or
12 employee, anything like that?
13    A.   No.
14    Q.   Okay.  In your role as a lease
15 administrator, how were you compensated as the
16 lease administrator?
17    A.   So that's spelled out in the lease
18 administration agreement.  And for the Naperville
19 property, the -- the fee, the administration fee is
20 1.75 percent of the gross rents.
21    Q.   And have you been paid at all since the
22 tenants have defaulted?
23    A.   Yes.
24    Q.   How have you been paid since -- if
25 there's no gross rent?

Page 63

1    A.   It's been really painful.  So in order
2  for me to continue working for the owners, they
3  have to pay me, and that becomes one of their
4  expenses.
5            (Reporter request for clarification.)
6            THE WITNESS:  And let me add to that if I
7  can.  There's times when I will go several months
8  without being compensated, and so I just keep a
9  tally of the expenses.  So in a perfect world when
10 a property is performing -- right? -- when rent was
11 being paid for Naperville, I was paid monthly
12 around the 15th of every month after rents had been
13 distributed.
14            And once Naperville went into default,
15 then that became an owner expense.
16    Q.   (BY MR. EVERETT)  And do you need to have
17 a poll for owners to approve that expense?  Or
18 owner approval to approve that expense?
19    A.   No.  Because that's part of the
20 contractual agreement between me and the owners.
21    Q.   Okay.  And what is it 1.7 percent of if
22 there's no current gross rent?
23    A.   It's still based on what the rent was
24 under the lease.
25    Q.   Okay.  Okay.  Have you ever invested in

Page 64

1  commercial real estate personally?
2    A.   Yes.
3    Q.   What is the nature of your investing with
4  real estate?
5            MR. SCHULTZ:  Irrelevant.  Why is that
6  pertinent to this case?
7            MR. EVERETT:  I'm just trying to get her
8  understanding of the market as a whole, just trying
9  to understand her experience.
10            If she instructs you not to answer, I
11 can't -- I'm not going to --
12            MR. SCHULTZ:  I'm not going to instruct
13 her not to answer, but I don't -- are you asking
14 her to tell you about her personal investments?
15 Because I don't think that's appropriate.
16            MR. EVERETT:  That's fair.  I'm just
17 trying to get at her experience as an investor, if
18 she was representing investors.
19            MR. SCHULTZ:  That's okay.  If you want
20 to ask her what her experience is, that's okay.
21            But don't get into your personal stuff.
22    Q.   (BY MR. EVERETT)  I wasn't trying to dig
23 too deep.  I wasn't trying to get too personal.  I
24 was just trying to understand your experience as a
25 real estate investor as you represent investors.

Page 65

1  That's kind of the -- where I'm trying to get at
2  here.
3         So what is the nature of your investing
4  in commercial real estate?
5     A.   That's really broad.  So I could talk for
6  an hour.  Or I can give you bullet points.
7     Q.   Let's do bullet points.
8         MR. SCHULTZ:  Don't talk for an hour.
9         THE WITNESS:  So I mentioned earlier that
10 I am a CCIM.  And, you know, part of that CCIM
11 education helps you to learn how to evaluate an
12 investment.  And so through my 28-year career, I
13 have -- you know, I've been asked to evaluate
14 properties for real estate clients.  Sometimes I
15 will see something that I like, and sometimes we
16 will, you know, purchase properties.
17    Q.   Great.  And have you been investing in --
18 how long have you invested in real estate?
19    A.   Well, really we only bought our first
20 investment about three years ago.
21    Q.   And when you say "we," who is "we"?
22    A.   Me and my husband.
23    Q.   Okay.  And you weren't invested in any
24 commercial real estate before that?
25    A.   No.  We bought houses for our kids when

Page 66

1  we had extra money.
2     Q.   And jumping back real quick to the lease
3  administrator, what qualifications do you have --
4  do you need to have to be a lease administrator?
5     A.   That's a really good question, because
6  I've searched the country over and haven't found
7  many other companies that do this.  And so the
8  qualifications -- I think the most important
9  qualification is honesty and integrity.  And I
10 don't -- I don't like to toot my own horn, but I
11 will tell you that my integrity and my sense of
12 responsibility and fiduciary to my clients is
13 extremely important to me.  You -- you know, you
14 have to understand real estate in order to be able
15 to enforce the terms of the lease.  And so I think
16 it's important to have a real estate background.
17 There is a lot of accounting involved in it.  I
18 will be the very first one to tell you that I am
19 not an accountant.  And so I'm grateful for the
20 bookkeepers and the accountants who do help.
21        You know, qualifications, I would say
22 it's -- I think it's very important to have a real
23 estate background.  But other than that, you are
24 dealing with handling other people's money.  And I
25 am always, always, always conscious of the fact

Page 67

1  that I'm dealing with other people's money.
2     Q.   And with that real estate background, do
3  you need to have a specific type of background in
4  real estate whether it's residential, commercial,
5  other?  Is there any one that's more beneficial
6  than the other?
7     A.   I don't think so.  I think what's more
8  important is the commitment to the clients and the
9  willingness to, you know -- the willingness to --
10 there's a lot of communication that has to happen
11 with your -- with your owners.  And so it does
12 require -- it requires time and patience and also,
13 you know, the understanding of how the -- how the
14 lease works to be able to enforce it.  And then of
15 course the keeping safe of the monies.  And so I
16 think you could sell homes and do the very same
17 thing.  I don't think you have to be a broker that
18 sells investment properties to do that.
19    Q.   And then as a broker/sales agent -- I'm
20 going to use the term "broker" just to kind of
21 encompass both.
22    A.   Sure.
23    Q.   Do you primarily sell commercial real
24 estate as a broker?  Or are you involved in
25 residential or other areas of real estate?

Page 68

1     A.   I do not list homes for sale.  And I will
2  occasionally -- because one of my clients is a
3  nonprofit organization that acquires residential
4  properties for housing for seniors, low income,
5  voucher based, homeless housing, permanent
6  supportive housing.  And so in that capacity, if I
7  have a client who buys that product type, then I
8  will help them.  But I don't list homes for sale.
9     Q.   Okay.  And can you help me understand the
10 difference between just residential and commercial
11 real estate to your knowledge?
12    A.   Well, I would say it's probably different
13 in other markets, but the way it works in Utah is
14 that residential real estate agents -- and I did
15 start in residential.  When I first got my license,
16 I sold homes and then decided I didn't like the
17 drama of selling homes.  Right?  So then I made the
18 transition over to commercial real estate.
19        In Utah, residential agents are part of
20 the Multiple Listing Service.  They have to be
21 members of a board of real estate in order to --
22 or, you know, like the Utah County -- Utah County
23 Realtors association, Utah County board, Salt Lake
24 County board, in order to have the MLS access.  And
25 they market their homes that they're selling on the

Page 69

1  MLS.  And by doing so -- you know, the rules have
2  just changed, by the way.
3          But in times past, by putting it on the
4  MLS, it is -- it is an implicit agreement that you
5  are going to share your commission with the agent
6  that represent a buyer.  So you're the listing
7  agent.  You're going to share your commission with
8  the buyer.
9          In commercial real estate in Utah, there
10  is no Multiple Listing Service.  And so the
11  marketing vehicles for how you market your
12  properties is very different.  It's a different
13  skill set, I would say.  It's not to say that a
14  residential agent can't sell a commercial property.
15  They quite often do.  But there is a different
16  skill set, I would say, associated with being a
17  full-time dedicated commercial real estate broker.
18  And, you know, you don't have -- if you don't have
19  the MLS, you don't have access to data.  And so you
20  have to be much more involved in the market on a
21  regular basis to understand the variables that are
22  going to impact your commercial real estate that
23  you're working on.
24      Q.    And are there dramatic differences in
25  this commercial versus residential real estate as a

Page 70

1  buyer?
2              MR. SCHULTZ:  Vague.
3      Q.    (BY MR. EVERETT)  If you were to buy a
4  property and you were looking as an investor, what
5  are some of the key differences between commercial
6  and residential real estate?
7              MR. SCHULTZ:  Overly broad.
8          THE WITNESS:  Every investor is
9  different.  And, you know, there are -- just like a
10  house is different than a retail strip center,
11  there's just different things that you're going to
12  need to know about if you're going to make good
13  informed decisions.  Right?  And I would say it is
14  different.  But the skills learned in one place can
15  apply to the skills that you need in the other
16  place.
17              MR. SCHULTZ:  Your wife and kids just
18  walked by.
19              MR. FELIX:  I don't know who those people
20  are.
21      Q.    (BY MR. EVERETT)  Next I want to jump
22  into some of the issues related to the tenants,
23  Advance Care Medical and Neuragenex, the tenancies,
24  or lack thereof of Neuragenex tenancy.
25              Let's start with Advanced Care Medical.

Page 71

1  Earlier you testified that you did not play a role
2  in finding Advanced Care Medical as a tenant.  Is
3  that correct?
4      A.    That is still true, yes.
5      Q.    Okay.  Just making sure that's correct.
6  Not still.  But just making sure that I understood
7  it properly.
8      A.    Okay.  Yes.  That's true.
9      Q.    To your knowledge, who is Advanced Care
10  Medical or who was Advanced Care Medical?
11      A.    So I'm going off memory here, so I may
12  not get the words exactly right, but Advanced Care
13  Medical was somehow an entity underneath the
14  umbrella of Health Care Solutions Management Group.
15  And so I believe they had multiple different
16  divisions.  And so Advanced Care Medical was the
17  group that was pursuing opening urgent care centers
18  around the country.
19      Q.    And were you involved at all in the
20  negotiating of the lease agreement once they were
21  found?
22      A.    No.  I actually knew nothing about them
23  at all until after a lease had already been signed
24  with them.  You know, if it was a build to suit
25  then, you know, the building built.  And in the

Page 72

1  case of Naperville, I believe that it was a build
2  to suit.  But the property is already built, the
3  lease is signed, before I come on the scene.  And
4  it's being sold to the investors before I come on
5  the scene.
6      Q.    Okay.  And when you say "build to suit,"
7  can you explain what that means?
8      A.    Yes.  So that's a real estate term.  It
9  means that you have a tenant that defines exactly
10  what they want.  Right?  They define what the
11  building is going to look like.  They define the
12  location or the essential elements of a location
13  that meets their requirements.  And so, you know,
14  it's like you go to a custom tailor and you tell
15  them what kind of suit you want.  So that's -- it
16  is a property that is built exactly to suit what
17  they request.
18      Q.    Okay.  And do you know if any due
19  diligence was done before ACM became a tenant?
20      A.    I have no idea.
21      Q.    Okay.  Let's jump to -- let's start with
22  Exhibit-6.
23      A.    Do you want to switch books again since
24  this is your book?
25              (Discussion off the record.)

Page 73

1    Q.    (BY MR. EVERETT)  Okay.  Do you recognize
2  this e-mail?
3    A.    Let me read it.
4    Q.    Go ahead.
5    A.    I do.  Are we just looking at the first
6  page?  Or --
7    Q.    Yeah.  For now.
8    A.    Okay.
9    Q.    So first off, who is Cori Cozort?  Help
10  me understand who she is.
11    A.    She's an attorney in Illinois that I
12  hired to work for the owners when Advanced Care
13  Medical defaulted on their lease.  We needed
14  someone to enforce the terms of the lease.  And in
15  the instance of a default, you have to follow
16  specific procedures that are different by state.
17  And so I hired Cori to help through that process.
18    Q.    And how did you find Cori?
19    A.    Well, I reached out to multiple law firms
20  and asked for real estate attorneys that had
21  experience with tenant defaults.  When I reached
22  Cori on the phone, we had a conversation.  She
23  seemed incredibly knowledgeable.  And so I asked
24  her to send me an engagement proposal, and we went
25  from there.

Page 74

1    Q.    Okay.  Let's jump to Exhibit-28.  Do you
2  recognize this document?
3    A.    Yes.
4    Q.    Do you recall what this document was sent
5  for?
6    A.    Yes.  So I don't understand completely
7  the process that you have to follow in Illinois.
8  That's why I hired an attorney.  Apparently --
9  well, she told me that the first thing you do is do
10  a landlord's five-day notice.  And then this is the
11  document that she prepared to do that.
12    Q.    And was the process of evicting Advance
13  Care Medical difficult?
14    A.    Yes.
15    Q.    Did they leave the premises after
16  receiving this notice?
17    A.    I am not sure when they left the
18  premises.  I'm not sure.
19    Q.    What other issues did you face when
20  trying to evict Advance Care Medical?
21    A.    The most difficult issue that we faced
22  was trying to find them so that they could be
23  properly served.  They kind of went into thin air.
24  You know, no forwarding addresses, no responses.
25  So the process servers were the ones that were

Page 75

1  trying to find them obviously.  And that caused a
2  lot of delays because they could not serve them in
3  the appropriate way.  If we could have sent them an
4  e-mail and said, "Hey, you're served," it would
5  have been very easy, but that's not the process.
6    Q.    Gotcha.  And did you ever find them to
7  serve them?  Were they found?
8    A.    I believe that -- if I'm remembering
9  correctly, I think Cori had to get the judge to
10  approve alternative service.  And, again, I'm not
11  an attorney, so I don't remember all the right
12  words to use, but she had to exhaust all other
13  possibilities of how to serve them and then ask
14  that the judge approve alternative service so that
15  she could serve them by e-mail.
16    Q.    And they did eventually leave.  Is that
17  correct?
18    A.    Yes.
19    Q.    Okay.  Did they ever pay any of their
20  past rents that were due before they were evicted?
21    A.    So, yes, they did.  I'm trying to recall.
22  So they -- they paid rent on schedule in September
23  of '22.  In October of '22, they were late paying
24  rent and I served them notice, you know, via e-mail
25  that they were late.  Sent them an invoice with

Page 76

1  late fees associated with it.  Discovered that they
2  had not paid the property taxes.  And so, you know,
3  started adding up all of the things that
4  contributed to their default.  Right?
5         I can't remember the exact day, but it
6  was late October, early November.  They did send a
7  payment.  And I don't recall the amount of the
8  payment, but I betcha it's in this folder
9  somewhere.
10    Q.    It may be.
11    A.    But they did make a payment.  And I
12  asked -- I asked Cori Cozort if we accepted the
13  payment, if it did anything to give up our rights
14  as a landlord in pursuing them for their defaults.
15  And she said, no, that the amount was not
16  sufficient to cover the full default.  And so,
17  "We'll take the check.  Thank you very much.  But
18  you're still in default and we're still pursuing
19  eviction."  So there was that -- I believe there
20  was that one payment.  And, again, it was late
21  October or early November of 2022.
22    Q.    And was any action ever taken against
23  Advance Care Medical to try and recover the past
24  due rent?
25    A.    Yes.  So Cori went through the full

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.991    Page
22 of 61

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

77 to 80

Page 77

1   process of getting a judgment against them.  Then
2   it becomes a matter of how do you collect on the
3   judgment?
4        Q.   Okay.  So there was a judgment entered in
5   by a Court.
6        A.   Yes.
7        Q.   Okay.  Let's turn to Exhibit-29.
8        A.   29?
9        Q.   29.  Yes.  Just the next one over.
10            Have you seen this document before?
11       A.   Yes.
12       Q.   Okay.  Do you know what this document is?
13       A.   Yes.  It's a form -- it's a proof of
14   claim form for a bankruptcy court.  So, you know,
15   you file it to say "We are creditors and this is a
16   claim that we're making against this entity that is
17   in bankruptcy, because we want the money that is
18   owed under this claim to be considered as part of
19   the bankruptcy."
20       Q.   And was anything ever paid pursuant to
21   the bankruptcy?
22       A.   No.
23       Q.   Okay.  And then if you look here on Part
24   1, it says "Who is the current creditor?"  It says
25   "CAMS Realty LLC et al."

Page 78

1        A.   Mm-hmm.
2        Q.   Why is CAMS Realty there as the creditor
3   and not all the owners?
4        A.   The reason is one of convenience in that
5   if you have -- and in this case, I can't remember
6   the exact number of owners in Naperville, but I'm
7   thinking it's 28 -- 25, 26, 28, somewhere along in
8   there.  The line doesn't have enough room for all
9   the owners' names, number one.  And because I am
10   the authorized -- you know, per the -- per the
11   agreement that I have with the owners, the lease
12   administration agreement, I am authorized to act on
13   their behalf in these kinds of matters.  And it
14   actually says that, you know, I'm authorized to
15   hire an attorney to represent them.
16            And so it is a -- it's a matter of
17   convenience for me to fill out a form with CAMS
18   Realty and others because I represent the owners.
19       Q.   Okay.  Now let's jump to number 30.  I
20   might be making you relive some exchanges with
21   Advance Care Medical guys here.
22       A.   Number 30?
23       Q.   Number 30.  Yeah.  Do you recall -- do
24   you remember this exchange with Josh Constantin?
25       A.   Yes.  Unfortunately.

Page 79

1        Q.   And -- where is it?  In the second half
2   of the page where it says "Mary, leases, contracts,
3   business deals get renegotiated all of the time.
4   Matter of fact, Kevin does it to us on a regular
5   basis."
6            Do you know why Josh claimed that Kevin
7   renegotiated deals with them?
8        A.   No, I don't.
9        Q.   Do you know if Kevin had ever
10   renegotiated a deal with Advance Care Medical?
11       A.   I don't.
12       Q.   All right.  Let's go to Exhibit-31 now.
13            Do you remember this conversation?
14       A.   Let me think.
15       Q.   You may not if you were just cc'd on it.
16   You may not have been an active participant, but
17   reread it and let me know.
18       A.   Yeah.  I see that I was copied on it, but
19   it's -- you know, it's not in context at the
20   moment.
21            MR. SCHULTZ:  Look at the whole thing.
22            THE WITNESS:  Look at the whole thing?
23       Q.   (BY MR. EVERETT)  Yeah.  You can look at
24   the whole thing if that's helpful.
25       A.   Okay.  So this is from Josh.  Okay.  I've

Page 80

1   read it.
2        Q.   Okay.  First, Josh references that he's
3   frustrated with the situation specifically because
4   of latent defects in construction.  Do you know
5   anything about those -- what those latent defects
6   were?
7        A.   So as I recall, there was a problem with
8   some x-ray glass in the Naperville -- in the
9   Naperville property.  And I can't remember if it
10   was cracked.  I think it was cracked x-ray glass.
11       Q.   Okay.  And that was just on a piece of
12   equipment?  Or was that part of the construction?
13       A.   No.  Like a -- like the glass that you
14   look through in the wall when somebody's getting an
15   x-ray and the tech has to be able to see them.
16   That glass.
17       Q.   Oh, okay.  Had ACM paid rent before this
18   e-mail?
19       A.   The date of the e-mail is March 24th.
20   And, yes, they did pay rent prior to that.
21       Q.   Okay.
22            MR. SCHULTZ:  2022.
23            MR. EVERETT:  2022.
24            THE WITNESS:  Yes.
25       Q.   (BY MR. EVERETT)  Okay.  And then in the

Page 81

1  e-mail above, it looks like Brent Smith sent an
2  e-mail to somebody named Manny Butera about not
3  understanding why Josh thinks this is their fault.
4  Who is Manny Butera.  Do you know?
5       A.    Manny Butera is -- I don't know his
6  title, whether he's owner, CEO -- of a company
7  called American Development Partners.  And I
8  believe that he was the developer for the
9  Naperville building.  And I'm not sure if he was
10 developer-builder -- in other words, did he -- was
11 he the general contractor or not?  I don't know
12 that.  But I know he was involved with the
13 construction of the location.
14      Q.    And do you know if he has been
15 continually involved with the building at all?
16      A.    I don't believe he has.  Not to my
17 knowledge.
18      Q.    Let's turn to Exhibit-32.  It's the next
19 one over.
20            Do you recall this communication?
21      A.    Yes.
22      Q.    If we start from the beginning on the
23 second -- third page of it -- let's see.  It looks
24 like Justin Smith appears to be saying we --
25      A.    Hang on.  I'm not there.

Page 82

1       Q.    Yep.  Sorry.  My brain moves faster than
2  my hand sometimes.
3       A.    Okay.  I'm there.
4       Q.    So it says "Dear Mary, please accept this
5  letter as a response and notice that we fully
6  intend to pay the rents."  And this coincides with
7  what you said earlier, around October 2022.  You
8  said -- was it your testimony that they paid
9  partial rent but never paid the full amount?  Or
10 was it they paid partial of the defaulted amount
11 that was owed?
12      A.    So to answer that, let me -- let me say
13 that per the terms of the lease, rent was due on
14 the 1st and late if not received within five days
15 after the due date.  So for me and my
16 interpretation of that in enforcing the lease, that
17 meant that if I didn't receive money from them
18 between the 1st and the 5th, on the 6th they are
19 late.  Right?  So I would have given them notice
20 that, "You are late paying your rent."  And this is
21 him responding that they intend to pay it.
22            And then they asked a separate question
23 about --
24      Q.    Yeah.  So you had testified that they
25 paid something.

Page 83

1       A.    Yes.
2       Q.    Was it the full amount of just that
3  month?  Or was it a -- was it a different amount
4  that was -- that they had owed a few months of back
5  rent and they only paid a partial amount?
6       A.    I don't recall exactly the amount that
7  they paid, but at that point I believe I invoiced
8  them for rent, late fee, interest penalty, and the
9  property taxes that they needed to pay.  And then
10 when they sent an amount, as I recall, the amount
11 did not match the amount on my invoice, but I don't
12 remember what the amounts were.
13      Q.    Okay.  Let's turn over here in the same
14 exhibit.  There appears to be some sort of
15 discussion where Josh is upset that you're
16 notifying some -- Doug?
17      A.    Doug Millar?
18      Q.    Doug -- yeah.  Can you explain why Josh
19 was upset that you were communicating with Doug?
20      A.    Well, let me just say that Josh
21 Constantin was a very unpleasant individual to
22 communicate with, and that's putting it lightly.
23 And so I found him very unprofessional in his
24 communications with me, rude.  Doug Millar was
25 either an employee of his or an associate or

Page 84

1  partner of his at HSH.  And Doug was generally much
2  nicer to work with.
3            I had been instructed previously to reach
4  out to Doug for items like certificates of
5  insurance, you know, more procedural things.  And
6  at some point, I decided to reach out to Doug when
7  I could not get a satisfactory response from Josh
8  Constantin.
9       Q.    And here Josh says that -- "to stop
10 nickel and diming us and you won't have that
11 problem."  How was the Naperville property in this
12 case nickel and diming?
13      A.    Late fees and interest penalties.
14      Q.    Okay.  And, again, Josh says that -- in
15 the top here, in the final correspondence, it says
16 that building agreements are always in flux and a
17 state of negotiation, especially when they are
18 morally unconscionable to begin with.
19            Again, had Kevin or Brent or anyone
20 renegotiated anything with Josh Constantin?
21      A.    No.  Not that I'm aware of.  I would say
22 that my primary -- you know, I indicated he was
23 very difficult to communicate with.
24      Q.    Mm-hmm.
25      A.    I'm a very matter-of-fact person.  And

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.993    Page
GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

85 to 88

Page 85

1  when in doubt, what does the contract say is the
2  guiding principle for me.  So when I send him an
3  invoice that includes late fees and interest
4  penalties, it's not intended to be a personal
5  insult.  It's -- you know, it is a matter of fact
6  that you owe these things.
7            He repeatedly said to me, "I don't pay
8  late fees."
9            And I repeatedly responded, "Your lease
10  says you do."  And that was kind of the
11  characteristic of the conversations that we would
12  have.
13            And I -- I don't remember -- you know I
14  don't remember what was going on the day that we
15  were having this exchange, but Josh Constantin
16  seemed to live in a world where you don't honor
17  your contractual obligations.  And I -- that's
18  what -- I mean, that's what he's implying here.  He
19  wanted me to just change the lease.  And at some
20  point, I said, "I can't do that.  That's not
21  possible.  This is a contract that you signed."
22  So...
23       Q.   Okay.  And he references a morally
24  unconscionable contract.  My -- I don't know what
25  he may be referring to.  Do you know of any terms

Page 86

1  in the agreement that were different than what
2  might be -- that might -- do you know of any terms
3  in the lease with ACM that might be different than
4  other comparable leases?
5            MS. WINDHAM:  Objection.  Foundation.
6  Form.
7            MR. BURGE:  Objection.  Vague.  Form.
8  Foundation.
9            MR. SCHULTZ:  Objection.  Vague.  Overly
10  broad.  Speculation.
11            MR. EVERETT:  That's okay.  I'm trying to
12  work it in my head as I'm going.
13       Q.   (BY MR. EVERETT)  Let me see how to
14  rephrase this.  Do you know why Josh may have
15  thought the lease was morally unconscionable?
16            MR. BURGE:  Objection.  Speculation.
17  Lack -- and -- excuse.  Foundation.
18            MS. WINDHAM:  Same.
19            THE WITNESS:  Do you want me to answer
20  anyway?
21            MR. SCHULTZ:  Yeah.  Go ahead.
22            THE WITNESS:  Because he didn't live in
23  reality land as far as I'm concerned.  Like I said,
24  and as I -- you know, as I've explained, he felt
25  like he was above the law.  You know?  He didn't

Page 87

1  have to honor a contract that he signed.  If he had
2  a problem with that contract, he shouldn't have
3  signed it in the beginning.  Right?
4            So I felt like in my interactions with
5  him, that he -- he felt like the rules did not
6  apply to him.  So I assume this is just another
7  example of that.
8       Q.   (BY MR. EVERETT)  Okay.  Let's jump to,
9  now, Exhibit-36.  I'm sorry.  35.
10       A.   35?
11       Q.   35.  I'm sorry.  Okay.
12            Do you recall this e-mail exchange?
13       A.   I don't -- you know, I don't remember
14  having it, but it looks like something -- I mean,
15  I'm copied on it, so I had this conversation.
16       Q.   Down at the bottom, Josh says "Mary,
17  knock it off.  There are latent defects in
18  construction."  This is a different e-mail about
19  latent defects, but he then --
20            (Reporter request for clarification.)
21       Q.   (BY MR. EVERETT)  "There are latent
22  defects in construction, which prevents HSMD from
23  paying rent."  And then he continues by stating
24  "CAMS is nothing more than a shill for Millcreek
25  and we all know it."

Page 88

1            Do you have any reason to know why he
2  would be saying something like that?
3            MR. SCHULTZ:  Speculation.
4            But you can answer.
5            THE WITNESS:  Okay.  Because he was an
6  ornery individual who wanted to bully people.  And
7  for some reason, in his head, he did not understand
8  that I worked for the owners.
9            I don't know the -- you know, the -- I
10  don't know why he would say that other than that in
11  the same way that he felt that he was above the
12  rules -- excuse me -- and, you know, characterized
13  me sending him an invoice for late fees as nickel
14  and diming, for some reason he's indicating that he
15  thinks I'm not legit.
16       Q.   (BY MR. EVERETT)  All right.  So once
17  Advance Care Medical was evicted -- we had
18  discussed their eviction -- what happened to the
19  building?
20       A.   So -- well, the building is obviously
21  vacant.  I put the utilities in my company's name
22  and made sure we had insurance for my property,
23  made sure -- one of -- the very first thing I did
24  was have it rekeyed, so hired a locksmith to go out
25  and secure the property, send me photos of the

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.994    Page
25 of 61

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

89 to 92

Page 89

1  interior of the property.  Then I arranged for
2  utilities to be put in my company's name.  Took
3  care of the insurance.  And of course throughout
4  all of this, I'm communicating with the owners
5  about what's going on, what the status is.  And,
6  you know, just general oversight of all the things
7  that you need to do to take care of the owners at
8  that point as well.
9      Q.    Was there equipment left in the building
10 from Advance Care Medical?
11     A.    There was boxes of medical records.
12 There was office furniture.  I don't know that I
13 have an inventory of equipment.  I believe there
14 was something called a C-arm.  But, yeah, there
15 was -- yes.  There were things in the building.
16     Q.    And what happened to those things?  Do
17 you know?
18     A.    I'm not 100 percent sure.  I did not -- I
19 was not involved in moving the things out of the
20 building.
21     Q.    Do you know who was?
22     A.    I believe it was Brent Smith, along with
23 somebody else who helped him.  But I don't
24 remember.  I don't know who it was.  And I can tell
25 you that, you know, we -- I did talk on the phone

Page 90

1  with Brent because medical records are protected
2  records under, you know, HIPAA regulations and we
3  were trying to figure out what's the right thing to
4  do with this kind of information?  So I attempted
5  to find out.  I attempted to find out what you do
6  with it in Illinois and I focused on that, but I
7  didn't move any furniture.
8      Q.    Okay.  So after Advanced Care Medical
9  defaulted and was evicted and were a thing of the
10 past, did you assist in finding the new tenant,
11 Neuragenex?
12     A.    No, I did not.
13     Q.    Do you know who was in charge of finding
14 that new tenant?
15     A.    I don't know if "in charge" is the right
16 phrase, but I do know that Millcreek Commercial
17 brought Neuragenex to the owners as an option for
18 reletting their building.  And at the time, there
19 were other offers as well that the owners were
20 looking at.
21     Q.    Do you recall who those offers were from?
22     A.    I don't.  The name Edwards Health comes
23 to mind, but I'm not remembering whether that was
24 at the same time as Neuragenex or after Neuragenex.
25 I'm sorry.

Page 91

1      Q.    That's okay.  Is it common for a
2  brokerage to bring a new tenant to a commercial --
3  commercial property?
4      A.    Yes.
5      Q.    Okay.  When reviewing -- so let me
6  rephrase.  When you are assisting the owners --
7  being the middleman essentially for the owners, do
8  you assist in due diligence for a new tenant
9  whether that's reviewing financial statements or
10 interpreting lease clauses or anything like that?
11 Do you assist with that type of work?
12     A.    I do not.  On purpose do not.  So I
13 recommend to the owners that they have legal advice
14 to review any contracts that they're presented
15 with.  And if they -- you know, I work at the
16 direction of the owners.  So if the owners ask me,
17 "Well, you know, how do you know this is a good
18 tenant?"
19          I'm going say, "You know what?  I don't
20 have any information.  Tell me what information you
21 need to be able to evaluate, and I will request
22 that information."
23          So I'm -- again, I'm a facilitator, but I
24 don't dig into looking at the tenants.
25     Q.    Okay.  And do you do anything with

Page 92

1  revising the lease and working with the owners to
2  revise provisions they want revised in the lease?
3      A.    I may make a suggestion.  For example, I
4  have suggested to the owners that my preference is
5  that a tenant pay their property taxes in
6  one-twelfth increments instead of just saying in
7  your lease the tenant's responsible to make sure
8  that they're paid.  Because if you are receiving
9  the one-twelfth increment payments when you're
10 receiving rent, then if a tenant does go out
11 midterm, you've got some money that you can use to
12 pay expenses.  So I would give them that advice,
13 that this is my preference.  But I don't
14 actually -- I'm not -- I'm not licensed to practice
15 law, and so I don't -- you know, I don't try to
16 interpret the phrases in leases and contracts.  I
17 always recommend that they get an attorney.
18     Q.    And who ultimately is responsible for
19 negotiating the contract?
20     A.    So in this instance, for Naperville, one
21 of the owners -- and I believe it was Darlene
22 Pennock -- had an attorney that she had consulted
23 with.  It was her attorney she had used on multiple
24 occasions.  And the owner, you know, he said, "I'll
25 do this for you for a minimal fee."

Case 2:23-cv-00936-AMA-CMR   Document 119-9   Filed 02/27/25   PageID.995   Page
26 of 61

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

93 to 96

Page 93

1          And the owner said, "Let's do that."
2    Because they were -- you know, they were paying
3    expenses for the property and tired of sending me
4    money to be able to take care of the property.  So
5    they wanted to economize to the extent that they
6    could.  So they asked Darlene to have her attorney
7    do the review.
8          Now, when you say "negotiate the lease,"
9    the terms that were offered in the lease were
10   brought to the table by Kevin Long and Millcreek
11   Commercial.
12   Q.   Okay.  And does Darlene Pennock's
13   attorney still represent the Naperville owners in
14   any issues?
15   A.   No.
16   Q.   Okay.  Okay.  So when Neuragenex -- when
17   the lease was being negotiated and ultimately -- I
18   believe it was signed, correct?
19   A.   Yes.
20   Q.   There was a signed lease?
21   A.   Yes.
22   Q.   Can you tell me what happened -- kind of
23   a timeline from when they signed the lease to when
24   they declared bankruptcy?
25   A.   They signed a lease in late April or May,

Page 94

1    I believe, of 2023.  And so April/May 2023 is when
2    they signed.  The building required some
3    renovations, so that commenced.  And then they
4    declared bankruptcy, I believe, like January of
5    2024.  Late January.  January 20th or something
6    like that of 2024.
7    Q.   Okay.  And did they ever take possession
8    of the building?
9    A.   No, they did not.
10   Q.   Okay.  In order for them to occupy the
11   building, there was a capital call; is that
12   correct?
13   A.   Yes.
14   Q.   Do you recall the amount of that capital
15   call?
16        MR. SCHULTZ:  Assumes facts.  Can you
17   repeat your question?
18        MR. EVERETT:  Yeah.
19   Q.   (BY MR. EVERETT)  In order for Neuragenex
20   to occupy the building, what needed to happen
21   before they could occupy the building?
22   A.   That's a different question.  Am I good
23   to go?
24        MR. EVERETT:  I'm trying to ask it so I
25   don't assume facts.

Page 95

1        MR. SCHULTZ:  Yeah.  Answer that
2    question.
3        THE WITNESS:  Okay.  Let's see.  In the
4    lease agreement, there were requirements that the
5    landlord had to meet in order for the property to
6    be suitable for Neuragenex.  So what had to happen
7    was that the terms of the lease had to be upheld.
8    Landlord had to meet their obligations, which
9    included doing a remodel of the property before
10   they could take possession of it.
11   Q.   (BY MR. EVERETT)  Okay.  And do you
12   recall how -- was there a capital call that was
13   issued to remodel the property?
14   A.   Yes.
15   Q.   Do you recall the amount of that capital
16   call?
17   A.   I have no idea.
18   Q.   Okay.  Do you know what happened to the
19   money after Neuragenex declared bankruptcy that
20   wasn't used in the capital call?
21        MR. SCHULTZ:  Assumes facts.
22        MR. BURGE:  Objection.  Vague and assumes
23   facts.
24        THE WITNESS:  I don't know.
25   Q.   (BY MR. EVERETT)  Let's go to -- yeah,

Page 96

1    let's go back to Exhibit-60 real quick.
2        (Discussion off the record.)
3        THE WITNESS:  Okay.
4    Q.   (BY MR. EVERETT)  Let's see here.  Let's
5    look at response to number -- Interrogatory No. 6.
6    We discussed this a little bit earlier.  But the
7    question is:  "Before Neuragenex could occupy the
8    property, some owners agreed to a capital call."
9        Do you know what happened to the
10   equipment after the capital call was -- after --
11   excuse me.  Do you know what happened to the
12   equipment that was purchased after Neuragenex
13   declared bankruptcy?
14        MR. SCHULTZ:  Assumes facts.
15        MR. BURGE:  Join.
16   Q.   (BY MR. EVERETT)  Go ahead.
17   A.   I don't know.
18   Q.   Okay.
19   A.   I was not involved in the capital call
20   because that was an agreement between Millcreek and
21   each individual owner.  So I stayed out of all of
22   that, and I don't have any information as to what
23   happened.  I couldn't even tell you what the
24   remodel was.  You know, they remodeled the
25   building, but I don't know specifics.

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.996    Page
26 of 61

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

97 to 100

Page 97

1    Q.    Okay.  And you weren't even involved,
2    like, in polling the owners or anything like that
3    to help get the votes?
4    A.    So I remembered I polled the owners for
5    the lease because I needed to -- I needed to have
6    greater than 50 percent agreement of the owners in
7    order to be able to sign the lease.  And so the
8    lease included the language -- excuse me.  Let me
9    get a drink.
10   Q.    Go ahead.
11   A.    The lease included the language of, you
12   know, there being a requirement that there be
13   buildout and equipment.  And so I polled the owners
14   on whether or not they wanted to sign the lease,
15   and I received greater than a majority vote.  And
16   so I signed the lease.  But then the capital
17   call -- where's the money going to come from to
18   remodel the building?  Right?  And so that is --
19   you know, in order to honor the terms of the lease,
20   the owners have to pay to remodel the building.
21   And so my understanding is that that is what the
22   capital call was all about.
23   Q.    Okay.  And did you poll owners every --
24   regarding the capital call specifically, whether
25   they wanted to participate?

Page 98

1    A.    I do not remember.  I honestly don't
2    remember if I did that.
3    Q.    Okay.  And did owners ever communicate
4    with you about the capital call?
5    A.    Yes.  And when they asked me questions
6    about it, I would refer them to Millcreek because I
7    did not know the specifics.
8    Q.    Do you know if after the capital call --
9    excuse me.  Do you know if there were -- if money
10   was returned to owners after the capital call --
11   the unused amount of the capital call was returned
12   to owners?
13          MR. BURGE:  Objection.  Assumes facts.
14          MR. SCHULTZ:  Join.
15          MR. BURGE:  Foundation.
16   Q.    (BY MR. EVERETT)  Go ahead.
17   A.    I honestly don't know.
18   Q.    All right.  Let's go to Exhibit-63.  What
19   time are we at?
20   A.    Is that a separate --
21   Q.    Oh, yes.  I'm sorry.  Let me hand that to
22   you.  If we go maybe 15 more minutes and then do
23   lunch.
24          MR. FELIX:  Or do you want to do lunch
25   now?

Page 99

1          MR. EVERETT:  I want to finish this line
2    of questioning real quick and then we can do it, if
3    that's okay with you guys.
4          MR. SCHULTZ:  I thought you were done.
5          MR. WRIGHT:  How much longer do you
6    think you have left to go?
7          MR. EVERETT:  Let me review at lunch, and
8    I'll let you know.
9          MR. WRIGHT:  I was just thinking if you
10   have four minutes after lunch, we could just go
11   through lunch.
12          MR. EVERETT:  No.  No.  We'll need lunch.
13          THE WITNESS:  That was wishful thinking.
14          MR. EVERETT:  Here we go.
15          (Exhibit-63 marked.)
16   Q.    (BY MR. EVERETT)  Do you recall this
17   e-mail, Mary?
18   A.    Yes.
19   Q.    Okay.  Do you recall if Millcreek had
20   retaken any ownership in the Naperville property?
21   A.    Had -- sorry.
22   Q.    Had retaken ownership in the Naperville
23   property?
24   A.    Had retaken it?  I can explain to you
25   what I understand.

Page 100

1    Q.    Please.
2    A.    Okay.  So what I understand is that there
3    were owners who did not have the money in their
4    bank accounts or their -- they did not have the
5    resources to be able to respond to the capital
6    call.  So they didn't have money to pay for the
7    improvements that had been agreed upon in the
8    lease.  And so Millcreek had told -- I guess I
9    should say Kevin Long had told owners that if they
10   did not have the money to pay for their portion of
11   the capital call, that Millcreek Commercial could
12   pay that for them in exchange for an adjustment of
13   their percentage ownership in their deed
14   commiserate with the amount of money that was
15   invested, if that makes sense.
16   Q.    Mm-hmm.
17   A.    That's my understanding.
18   Q.    Okay.  And was -- was Millrock an owner
19   of the Naperville property before the capital call?
20   A.    I don't think they were.  There are some
21   properties where they end up with like, you know, a
22   remainder of like a half a percent interest that
23   they don't sell or can't sell.  But I don't believe
24   they owned any percentage of Naperville previous to
25   this.

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.997    Page
22 of 61

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

101 to 104

Page 101

1    Q.    And if -- if Millrock had not owned
2  anything in the property, I guess I'm still just
3  trying to understand, aside from just being good
4  sales agents or broker trying to -- why were Kevin
5  and Brent still involved with the property if they
6  had no longer had any ownership?
7    A.    I'm waiting for the objections.
8          THE WITNESS:  None?
9          MR. BURGE:  Foundation.
10          MR. SCHULTZ:  Foundation.  Speculation.
11    Q.   (BY MR. EVERETT)  Do you know why?
12    A.    I don't specifically know why.  I can --
13  I can tell you that I believe that their
14  involvement was in an effort to try to continue to
15  support the people who had purchased investment
16  properties from them.  My sincere impression of
17  them is that they were trying to do the right
18  thing, and they were trying to provide solutions in
19  a difficult situation.
20    Q.    Let's jump to Exhibit-43 now.  That
21  should be in your binder.  Is this a poll that you
22  created?
23    A.    It doesn't look like I created this.
24    Q.    Looks like it may have been by John
25  Keiter.

Page 102

1    A.    Right.  Yeah.  This is not me.
2    Q.    Okay.  Is this similar to the types of
3  polls that you created for the Naperville owners?
4    A.    It's a Google poll, so, yes, it works the
5  same way.  I haven't read the questions.  But, you
6  know, it looks similar.
7    Q.    Okay.  Has -- along with this Neuragenex
8  tenancy, has Millcreek -- excuse me.  Have the
9  Naperville owners made any claim against Neuragenex
10  to try and recover for lost rent or any other
11  breach of agreement, breach of their contract?
12    A.    Okay.  I'm trying to think this one
13  through.  No.  Not directly.  So Millcreek
14  Commercial did file documents in the bankruptcy
15  court representing the properties that Neuragenex
16  defaulted on their leases for that they had been
17  involved with.  So if they -- if they had helped
18  negotiate a lease with Neuragenex and then
19  Neuragenex filed for bankruptcy, Millcreek filed
20  the appropriate paperwork with the bankruptcy court
21  in order to represent the amounts owed to the
22  owners as a result of their default on their lease.
23    Q.    Okay.  So it was Millcreek that filed?
24  Or was it Millrock that filed?
25    A.    Okay.  I don't know.  It was one or the

Page 103

1  other.  Sorry.
2    Q.    That's okay.  I just want to make sure
3  I'm clear, that I understand who the filing party
4  was.
5    A.    Right.  And I apologize.
6    Q.    That's okay.  Okay.  In the -- let's see.
7  I'm going to jump a little bit.  Let's jump to
8  Exhibit- -- yeah.  Let's go to Exhibit- -- I
9  believe it's Exhibit-10.  Let me double-check.
10  Yeah.  Let's jump to Exhibit-10.  And we'll come
11  back to this after lunch a little bit, but I have a
12  couple questions related to ACM and Neuragenex.
13  Specifically the total amount of rent that would be
14  paid per year.  If you turn to the second page, it
15  says "DEF 000303."  It gives a table of gross rent
16  for the property.  Do you know how the value of the
17  monthly rent is calculated?
18          MR. BURGE:  Objection.  Foundation.
19  Speculation.
20          MR. SCHULTZ:  Foundation.  You mean in
21  this specific instance?
22          MR. EVERETT:  Not in this specific case.
23  But just generally with -- with specifically -- it
24  will be 10 and 11, because both of them show -- I
25  guess 11 doesn't show a rent amount.

Page 104

1    Q.    (BY MR. EVERETT)  But I'm curious of
2  how -- how the number for rent is calculated.  Do
3  you know how that's calculated?
4    A.    Are you referring specifically to this
5  rent?
6    Q.    Yeah.  Let's do for this rent and then
7  just kind of as a general principle in real estate
8  in your experience as a broker.
9          MR. SCHULTZ:  Lacks foundation as to
10  this.
11          MR. BURGE:  Form and vague.  I said
12  vague.
13          MR. EVERETT:  You guys are good.
14          MR. SCHULTZ:  I agree.  Vague.  And I
15  also -- lacks foundation as to the specifics of
16  this lease that we're talking about here in
17  Naperville.
18          But you can answer.
19          THE WITNESS:  So I don't know relative to
20  this rent table.  I wasn't involved in any of the
21  negotiations with -- with Advance Care Medical,
22  HSH, or Neuragenex in terms of determining what the
23  rent rate was going to be.  So I don't know what
24  process they employed to do this.
25    Q.    (BY MR. EVERETT)  Generally as a broker,

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

Page 105

1  how would you calculate rent?
2      A.    That is really a broad question.  So I
3  can say that for an investment property, what we
4  would typically look at is the cost of
5  construction -- cost of acquisition, cost of
6  construction, developer fee, the profit that needs
7  to go into it, and then apply a cap rate to that
8  number, you know, the total cost of creating it.
9  Right?  And then based on what the prevailing cap
10 rates are in the market at the time and the
11 strength of the credit or the strength of -- credit
12 strength of the tenant, you would arrive at an
13 appropriate cap rate.  The cap rate applied to the
14 cost of construction/acquisition determines your
15 rent.
16     Q.    Okay.  Let's look at Exhibit-25 quickly.
17 Do you know what this document is?
18     A.    It's a CoStar report.
19     Q.    And what is a CoStar report?
20     A.    CoStar is a software, is a service that
21 is -- it's used nationwide.  I'm not sure if
22 they're international.  But in Utah specifically --
23 I'll speak to that since I'm most familiar with
24 Utah -- CoStar provides a platform for commercial
25 real estate brokerages to market their properties

Page 106

1  to other brokers.  It is as close to being a
2  Multiple Listing Service as we get in the
3  commercial world.  And when you are a subscriber to
4  CoStar, you have the ability to query the database
5  for the -- for listings, and you can change the
6  parameters, you know, of what you're querying for.
7  Am I looking for warehouse?  Am I looking for
8  office?
9            And I can't tell -- you can also look at
10 what -- at comparables.  And so in this market, we
11 do not share data with CoStar.  Some markets do.
12 And so you can use CoStar as a vehicle to see what
13 other things have sold for or leased for.  So it
14 provides -- in this market specifically, it
15 provides a database of availables.  And in some
16 markets around the country, it's also a database of
17 sold data or lease data.
18     Q.    Okay.  If you turn over to the second
19 page here on Exhibit-25, it looks -- it appears to
20 me that this is a list of comparable buildings.  Do
21 you know if the rental per square foot price in
22 Naperville is comparable to those in the
23 surrounding areas?
24            MR. BURGE:  Objection.  Foundation.
25            MR. SCHULTZ:  Foundation.

Page 107

1            THE WITNESS:  This doesn't look like
2  something I created.  I'm not sure if I did.  So
3  let me look at it for a minute.
4            I'd say that, you know, at first glance,
5  a lot of these --
6            MR. SCHULTZ:  Listen for his question.
7            THE WITNESS:  What is your question
8  again?
9      Q.    (BY MR. EVERETT)  Is the rent per square
10 foot in Naperville comparable to the surrounding
11 area?  Do you know if it is comparable?
12            MR. BURGE:  Same objections.
13            MS. WINDHAM:  Join.
14            MR. KEITER:  Join.
15            MR. WRIGHT:  Join.
16            MR. SCHULTZ:  Join.
17            (Reporter request for clarification.)
18            THE WITNESS:  So answer?
19            MR. SCHULTZ:  Yeah.  Define "surrounding
20 area."  Naperville is a suburb of Chicago.  And
21 it's kind of a sprawling area.  So I would imagine
22 rents would be higher in downtown Chicago than they
23 are in other -- in the suburbs.
24     Q.    (BY MR. EVERETT)  Okay.  If you were to
25 value this property as a broker -- let me rephrase

Page 108

1  that.
2            If you were to begin negotiating a lease
3  and looking to the rents, what areas would you look
4  for specifically -- what geographical area -- what
5  surrounding areas would you look to to have a
6  comparable rate?
7            MR. BURGE:  I'll object on the basis of
8  vague.
9            MR. SCHULTZ:  I join.  And foundation.
10 Calls for speculation.
11     Q.    (BY MR. EVERETT)  I guess what I'm trying
12 to get at is I'm trying to understand just the
13 process that you would go through if you were
14 trying to come up with a number for rent based on
15 comparable properties in the area.
16            So if you were -- if you were the broker
17 in that area or the agent in that area, how would
18 you -- how would you find the comparable buildings?
19 What would you look for for comparable properties?
20            MR. BURGE:  Same objections.  And I'll
21 add also incomplete hypothetical.
22            MR. SCHULTZ:  And lacks foundation.  I
23 join.  And assumes facts.
24            THE WITNESS:  Do you want me to say
25 anything?

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.999    Page
GRANT, et al. vs LONG, et al.
30 of 61
MARY STREET - 11/27/2024

109 to 112

Page 109

1    MR. SCHULTZ:  Yeah.  I'm not telling you
2  not to answer.
3    Q.    (BY MR. EVERETT)  Sorry.  I'm trying
4  to -- it's one of those questions that's coming to
5  me now.  I didn't prepare for -- I'm trying to work
6  through it.
7    MR. SCHULTZ:  Let me just ask you.  Are
8  you asking her to opine on the -- how you would go
9  about determining a lease rate in Naperville?
10    MR. EVERETT:  Yes.
11    MR. SCHULTZ:  Okay.  I don't think she
12  has the background.  But I'll just say lacks
13  foundation.
14    MR. WRIGHT:  Are you objecting to your
15  own question?
16    MR. SCHULTZ:  I'm objecting to my summary
17  of his question.
18    MR. BURGE:  To his characterization of
19  the question.
20    MR. SCHULTZ:  But if you -- if you want
21  to, you can object.
22    Go ahead if you can.
23    Q.    (BY MR. EVERETT)  Only if you can.
24    A.    If I were an agent in Naperville, I would
25  start by looking for properties that are the most

Page 110

1  apples to apples that I could find.  Right?  I
2  would want properties that are similar in size,
3  construction, location, permitted uses.  So -- and
4  it is generally pretty difficult to find, you know,
5  an exact.  Right?  If you find an exact match
6  somewhere, that's your best comparable.  But you
7  almost never find exact matches.
8    And so, you know, the process that --
9  that I would use would be to try to find the things
10  that are as similar as possible.  And I may go
11  outside of a geographic region to do that,
12  especially with a building that is built as an
13  urgent care, which this one was.  And so I may look
14  for urgent cares in other geographies that are
15  similar in order to see what rents are.  And I
16  would also see if the data was available on CoStar
17  for what similar properties have rented for.
18    And it really -- it's an art, not a
19  science.  If I can just say it that way, that, you
20  know, the appraisers -- appraisers will tell you
21  your building is worth a million dollars.  Right?
22  And as a real estate broker, I would tell you,
23  "Your building is worth whatever somebody is
24  willing to pay you for it."  And it's only -- it's
25  only worth -- you know, it's only worth that amount

Page 111

1  of money once you've negotiated the deal and
2  closed.  Right?
3    And so people say, "I've had offered for
4  $2 million all the time."
5    And I say, "Well, did it close?"
6    "No."
7    Okay.  Well, then it's not a comp.
8  Right?  But that's the general process.
9    Q.    Okay.  I appreciate that.
10    MR. EVERETT:  Okay.  I think we can take
11  a break for lunch if you guys are okay with that.
12  Come back in an hour.
13    (Off the record from 12:06 p.m. to
14  1:05 p.m.)
15    Q.    (BY MR. EVERETT)  All right.  Now let's
16  jump into -- I'd like to discuss the marketing and
17  sale of the TIC investments.  I know you said you
18  were not directly involved in this, but I just want
19  to know your understanding of how these
20  tenancy-in-common investments were marketed and
21  sold.  Let's start with Exhibit-10.
22    MR. SCHULTZ:  Lacks foundation.
23    Q.    (BY MR. EVERETT)  Okay.  Have you seen
24  this document before?
25    A.    Yes.

Page 112

1    Q.    Do you know what it is?
2    A.    It is a marketing flyer.
3    Q.    And do you know how this is typically
4  distributed?
5    MS. WINDHAM:  Object to foundation.
6    MR. SCHULTZ:  Join.  Calls for
7  speculation.  Overly broad.
8    MR. BURGE:  Join.
9    THE WITNESS:  Do you want me to answer?
10    MR. SCHULTZ:  Yeah.  You can answer.
11    THE WITNESS:  How this was distributed?
12  Or how marketing materials are typically
13  distributed?
14    Q.    (BY MR. EVERETT)  How marketing materials
15  are typically distributed with Millcreek -- from
16  Millcreek Commercial.
17    MS. WINDHAM:  Object.  Foundation.
18    MR. BURGE:  Same objections.
19    MR. SCHULTZ:  Same objections.
20    MR. KEITER:  Join.
21    Q.    (BY MR. EVERETT)  Go ahead.
22    A.    I don't know -- I don't know all the
23  avenues that they would use to distribute it.  I do
24  believe that they put their properties on CoStar
25  because I've seen them there.

Case 2:23-cv-00936-AMA-CMR     Document 119-9     Filed 02/27/25     PageID.1000     Page

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

113 to 116

Page 113

1    Q.    And CoStar was the company similar to the
2    MLS service?
3    A.    It's the most -- yeah.  It's the most
4    similar to an MLS that you find in commercial real
5    estate.
6    Q.    Okay.  Awesome.  Do you know how long it
7    typically takes to market and sell a property to
8    investors?
9          MR. SCHULTZ:  Calls for speculation.
10   Overly broad.
11         MR. WRIGHT:  Foundation as well.
12         MR. BURGE:  Join.
13         MR. SCHULTZ:  Join.
14         THE WITNESS:  Any kind of investment
15   property?  Because, I mean, it could be quick.  It
16   could be a long process.
17   Q.    (BY MR. EVERETT)  My apologies.  I should
18   have been more narrow.  As it relates to Millcreek
19   Commercial and their sale of the tenancy-in-common
20   properties, do you know how long it takes on
21   average to market and sell an entire property?
22   A.    I don't --
23         MS. WINDHAM:  Object.  Foundation and
24   form.
25         MR. BURGE:  Same.  Join.

Page 114

1          MR. KEITER:  Join.
2          MR. SCHULTZ:  Join.
3          MR. WRIGHT:  Join that.  And foundation.
4          MR. SCHULTZ:  And her answer was?
5          THE WITNESS:  I don't know.
6    Q.    (BY MR. EVERETT)  Okay.  Let's turn to
7    the -- let's look at the second page here on the --
8    on Exhibit-10.  Up at the top where it says
9    "Property information," do you see where it says
10   the purchase price?
11   A.    Yes.
12   Q.    Do you know how that price was
13   calculated?
14   A.    I don't.
15   Q.    And then under "Cap rate," do you know
16   how they came to the percentage for the cap rate?
17   A.    I don't.
18   Q.    Let's turn to the next page here.  Under
19   the "Tenant Of Your Dreams" section, it says that
20   there was a corporate guarantee and it was insured
21   by Lloyd's of London.  Do you recall seeing any
22   documents that indicated that the property was
23   insured by Lloyd's of London?
24         MS. WINDHAM:  Object to form.
25         THE WITNESS:  No.  Not until there was a

Page 115

1    default and I asked for a copy of the bond.  That's
2    when I saw it.
3    Q.    (BY MR. EVERETT)  Okay.  And the only
4    copy of the bond that you saw was the Talisman
5    bond; is that correct?
6    A.    Yes.
7    Q.    Okay.  Let's go to number 11 here,
8    Exhibit-11.  Do you recognize this document?
9    A.    I haven't seen it before.
10   Q.    You have not seen this one before?
11   A.    Hm-mm.
12   Q.    Okay.  Were you involved at all with the
13   calculation of the purchase price that is listed
14   here on the second page of $7,002,492?
15   A.    No.  I'm never involved in anything that
16   has anything to do with the marketing or the sales
17   or the development or any of those things.
18   Q.    Okay.  And do you have any knowledge of
19   how that difference was calculated between the old
20   value and the new value, from Exhibit-10 to
21   Exhibit-11?
22         MR. BURGE:  Foundation.
23         MS. WINDHAM:  Same objection.
24         THE WITNESS:  No.
25   Q.    (BY MR. EVERETT)  Do you know who was in

Page 116

1    charge of calculating that value?
2    A.    No.
3    Q.    Do you know who sold the property to
4    the -- to the tenancy-in-common investors?
5          MR. BURGE:  Objection.  Vague.
6          MR. SCHULTZ:  Join.
7          THE WITNESS:  When you say "sold," do you
8    mean who the broker was or who the owner was that
9    sold it?
10   Q.    (BY MR. EVERETT)  The owner.
11   A.    The owner that sold it to the
12   tenant-in-common owners.  I don't --
13         MR. BURGE:  I'll object.
14         Sorry.  Before you answer.
15         Assumes facts in evidence as well, that
16   it was a single owner.
17         MR. KEITER:  Join.
18         THE WITNESS:  I have never seen a
19   purchase and sale agreement, so I don't know who
20   the person or entity was that was listed, so I
21   don't know.
22   Q.    (BY MR. EVERETT)  Okay.  Here on
23   Exhibit-10, you can see that -- I'll let you get
24   there.  Going back to Exhibit-10.  There on the top
25   of the page prominently featured is the Colliers

Page 117

1  logo.  Do you know if Millcreek was given
2  permission from Colliers to use their logo?
3         MR. WRIGHT:  Objection.  Foundation.
4  Speculation.
5         MR. SCHULTZ:  Same.
6         **THE WITNESS:  I have no idea.**
7     Q.   (BY MR. EVERETT)  Do you know -- do you
8  have any reason to know why they would have used
9  Colliers?
10        MR. WRIGHT:  Same objection.
11        MR. SCHULTZ:  Same objection.  Calls for
12 speculation also.
13        **THE WITNESS:  If I knew when this was**
14 **produced, if it was produced while they were**
15 **working at Colliers, then you are required to**
16 **put -- the division of real estate rules require**
17 **you to put on your marketing materials the name of**
18 **the brokerage that you -- that your license is**
19 **affiliated with.  So if this was created then, that**
20 **would be a reason.**
21    Q.   (BY MR. EVERETT)  Okay.  And under those
22 rules that you referenced, does it have to be just
23 disclosed?  Or is it okay that it's put in the
24 marketing materials as a prominent feature?  Do you
25 know?

Page 118

1         MR. WRIGHT:  Also object on the basis of
2  foundation as to her knowledge of the rules and
3  what's required under the rules.  Whatever rules
4  you're referring to.
5         MR. SCHULTZ:  Vague also.
6         Go ahead.
7         **THE WITNESS:  I don't -- I don't know**
8  **what the division rules say exactly, other than you**
9  **have to disclose if you are an agent, and you have**
10 **to disclose and put the information about what**
11 **company you work for, whether you have a logo or**
12 **the name.  It has to be on your materials.**
13    Q.   (BY MR. EVERETT)  Okay.  Do you know if
14 Millcreek ever was actually a partner or a
15 contractor with Colliers in any way?
16        MR. WRIGHT:  Same objection.  Foundation.
17        **THE WITNESS:  Independent contractor.**
18    Q.   (BY MR. EVERETT)  Millcreek was?
19    A.   **I would assume so, because they're**
20 **licensed agents.  And licensed agents aren't W-2**
21 **employees.  They are independent contractors.**
22    Q.   Okay.  And do you know if Millcreek
23 Commercial is still marketing and selling
24 tenancy-in-common interests similar to these?
25        MR. BURGE:  Objection as to vague.

Page 119

1         MR. SCHULTZ:  Vague.
2         **THE WITNESS:  I don't know today whether**
3  **or not they're doing that or not.**
4     Q.   (BY MR. EVERETT)  Okay.  Do you know if
5  Millcreek Commercial sells other investment
6  products outside of the tenancy-in-common
7  agreement?
8         MS. WINDHAM:  Object.  Foundation.
9         MR. SCHULTZ:  Join.
10        **THE WITNESS:  I don't know.**
11    Q.   (BY MR. EVERETT)  Okay.  And have you
12 assisted with any other project that's not a
13 tenancy-in-common agreement with Millcreek
14 Commercial?
15    A.   No.
16    Q.   Do you know if Millcreek plays a role in
17 the day-to-day affairs of the tenancy-in-common
18 investments that they sell?
19        MR. BURGE:  Objection.  Vague.
20        MR. SCHULTZ:  Join.
21        **THE WITNESS:  So as it relates to**
22 **Naperville?  Or as it relates to all products that**
23 **they sell?**
24    Q.   (BY MR. EVERETT)  Right now, I'm curious
25 to all products.

Page 120

1     A.   So no --
2         MR. BURGE:  Same objection and
3  foundation.
4     Q.   (BY MR. EVERETT)  Go ahead.
5     A.   **Okay.  So, no, they're not involved in**
6  **day-to-day operations of a lot of the properties**
7  **that they sell.  Like, for example, there's a**
8  **Dollar Tree in Jerseyville, Illinois.  And there is**
9  **no involvement with that property at all.**
10    Q.   Okay.  Are you involved with that
11 property as a lease administrator?
12    A.   **Yes.  Mm-hmm.**
13    Q.   The Jerseyville?  Okay.
14        Do you know if the tenancy -- do -- let
15 me rephrase that.  Do you know if the
16 tenant-in-common investments are marketed through
17 public channels or through private channels or to
18 private individuals?
19        MS. WINDHAM:  Objection to foundation.
20        MR. BURGE:  Vague.
21        MR. SCHULTZ:  Join.
22    Q.   (BY MR. EVERETT)  Go ahead.
23    A.   **I forgot the question.**
24    Q.   Do you know whether --
25        (Record read back as follows:

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.1002    Page
33 of 61

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

121 to 124

Page 121

1          "Do you know if the tenancy -- do -- let
2    me rephrase that.  Do you know if the
3    tenant-in-common investments are marketed through
4    public channels or through private channels or to
5    private individuals?")
6          MS. WINDHAM:  Same objections.
7          MR. SCHULTZ:  Same objections.  Lacks
8    foundation.
9          THE WITNESS:  Public channels, private
10   channels.  I don't know what you mean by that, but
11   I don't know how they market or make decisions
12   about how they're marketing or who they're
13   marketing to.
14      Q.   (BY MR. EVERETT)  Okay.  Do you know if
15   there is information available to the public
16   through a website or other means that specifically
17   markets the tenancy-in-common properties?
18      A.   I -- yes.  I believe they have a website.
19      Q.   Okay.  And do they have sales staff or
20   anyone else that's calling, making private offers
21   or trying to sell to private individuals?
22          MR. WRIGHT:  Objection as to vague as to
23   "they."
24          MR. SCHULTZ:  Join.
25          MR. BURGE:  I will join.

Page 122

1          MR. KEITER:  Join.
2          THE WITNESS:  Given the fact that owners
3    have referenced to me that they have agents, yes.
4    Agents were used to sell the property.
5       Q.   (BY MR. EVERETT)  Okay.
6          MR. SCHULTZ:  Can you -- I'm sorry.  Can
7    I just interrupt?  When you say "they," who do you
8    mean?  "They have agents."  Who are you talking
9    about?
10          THE WITNESS:  Millcreek.
11          MR. SCHULTZ:  Okay.
12      Q.   (BY MR. EVERETT)  Let's jump back to
13   the -- I think it's Exhibit-7, the
14   tenancy-in-common agreement.  Let's go to Section
15   8.3 and 8.4.  This is Exhibit-7.  I'll give you a
16   second to look at that.
17      A.   Mm-hmm.
18      Q.   Are you familiar with the language in
19   this part of the contract?
20      A.   Yes.  Yes, I am.
21      Q.   Can you explain to me how this works
22   specifically with the Naperville property regarding
23   the right of first offer?
24      A.   Yes.  So, again, this is a document that
25   all of the owners enter into at the time that they

Page 123

1    purchase their interest.  And it defines, you know,
2    their responsibilities and how their ownership
3    group is going to work.  And so what 8.3 says is
4    that an owner can't sell, convey, or transfer an
5    owner's undivided interest in the property or seek
6    a partition of the owner's undivided interest in
7    the property unless the owner, and then in
8    parentheses, the selling owner, first offers to
9    sell the selling owner's undivided interest to the
10   other owners under the terms of this Section 8.  So
11   they have to offer it to the other owners.  If they
12   decide they want to sell, they have to give their
13   co-owners an opportunity to purchase first.
14      Q.   And specifically as it relates to
15   Naperville, have any owners been successful in
16   either selling their share to another owner or to a
17   third party?
18          MR. BURGE:  Objection.  Assumes facts and
19   foundation.
20          MR. KEITER:  Compound.
21      Q.   (BY MR. EVERETT)  All right.  Let's start
22   with just one of them.  Has any -- has any owner in
23   the Naperville property been successful at selling
24   their share to another owner?
25      A.   No.

Page 124

1       Q.   Have any of the Naperville owners been
2    successful in selling their share to a third party?
3       A.   No.
4       Q.   Has that been attempted?
5       A.   I don't know.  I would know if they were
6    trying to sell to a co-owner.  I would not know
7    necessarily if they were marketing it using an
8    agent and trying to sell it outside of selling to
9    an owner.
10      Q.   Okay.  You already answered a bunch of
11   the questions I had for later today, so maybe we'll
12   get out of here earlier today.
13      A.   Good.  I have a turkey to cook.
14      Q.   Let's look at Exhibit-27.
15      A.   Oh, my gosh.  This is small.
16          MR. SCHULTZ:  Here.  Can you see it
17   better on mine?
18          THE WITNESS:  It depends.
19          MR. BURGE:  I remember these documents.
20      Q.   (BY MR. EVERETT)  So it's on the
21   second -- second half of the first page.  Where
22   Kevin is talking to Doug Millar --
23      A.   Mm-hmm.
24      Q.   -- where he says "Thank you for bringing
25   this to our attention."  But then he says "We often

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.1003    Page
34 of 61

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

125 to 128

Page 125

1  check up on our developed properties on behalf of
2  the owners." Do you know why they do that?
3  **A.    No.**
4      Q.    Has Kevin and presumably Brent Smith, I
5  believe, is also here -- have they checked up
6  specifically on the Naperville property?
7          MR. KEITER: Objection. Foundation.
8          MR. BURGE: Vague.
9          MR. SCHULTZ: Vague.
10         **THE WITNESS: They have told me that they**
11 **have, yes.**
12     Q.    (BY MR. EVERETT) Okay.
13     **A.    And I conveyed that to the owners, I**
14 **believe, too.**
15     Q.    And do you know what Kevin and Brent were
16 looking at when they visited?
17     **A.    No. I can tell you what it was -- what**
18 **was explained to me. So what was explained to me**
19 **is if you were in a market where you have**
20 **properties, it makes sense to drive and take a look**
21 **at a property that you've sold or a property you're**
22 **considering purchasing or developing. So I think**
23 **it was part of being in the market.**
24     Q.    Okay. Do you know if Millcreek or Kevin
25 or Brent received any compensation for check up, as

Page 126

1  they say in the e-mail, on the property?
2      **A.    They didn't from me. I don't know if**
3  **anybody else would have paid them.**
4      Q.    Let's turn to Exhibit-12.
5          Have you visited the Naperville property?
6      **A.    I have not.**
7      Q.    Okay. Have you seen pictures of the
8  completed Naperville property?
9      **A.    Yes.**
10     Q.    To your knowledge, does this represent
11 the -- is this the Naperville property?
12     **A.    I don't know for certain. And the reason**
13 **I say that is that Naperville and another property**
14 **that is close by, the buildings look identical. So**
15 **if you tell me this is Naperville, I'll believe**
16 **you.**
17     Q.    Okay. And if you need to take a sift --
18 there's a few pictures there. I just want to make
19 sure that that is -- is what you believe it is.
20         Okay. Is there anything in there that
21 would make you think that this is not Naperville?
22     **A.    No. It looks like it's more likely to be**
23 **Naperville because there is a fast food restaurant**
24 **next door to it. So I would believe that that**
25 **probably is Naperville.**

Page 127

1      Q.    Great. Let's go to Exhibit-13 now. Is
2  this a document that you have seen before?
3      **A.    Yes.**
4      Q.    Do you know what it is?
5      **A.    It is the printout from what you find**
6  **when you go on the county -- well, their township**
7  **website, trying to -- when you're trying to learn**
8  **about property taxes.**
9      Q.    Okay. Down here on the bottom, it shows
10 two different sales in November 1st of 2021 and
11 October 1st of 2021. Do you know if that was for
12 the sale of the entire property?
13     **A.    I have no idea.**
14     Q.    Okay. Do you have any reason to believe
15 it was for the entire property?
16     **A.    The amounts are too small. So I would**
17 **not guess that they would be for the entire**
18 **property.**
19     Q.    Were you involved with the Naperville
20 property on the -- on these dates?
21     **A.    I'm trying to remember. When did I open**
22 **the bank account? Let's see. I was -- yes. I**
23 **opened the bank account for the Naperville property**
24 **in February of 2021.**
25     Q.    And then do you see here under "Market

Page 128

1  value" over on the right-hand side, it says
2  "340,876"?
3      **A.    Yes. I see it.**
4      Q.    Would you have any knowledge of why that
5  market value is so different from the value that
6  was advertised on the marketing materials?
7      **A.    No.**
8      Q.    Okay. All right. We'll just read
9  Exhibit-15 and -- or 14 and 15 into the record. We
10 don't need to go over those. Actually, we'll turn
11 to 15 real quick. I had one question here. Do you
12 recognize this document?
13     **A.    I do.**
14     Q.    What is it?
15     **A.    It's a tax notice.**
16     Q.    Do you see where it lists Millrock
17 Investment Fund 1 as the owner of the Naperville
18 property?
19     **A.    Yes, I do.**
20     Q.    Do you know why Millrock was listed as
21 the owner at this date, as of 2022?
22     **A.    So I don't know why the county hasn't**
23 **updated their records yet, but it's my experience**
24 **that with a lot of the properties that I work with,**
25 **that the county is very slow to update the recorded**

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.1004    Page
32 of 61

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

129 to 132

Page 129

1  owner's name. And I quite often have to reach out
2  to, you know, the different counties and update the
3  mailing address for tax notices and all that sort
4  of stuff.
5      So I -- I believe that this is probably a
6  case where the county has not updated their
7  records.
8      Q.  And do you know if those records have
9  been updated since then?
10     A.  I don't remember.
11     Q.  Okay. Let's jump to Exhibit-33. Do you
12 recall this communication with Manny Butera?
13     A.  Yes, I do.
14     Q.  Okay. So on the third page of it that's
15 marked as DEF 005007, it looks like an e-mail from
16 you to Manny saying "HSH has the Romeoville and
17 Naperville buildings insured for just over $1
18 million for each location for the property casualty
19 insurance. What is the actual replacement --
20 replace cost for these buildings?"
21     And then Manny asks if it includes FF&E.
22 Do you know what FF&E stands for?
23     A.  Furniture, fixtures, and equipment.
24     Q.  Okay. And is that under a separate
25 policy? Do you know?

Page 130

1      A.  Typically your property casualty
2  insurance is for your structure, and then a tenant
3  will have a separate policy that covers all of the
4  things that they put inside of -- just like
5  renter's insurance, for example. You know, with an
6  apartment.
7      Q.  Okay. Awesome. And it looks here on the
8  first page that Manny says "I think the structure
9  can be replaced for 1 million" -- "1 mil." I
10 assume that's $1 million.
11     A.  Mm-hmm.
12     Q.  Do you have any reason to believe that is
13 not an accurate number?
14     A.  I don't have enough information to be
15 able to make that call. That's not my world.
16     Q.  Okay. Do you know why Manny Butera would
17 know how much it would cost to replace?
18     MS. WINDHAM:  Object. Foundation.
19     THE WITNESS:  I believe he was the
20 developer. I don't know if he was the general
21 contractor. But I -- he was -- he was the -- what
22 do you call it? He was the preferred developer for
23 Health Care Solutions Management Group, of which
24 Advance Care Medical is a part. And so I thought
25 he would have this information.

Page 131

1      Q.  (BY MR. EVERETT)  Gotcha. Okay. Now I
2  want to talk about the bond, a little bit more
3  about the bond that was supposedly issued by
4  Lloyd's of London or others. Let's jump back to
5  Exhibit-60. That was one of the separate documents
6  we gave you this morning. And if we have already
7  asked this, just let me know.
8      In here, you have stated that you had no
9  firsthand knowledge of this. Were you ever told
10 directly that Lloyd's of London had insured the
11 property?
12     A.  Was I told --
13     Q.  Directly by anyone that Lloyd's of London
14 insured the property?
15     A.  I have heard that said by Kevin Long.
16     Q.  Okay. Did you have any reason to not
17 believe that it was insured by Lloyd's of London?
18     A.  No.
19     Q.  Were you skeptical at all when he said
20 that it was Lloyd's of London that was insuring it?
21     A.  No.
22     Q.  When did you learn that Lloyd's of London
23 would not be insuring the Naperville property?
24     A.  I would say when Advance Care Medical
25 defaulted and I requested a copy of the bond and it

Page 132

1  did not say "Lloyd's of London" on it, that might
2  have been my first clue. But I wasn't sure if
3  Talisman was somehow affiliated. So, you know, I
4  wouldn't say that there was a specific moment when
5  I knew anything. It's just, like, information kind
6  of came out.
7      Q.  Okay. Do you know if Millcreek promised
8  prospective investors that Lloyd's of London had
9  insured the property?
10     A.  I don't know other than the marketing
11 materials you showed me, that it was in the
12 marketing materials. But I don't know what was
13 represented, like, verbally and all that sort of
14 stuff.
15     Q.  Okay. So you don't know what was
16 represented outside of the marketing materials?
17     A.  Correct.
18     Q.  Okay. Okay. Let's jump to Exhibit-16
19 briefly here. Okay. Do you recognize this
20 document?
21     A.  Yes.
22     Q.  Can you tell me what it is?
23     A.  It is paperwork associated with the
24 performance bond that was issued by Talisman. I
25 haven't had a chance to read all the way through

Case 2:23-cv-00936-AMA-CMR   Document 119-9   Filed 02/27/25   PageID.1005   Page
36 of 61
GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

133 to 136

Page 133

1    it.
2        Q.    That's okay.  I don't think we need to
3    dig into the specific --
4        A.    That's high level of what it is.
5        Q.    I just have a few questions.  If you look
6    there at the obligee, this name ADP - Millcreek 1
7    LLC pops up again.  Earlier you testified that you
8    don't know who that is.  Is that correct?
9        A.    Right.  I don't -- I don't have personal
10   knowledge of who that is.  Right.  Correct.
11       Q.    Do you know why they would be the obligee
12   under the performance bond instead of Millrock or
13   the owners?
14       A.    Let's see.  The obligee is -- I'm not
15   sure that I know what an obligee is.  That's the
16   person that's obligated?  Or the person that has --
17   someone has obligations to?
18       Q.    Someone has obligations to.
19       A.    Okay.  This --
20             MR. BURGE:  I'll object that it calls for
21   speculation.
22             MR. SCHULTZ:  Yeah.  Join in that.
23             MR. KEITER:  And assumes facts.
24       Q.    (BY MR. EVERETT)  I'm just trying to
25   understand who ADP Millcreek 1 is.  I don't know

Page 134

1    why they would be the party aside from --
2        A.    You can look them up in the division of
3    corporations and find out who they are.  I haven't
4    done that.
5        Q.    That's okay.
6              But you don't have any knowledge of why
7    they would be the party here instead of --
8        A.    Not personal knowledge, no.  I mean, I
9    could sit here and guess, but I don't want to
10   guess.
11       Q.    No.  We don't need you to guess.  That's
12   okay.
13             And then under the amount, it shows
14   343,103.36.  Do you know what that amount
15   represents?
16       A.    Let's see.  Issue date and amount.  No.
17   It doesn't tell me what that is, so I'm not sure
18   what that is.
19       Q.    Okay.
20       A.    Everything -- everything I know about it
21   is what I'm seeing right here.
22       Q.    That's okay.
23             MR. SCHULTZ:  I'll just say the document
24   speaks for itself.  I think it explains right
25   there.

Page 135

1              THE WITNESS:  Oh, okay.  I didn't read
2    that far.
3        Q.    (BY MR. EVERETT)  All right.  Let's jump
4    to Exhibit-34.  Have you seen this document before?
5        A.    I -- yeah.  I don't recall seeing it
6    before.
7        Q.    That's okay.  I just -- I'm asking for
8    your -- what you've seen, if you have seen it.
9        A.    If I've seen it, I don't remember seeing
10   it.  It doesn't look familiar.
11       Q.    That's okay.  Do you have -- well, I'll
12   represent to you that this is -- the document
13   states it's the casualty insurance -- essentially
14   the policy for -- between Talisman insurance
15   company and Millrock Investment Fund 1.  Do you
16   have any knowledge of why Millrock Investment Fund
17   1 is the insured party here?
18             MR. SCHULTZ:  Speculation.
19             THE WITNESS:  No, I don't.
20       Q.    (BY MR. EVERETT)  Okay.  And on the
21   second page here, it gives a date of the 12th day
22   of August 2020.  Were you involved as a lease
23   administrator for the Millcreek Commercial
24   Properties at this time?
25       A.    I don't believe so.

Page 136

1        Q.    Okay.
2        A.    I don't recall the exact date that I
3    started doing that, so I don't believe so.  I think
4    this predates it.
5        Q.    Okay.  Do you recall kind of the general
6    timeline you started working with Millcreek
7    properties?
8        A.    It would have been sometime second half
9    of 2020, but I don't remember an exact date.
10       Q.    Was a claim ever made to Talisman to pay
11   for the lost rent?
12             MR. SCHULTZ:  Asked and answered.
13             MR. BURGE:  Join.
14             THE WITNESS:  I asked Cori Cozort, the
15   attorney who represented us and the owners, to file
16   a claim and submit all the information that was
17   necessary.
18       Q.    (BY MR. EVERETT)  Okay.  And what is the
19   result of that claim?  Has it been settled?
20       A.    I do not know what the result of the
21   claim is.
22       Q.    Okay.  Is it still pending?  Do you know?
23       A.    Let's see.  So what I understand about
24   the -- so Cori -- Cori made a claim.
25             There were bonds for other properties as

Page 137

1  well, so other attorneys made claims.  My
2  understanding is that John Keiter, working on
3  behalf of Millcreek Commercial -- I don't know
4  whether it was Millcreek or Millrock Investment
5  Fund -- but that he has been working with counsel
6  in Nevada, I believe, to pursue litigation to
7  enforce the terms of the bond.  And I believe
8  that's ongoing.
9      Q.   (BY MR. EVERETT)  Okay.  Do you know why
10 Talisman wouldn't pay on the bond?
11     A.   I don't.
12     Q.   Okay.  Let's jump to Exhibit-18.  I just
13 want to see if you have ever seen this document.
14 So Exhibit-18, about halfway through, it starts
15 Colliers-000144.
16     A.   Okay.  I'm there.
17     Q.   Okay.  Have you ever seen this document
18 before?
19     A.   No.
20     Q.   Okay.  And you were never involved with
21 the -- with the creation of the -- let's see.  You
22 weren't involved in creating this document at all?
23     A.   No.
24     Q.   Okay.  Let's go to the second page of
25 this document.  On the 1, 2 --

Page 138

1      A.   Of this one?
2      Q.   Of the -- yeah, still of the same page we
3  were.
4      A.   So page 145?
5      Q.   145.  Yes.
6      A.   Okay.
7      Q.   On the fourth bullet point down, this
8  states that "Colliers recognizes that as the fund
9  manager, Kevin Long may acquire properties in
10 states where he is not licensed due to there being
11 no licensing requirements related to
12 self-representation."
13          Do you know if Kevin Long purchased
14 properties in other states without being licensed,
15 self-represented?
16     A.   I don't know.
17     Q.   Okay.  Do you know if Kevin Long was
18 the -- was the broker or agent for the purchase of
19 the Naperville property from the TIC owners?
20          MR. SCHULTZ:  Purchased from the TIC
21 owners?
22     Q.   (BY MR. EVERETT)  Let me rephrase that.
23 When Millrock Fund 1 sold to the individual
24 tenant-in-common owners, did Kevin Long represent
25 Millrock Fund 1?  Do you know?

Page 139

1          MR. SCHULTZ:  Lacks foundation.
2          THE WITNESS:  Yeah.  I don't know.
3      Q.   (BY MR. EVERETT)  Okay.  That's all with
4  that exhibit.
5          Do you know what type of relationship
6  Millrock Fund 1 has with Millcreek Commercial?
7          MR. BURGE:  Objection.  Vague.
8          MR. SCHULTZ:  Join.
9          THE WITNESS:  Okay.  So I'm not sure that
10 I understand it well enough to be able to explain
11 it and be accurate, but Millrock Investment Fund is
12 a fund with investors that has money and they
13 acquire properties, and then Millcreek Commercial
14 is their agent, their brokerage that markets their
15 properties to sell them.
16     Q.   (BY MR. EVERETT)  Do you know who the
17 investors are in Millrock Fund 1?
18     A.   I don't.
19     Q.   Do you have any relationship with
20 Millrock Investment Fund 1?
21     A.   The only relationship I would have is if
22 they are -- if they have signed a lease and I'm
23 administering the lease, and that -- you know.
24 Then they have assigned their lease interest to the
25 people that I represent.  And so I -- I work with

Page 140

1  them if they are involved in a contract.  Or I work
2  with them, you know, if -- well, that's it really.
3  If they're involved in a contract or a lease, then
4  I have reason to work with them on it.
5      Q.   And you're not invested in Millrock Fund
6  1 at all?
7      A.   No.
8      Q.   Let's go to Exhibit-52 now.  We'll change
9  gears a little bit.
10          Okay.  Do you recognize this document?
11     A.   Certificate of occupancy.  I -- I can't
12 remember if I've ever seen it or not.
13     Q.   Okay.  Well, I really only have one
14 question here.  Under where it says "owner," do you
15 know why CAMS Realty is listed as the owner and not
16 the other owners?
17     A.   This relates to the Naperville property,
18 and I am their authorized agent per the terms of
19 the lease administration agreement that I have with
20 them.  So, again, it's a matter of convenience.
21 Rather than listing 25 people that they have to
22 send out information to, I'm the collection point
23 for information for the owners.
24     Q.   Next question, I want to ask you a little
25 bit, again, about your relationship with Kevin

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.1007    Page
38 of 61

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

141 to 144

Page 141

1    Long.  What relationship does Kevin have with CAMS
2    Realty?
3        A.    None.
4        Q.    None.
5        A.    Hm-mm.
6        Q.    Okay.
7        MR. SCHULTZ:  "Hm-mm" means no?
8        THE WITNESS:  Yes.  No.  Sorry.  No.
9        Q.    (BY MR. EVERETT)  That's okay.
10       A.    I forgot the rules.
11       Q.    Okay.  I'll ask you about a couple of the
12   other defendants in this matter and just what you
13   know about them.
14       A.    Okay.
15       Q.    Who is Blake McDougal?
16       A.    I don't really know Blake.
17       Q.    You haven't met him?  Or...
18       A.    I wouldn't recognize him if I saw him on
19   the street.  I -- you know, the name is familiar,
20   but I really don't know him.
21       Q.    Okay.  Who is Spencer Taylor?
22       A.    Spencer Taylor is -- he used to be an
23   employee, I believe would be the right word, at
24   Millcreek.  And now I believe he's an agent at a
25   different real estate brokerage.

Page 142

1        Q.    Is he a real estate agent, broker?  Do
2    you know?
3        A.    I don't know whether he's a broker or a
4    sales agent.  He's one or the other.
5        Q.    Okay.  Does he have a relationship with
6    CAMS Realty?
7        A.    No.
8        Q.    Have you ever had any sort of
9    professional relationship outside of CAMS Realty
10   with Spencer Taylor?
11       A.    No.
12       Q.    Okay.  Do you have any other duties
13   related to the Naperville property outside of your
14   lease agreement duties?
15       MR. BURGE:  Objection.  Vague.
16       MR. SCHULTZ:  Join.
17       THE WITNESS:  No.
18       Q.    (BY MR. EVERETT)  Are you licensed as a
19   real estate agent or broker in Illinois?
20       A.    No.
21       Q.    Do you know if anyone at Millcreek is
22   licensed in Illinois as a real estate agent or
23   broker?
24       A.    No, I don't know.
25       Q.    Or do you know if anyone at Millrock is?

Page 143

1        A.    No, I don't know.
2        Q.    All right.  Let's go to Exhibit-41.
3        A.    Okay.  I'm there.
4        Q.    Does this -- do you recognize this
5    correspondence?
6        A.    Yes.
7        Q.    Can you tell me what this e-mail thread
8    is about?
9        A.    It will take me a minute.
10       Q.    Go ahead.
11       A.    I saw my name, so I know I'm involved.
12   But I don't remember the details.
13       Q.    Take your time.
14       A.    Okay.  Are we going to go multiple pages
15   here?  Or are you just looking at the first page?
16       MR. SCHULTZ:  Read the whole thing.
17       MR. EVERETT:  Yeah.  Let's read the whole
18   e-mail.
19       THE WITNESS:  Okay.  I should have
20   started at the back and read forward.  Is that the
21   way to do this to understand?
22       Q.    (BY MR. EVERETT)  Whatever's easiest for
23   you.
24       A.    To understand what the chain of
25   communication is.

Page 144

1        Q.    Yeah.  Either way.  I've gotten so used
2    to reading them backwards that I don't even think
3    about it anymore.
4        A.    Okay.  I got a sense of what we're doing
5    here.
6        Okay.  Here it talks about something
7    called "deed adjustments."  Do you know what
8    they're referring to with "deed adjustments"?
9        A.    Yes.  So I described earlier about how
10   the lease with Neuragenex included that the
11   building would be remodeled, right?  And that there
12   was money that would need to be spent by the owners
13   in order to remodel the building.  And that -- I'm
14   going to get them -- I'm going to get it
15   confused -- Millcreek or Millrock, one or the
16   other, had told the owners that if they did not --
17   it would have been Kevin acting in whatever
18   capacity.  But he told the owners that if they
19   could not afford to pay their portion of the
20   expense of remodeling the building, that Millcreek
21   could pay that for them in exchange for an
22   adjustment of the deed of ownership.  So, you know,
23   there's more money going in.  And so now you don't
24   own 20 percent.  You own 19 percent.
25       Q.    Mm-hmm.  That makes sense.

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.1008    Page
GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

145 to 148

Page 145

1        Were you involved with calculating those
2   deed adjustments?
3        **A.   I was not.**
4        Q.   Were you involved with polling or
5   collecting -- let me just rephrase that.
6        Were you involved with polling for the
7   deed adjustments to get the owners' votes?
8        MR. SCHULTZ:  Asked and answered.
9        **THE WITNESS:  No, I wasn't.**
10       Q.   (BY MR. EVERETT)  Were you involved at
11  all with the collection of money for the capital
12  call?
13       MR. SCHULTZ:  Asked and answered.
14       **THE WITNESS:  No, I was not.**
15       Q.   (BY MR. EVERETT)  Okay.  Let's go to
16  Exhibit-45.  Correction.  46.  Sorry.
17       Have you been involved at all with the
18  updates related to the Talisman bond lawsuit?
19       **A.   I request updates because owners ask me**
20  **what's going on.  So, yes, I do ask for updates.**
21       Q.   In this e-mail, John Keiter states
22  that -- I believe they're beginning discovery and
23  requesting interrogatories.  Do you know if
24  discovery requests and interrogatories were ever
25  responded to in the Talisman matter?

Page 146

1        **A.   I don't know personally.  I believe that**
2   **they have been.**
3        Q.   Okay.  Have the owners of the property
4   been given access to those?
5        **A.   I don't know.**
6        Q.   Okay.  Let's go to Exhibit-47 now.
7        Okay.  I represent to you that this
8   appears to be a text thread between Kate Grant and
9   Ileana -- is it Stucco?  Stucco?  One of the two?
10       **A.   It's Argentinian.  I don't know.  Stucco.**
11       Q.   Stucco?
12       **A.   Stucco.  That sounds right.  Or Uruguay.**
13  **Sorry.  Uruguay.**
14       Q.   Both are fine.
15       So here it states that she is acting from
16  Millcreek Commercial regarding the deed
17  adjustments.  Do you know if Ileana is an employee
18  at Millcreek Commercial?
19       **A.   I believe she is.  She works there.**
20       Q.   Do you know if she is also employed with
21  Millrock Investment Fund 1?
22       **A.   I don't know.**
23       Q.   Do you have any reason to know why she
24  would be reaching out to Kate Grant to do the deed
25  adjustments instead of Kevin or Brent?

Page 147

1        MR. SCHULTZ:  Speculation.
2        MR. BURGE:  Join.
3        **THE WITNESS:  Yeah.  I don't know.**
4        Q.   (BY MR. EVERETT)  Okay.  We're just going
5   to enter these into the record.  Exhibit-61.
6        (Exhibit-61 marked.)
7        Q.   (BY MR. EVERETT)  These were news
8   releases issued by Colliers regarding the Street
9   Team.
10       **A.   Mm-hmm.**
11       Q.   Can you remind me to the extent you have
12  not already explained what your role was at
13  Colliers International?
14       **A.   Yes.  I was an associate broker.**
15       Q.   Okay.
16       **A.   And the Street Team refers to me and my**
17  **husband.  So sometime around 2016, my husband had**
18  **had a long, successful career in the software**
19  **industry, was working for a startup.  I was making**
20  **more money than he was, so he decided he would go**
21  **into real estate.  And so we started working**
22  **together as a team.  And so, you know, the Street**
23  **Team Is Bill and Mary Street.  And then we hired an**
24  **assistant, Amber Sheldon.  And Nic Woods is our**
25  **son-in-law.  And we trained him how to be a real**

Page 148

1   estate agent.
2        Q.   And here it says that you were executive
3   vice president at Colliers international.  You said
4   you were a principal broker.  Is there a difference
5   between those two things?
6        **A.   I was an associate broker.  Yeah.  I was**
7   **never the principal broker.  And titles in real**
8   **estate companies are like, you know -- they mean**
9   **nothing really as far as I'm concerned.  I could**
10  **have called myself, you know, a -- the czar of Utah**
11  **County.  It just -- it's a name on a -- it's a**
12  **title on a business card.**
13       Q.   Okay.  We'll enter Exhibit-62 into the
14  record.
15       (Exhibit-62 marked.)
16       Q.   (BY MR. EVERETT)  Okay.  Have you seen
17  this document before?
18       **A.   Yes, I have.**
19       Q.   Do you know what it is?
20       **A.   Mm-hmm.  I do.**
21       Q.   Can you tell me what it is?
22       **A.   It is my answer to an amended complaint.**
23       Q.   Perfect.  I specifically want to ask you
24  about -- on page 13.  And to give you some context,
25  these are referring to specific sections in the

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.1009    Page 40 of 61

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

149 to 152

Page 149

1  complaint, which is Exhibit-1.
2     A.   Okay.  I'm there.
3     Q.   So let's --
4     A.   Do I need Exhibit-1 to refer to?
5     Q.   Yeah.  Let's look at Exhibit-1 to refer
6  back to so we can understand what we're referring
7  to here.  And that is on Exhibit-1, page -- let's
8  see -- referencing -- it's on page 35, referencing
9  paragraph 235, 237, and 238.
10    A.   Page 35.  Which paragraphs again?
11    Q.   235, 237, and 238.
12    A.   Okay.  I'm there.
13    Q.   Okay.  So let's -- first let's read
14 paragraph 235, which states "In or about early
15 October 2022, the TIC owners of the Naperville
16 property, including plaintiffs, were informed by
17 the self-proclaimed lease administrator (Mary
18 Street of Mountain West Commercial Real Estate)
19 that the tenant at the Naperville property had
20 defaulted."
21        And in your answer, you say that you
22 "admits that CAMS Realty, a contract service
23 provider for the owners, informed the owners that
24 the tenant had defaulted and otherwise denies, and
25 denies that there was anything 'self-proclaimed'

Page 150

1  involved."
2         I want to understand, were -- how were
3  you selected as the lease administrator over anyone
4  else?  Was it a role you applied for?  Or how did
5  you come to get that role?
6     A.   My --
7         MR. SCHULTZ:  Asked and answered.
8         Go ahead.
9         THE WITNESS:  Okay.  My understanding is
10 that Millcreek interviewed another company.  I put
11 a proposal together and I was selected.
12    Q.   (BY MR. EVERETT)  Okay.  So did Kevin
13 Long come to you with the offer?  Or you submitted
14 a proposal?
15    A.   On Naperville?  I don't remember.
16    Q.   Okay.  Then let's look at 237.  It says
17 "Street knew or should have known the actions in
18 236 were not permitted under Illinois law."  And
19 your response states that you deny paragraph 236,
20 which claims that you acted as a -- which alleges
21 that you acted as a real estate broker in Illinois
22 without a license.  Can you help me understand your
23 understanding of how your actions in Illinois do
24 not fall under the -- no.  That's going to be
25 objected to.

Page 151

1         What is your understanding of what
2  constitutes actions by a broker, by a real estate
3  broker in Illinois?
4         MR. BURGE:  Objection.  Foundation.
5         MR. SCHULTZ:  Foundation.  Calls for a
6  legal conclusion.
7         MS. WINDHAM:  Join.
8         THE WITNESS:  I wasn't selling or leasing
9  real estate in Illinois.
10    Q.   (BY MR. EVERETT)  Did you obtain a legal
11 opinion before acting as the lease administrator in
12 Illinois?
13        MR. BURGE:  Objection.  Assumes facts.
14        MR. SCHULTZ:  Join.
15        THE WITNESS:  No.
16    Q.   (BY MR. EVERETT)  Okay.  That's all I
17 want to know on that one.  I just have a few final
18 follow-ups here.
19        So I want to go back to your -- how
20 you're compensated as a lease administrator.  Did
21 Millcreek ever directly pay you as the lease
22 administrator?
23    A.   Only if Millcreek is an owner in a
24 property that has gone into default and they are
25 paying their share of expenses and my fee would be

Page 152

1  part of the expenses, then the answer is yes.  As
2  an owner in that property -- and this has happened
3  in the case of Naperville.
4     Q.   Millcreek was an owner in Naperville?
5     A.   Okay.  Don't get me started here.
6  Millcreek, Millrock.  You know, it's one or -- it's
7  one or the other.  I don't -- I can't remember who
8  takes title.  But -- but the general entities that
9  you're talking about, the owner in Naperville, if
10 they own and there's an expense, they pay their
11 share.
12    Q.   Okay.  Has -- have you been approached by
13 the Securities and Exchange Commission or
14 department of justice related to these cases?
15    A.   No.
16    Q.   Have they called you?
17    A.   No, they haven't.
18        MR. EVERETT:  Those are all the questions
19 I have.
20        MR. WRIGHT:  I've just got really
21 short -- probably just a couple hours.  Just
22 kidding.  Just three or four minutes for me.  Do
23 you have some?
24        MR. BURGE:  A handful.  I might not after
25 you get done.

Page 153

1      MR. WRIGHT:  I can finish now.  Andy
2  Wright for Colliers.
3           EXAMINATION
4  BY MR. WRIGHT:
5      Q.   Thanks, Mary, for sticking around and
6  your answers today.  I just want to follow up on a
7  few questions and just nail a couple things down
8  that I was unclear on.  I just want to make sure.
9  I think you said that you ceased working with
10 Colliers for Colliers as an independent contractor
11 in May of 2020; is that right?
12     A.   That's correct.
13     Q.   And when was the first -- the earliest
14 date that you, through CAMS, started working with
15 any TIC properties?  I think you said the second
16 half of 2020?
17     A.   Second half of 2020, but I don't remember
18 an exact date.
19     Q.   Okay.  By the time you started working
20 with CAMS and with any TIC properties, you had no
21 affiliation with Colliers; is that correct?
22     A.   That's correct.  I was at Mountain West
23 Commercial by then.
24     Q.   Okay.  So if we could look at Exhibit-1,
25 which is the amended complaint in this matter.  And

Page 154

1  it should be in that binder, Exhibit-1.  Mary, you
2  can turn to page 3.  It's paragraphs 24.
3      A.   Page 3, paragraph 4?
4      Q.   24.
5      A.   Okay.  I'm there.
6      Q.   I'll read that.  It says "Street was
7  employed at Colliers until 2023 and worked for them
8  at all material times when the tenant-in-common
9  interests discussed herein was beginning to be
10 sold."  That's false, correct?
11     A.   That is correct.  That's false.
12     Q.   And at paragraph 25 when it states
13 "Street allegedly manages upwards of 32 of the TIC
14 interests on behalf of Millcreek and Colliers,"
15 that's not true, is it?
16     A.   That's not true.
17     Q.   Okay.  You had mentioned earlier and just
18 a minute ago that in Exhibit-61, when Colliers
19 released some sort of press announcement that you
20 were brought on -- the Street Team was brought on,
21 did you see that?
22     A.   Yeah.  I recall.
23     Q.   And you were asked about the title of
24 executive VP.
25     A.   Right.

Page 155

1      Q.   And you said that in the real estate
2  industry, titles are -- mean nothing, I think you
3  said?
4      A.   You may take it more seriously than I do.
5  But down in Utah County, we don't take titles
6  seriously.
7      Q.   Is it similar to someone calling
8  themselves maybe assistant to the regional manager,
9  something like that?  I'm sorry.  I'm making an
10 Office reference.  It means nothing.  Have you
11 heard that before?  So it means nothing is what
12 you're saying.
13     A.   Okay.  It means nothing.  I mean, in
14 general, like, for example, Mountain West does not
15 give people titles purposefully because they don't
16 want people to rank or think that they rank one
17 above the other.  And so we -- you know, I don't
18 know.  It's just -- it may mean something to other
19 people.  It means nothing to me.
20     Q.   But your duties and responsibilities at
21 Colliers was an assistant broker?
22     A.   Associate broker.
23     Q.   Associate broker.  And nothing beyond
24 that; is that correct?
25     A.   That's correct.

Page 156

1      Q.   Okay.  Are you still affiliated with
2  Mountain West?
3      A.   Yes.
4      Q.   You are?
5      A.   Today.
6      Q.   Today.  Okay.  That's all I have.
7      A.   Okay.
8      Q.   Thank you.
9           EXAMINATION
10 BY MR. BURGE:
11     Q.   Good afternoon, Ms. Street.  My name is
12 Rodger Burge.  I represent Kevin Long and Millcreek
13 in this litigation.  I just have a few follow-up
14 questions.  You mentioned during Mr. Everett's
15 examination about weekly Zoom meetings.
16     A.   Yes.
17     Q.   And I believe you're responsible for,
18 lack of a better term, conducting them; is that
19 right?
20     A.   Yes.
21     Q.   So these meetings were occurring
22 regularly?
23     A.   Yes.
24     Q.   Can you briefly describe for us the
25 nature of these meetings and what was being

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.1011    Page
157 to 160

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

Page 157

1  discussed or conducted generally?  Very briefly.
2      **A.    Regarding Naperville?**
3      Q.    Yes.
4      **A.    These -- the purpose of the Zoom meetings**
5  **is to give the owners a forum to be able to get**
6  **together and to ask questions of me or give me**
7  **direction.  Kevin Long often participated in the**
8  **Zoom meetings early on because we were all finding**
9  **out information, you know, at the same time.  And**
10  **the owners liked to hear his updates.**
11      Q.    Is it fair to say these Zoom meetings
12  helped facilitate the management of the property by
13  the owners?
14      **A.    Yeah.  It is fair.**
15      Q.    Okay.  I think at one point in time, in
16  response to a question, you answered something
17  along the lines of "procedural tasks" that you
18  would be performing on behalf of or at the
19  direction of the owners.  Do you remember that?
20      **A.    Yes.  I remember in general.**
21      Q.    I know you have this lease administration
22  agreement that we've talked about that has some
23  very specific powers and duties.  But can you tell
24  us what type of tasks you felt that you could
25  perform that didn't require the owners' direct

Page 158

1  authorization?  Paying expenses, for example, or
2  something like that.
3          MR. SCHULTZ:  Just for purposes of his
4  question, the lease administration document speaks
5  for itself.
6          You may answer.
7          MR. BURGE:  Yes.
8          **THE WITNESS:  Okay.  The -- for example,**
9  **the lease administration agreement says that I --**
10  **you know, I can take care of the property or pay**
11  **expenses for the property on behalf of the owners.**
12  **So when I get an electric bill, I don't ask the**
13  **owners, "May I pay it?"  Right?  I have the express**
14  **authorization to be able to do those things.  So**
15  **those are the kinds of things that I do without**
16  **asking them, "Is it okay?"**
17      Q.    (BY MR. BURGE)  Is it fair to
18  characterize those as clerical-type tasks?
19      **A.    Yes.**
20      Q.    Okay.  Same thing with collecting rents
21  and sending out each parties' owners' proportionate
22  share of the rents?
23      **A.    Yes.  It's very accounting heavy.**
24      Q.    What types of tasks or decisions would
25  you say -- did you feel or understand that you

Page 159

1  needed to go to the owners to get their
2  authorization?
3      **A.    Anything that the -- the tenant-in-common**
4  **agreement actually spells out the things that the**
5  **owners need to vote on.  And so if it is -- if it's**
6  **explicitly spelled out that they need to vote on**
7  **it, then I would go to them for it.**
8      Q.    Okay.
9      **A.    There are areas that are left open.  And**
10  **so, for example, you know, it doesn't say**
11  **specifically that I'm required to ask the owners if**
12  **they want an attorney.  So I do that anyway because**
13  **I feel like it's the right thing to do.**
14      Q.    So they would be making decisions about
15  that?
16      **A.    Yes.**
17      Q.    We've discussed a few of these things.  I
18  know that -- what was the attorney's name?  Cori
19  Cozort, I think, or something like that.
20      **A.    Yes.**
21      Q.    You had -- you went and obtained the
22  approval of the owners to retain her; is that
23  right?
24      **A.    I -- I don't recall whether or not I**
25  **said, "Is it okay if I hire Cori Cozort? "**

Page 160

1      Q.    A lawyer.  To pursue legal action.
2      **A.    Yeah.  My lease administration agreement**
3  **directs me in the event of a default to take**
4  **certain actions.  I can't remember if I said to the**
5  **owners, "May I?"  Or if I said to the owners, "I'm**
6  **going to."**
7      Q.    Okay.  I know there were -- there have
8  been some attempts to re-lease the Naperville
9  property.
10      **A.    Yes.**
11      Q.    Correct?  Who would be making the
12  decision to whether or not to enter into a lease
13  agreement?
14      **A.    The owners.**
15      Q.    It would not be you?
16      **A.    It would not be me.**
17      Q.    Would you characterize your own tasks as
18  management tasks, managing the property?
19      **A.    No.  It's more managing the**
20  **tenant-in-common relationship amongst the owners as**
21  **it relates to the property that they own.**
22  **That's -- yes.**
23      Q.    Would you say that the owners are, in
24  fact, managing the property?
25      **A.    They are actively involved in making**

Page 161

1    decisions, yes.
2        Q.    And did that -- at any time, was that not
3    the case while you were serving as the lease
4    administrator?
5        A.    Say that again for me so I've got the
6    whole thing.
7        Q.    Yeah.  You mentioned that the owners are
8    in charge of managing the property.
9        A.    Yeah.
10       Q.    And I'm just asking you, was that always
11   the case during the time that you acted as lease
12   administrator?
13       A.    Yes.
14       Q.    Okay.  I know there's been a little bit
15   of some confusion in Millrock versus Millcreek.
16   And I did want to clarify one thing.  About this
17   capital call.  I think that you said that Millrock
18   would pay an owner's portion.  Do you know if it
19   was Millcreek, or could it have been a different
20   entity that was going to be paying --
21       A.    Yeah.  That's a great question.  I
22   don't -- I don't know.  And I often catch myself
23   saying "Millrock creek," whichever first.  Because
24   with everything I have on my plate, sometimes I
25   don't take the time to distinguish.  So...

Page 162

1        Q.    Sure.  And I'm not meaning to be
2    critical.  I'm just trying to make sure that --
3    that my understanding of the facts are not
4    contradicted by what you're saying.
5        A.    Right.
6        Q.    So it could have been a Millrock entity
7    or someone else that could have been --
8        A.    Correct.
9        Q.    -- paying that portion of --
10       A.    Yeah.  It was somebody there.  It wasn't
11   Adam Sandler.  Right?  It was somebody in that
12   group.
13       Q.    Yeah.  And same thing, I think, that
14   there was mention about Millcreek filing bankruptcy
15   papers.  It could have been a Millrock entity that
16   was actually the party filing?
17       A.    Filing bankruptcy for what?
18       Q.    Well, I know the proof of claim.  That's
19   not what I'm talking about.  I just have in my
20   notes that Millcreek filed the bankruptcy papers.
21   And I'm just wondering, again, if that was another
22   instance of Millcreek maybe being used inartfully
23   instead of Millrock?
24       A.    Yes.  It could have been.
25       Q.    I know Mr. Everett asked you some

Page 163

1    questions about coming -- how to calculate values
2    or lease rates and whatnot.  To the extent you
3    know -- I'm not asking you to tell me something
4    that you don't know.  But would the use of the
5    property also be a factor in setting a lease rate
6    or the value of the property?
7        A.    Yes, it would.
8        Q.    For example, general commercial real
9    estate versus a very specific use of a property.
10       A.    Yes.  We factor that in when we're
11   looking at real estate, yes.
12       Q.    Okay.  I think that that's all I have.
13   Thank you, Ms. Street.
14       A.    You're welcome.
15           MS. WINDHAM:  Nothing from me.
16           MR. KEITER:  None from me.
17           MR. SCHULTZ:  I got one -- I got one
18   question.
19               EXAMINATION
20   BY MR. SCHULTZ:
21       Q.    Did you or CAMS Realty ever sell or
22   market any interest in real estate of any kind in
23   the state of Illinois?
24       A.    No.
25           MR. SCHULTZ:  That's all.

Page 164

1    We'll read and sign.
2    (Proceedings concluded at 2:17 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.1013    Page
GRANT, et al. vs LONG, et al.    page 01
MARY STREET - 11/27/2024

165 to 166

Page 165

```
 1                  REPORTER CERTIFICATE
 2
 3          I, Phoebe Moorhead, RDR, CRR, a Certified
    Shorthand Reporter in and for the State of Utah, do
    hereby certify:
 4          That the testimony of MARY STREET, the
    witness in the foregoing proceeding named, was
 5  taken on November 27, 2024; that said witness was
    by me, before examination, duly sworn to testify
 6  the truth, the whole truth, and nothing but the
    truth in said cause;
 7
            That the testimony of said witness was
 8  reported by me in stenotype and thereafter
    transcribed into typewritten form;
 9
            That the same constitutes a true and
10  correct transcription of said testimony so taken
    and transcribed and that the said witness testified
11  as in the foregoing annexed pages set out.
12          I further certify that I am not of kin or
    otherwise associated with any of the parties of
13  said cause of action and that I am not interested
    in the event thereof.
14
            Certified and dated this 4th day of
15  December, 2024.
16
17
18                  _____
                    PHOEBE S. MOORHEAD, RDR, CRR
19                  Certified Shorthand Reporter
                    for the State of Utah
20
21
22
23
24
25
```

Page 166

```
 1  Case:  Grant vs. Long
    Case No.: 2:23-cv-00936-AMA-CMR
 2  Date: November 27, 2024
    Reporter:  Phoebe Moorhead, RDR, CRR
 3
                    WITNESS CERTIFICATE
 4
    State of Utah       )
 5                      )
    County of Salt Lake )
 6
            I, MARY STREET, HEREBY DECLARE UNDER
 7  PENALTY OF PERJURY:  That I am the witness referred
    to in the foregoing testimony; that I have read the
 8  transcript and know the contents thereof; that with
    these corrections I have noted this transcript
 9  truly and accurately reflects my testimony.
10  PAGE-LINE    CHANGE/CORRECTION             REASON
11  ____ ____    _____
12  ____ ____    _____
13  ____ ____    _____
14  ____ ____    _____
15  ____ ____    _____
16  ____ ____    _____
17  ____ ____    _____
18  ____ ____    _____
19  ____ ____    _____
20  _____      No corrections were made.
21
22  Executed on this _____day of _____,
    20_____.
23
24              _____
                    MARY STREET
25
```

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

1

---

**Exhibits**

**Exhibit 59** 14:11
**Exhibit 60** 19:15,25
20:1 96:1 131:5
**Exhibit 61** 147:5,6
154:18
**Exhibit 62** 148:13,15
**Exhibit 63** 98:18 99:15

---

**$**

**$1** 129:17 130:10
**$2** 111:4
**$300,000** 35:5,15
**$7,002,492** 115:14

---

**0**

**000001** 46:5
**000018** 51:13
**000022** 52:9
**000303** 103:15
**0022** 52:12
**005007** 129:15

---

**1**

**1** 28:13,14,15,18,24
29:3,7,18 39:14 52:18,
19,23 53:9,10 57:7
60:19 77:24 128:17
130:9 133:6,25 135:15,
17 137:25 138:23,25
139:6,17,20 140:6
146:21
**1.7** 63:21
**1.75** 62:20
**10** 103:24
**100** 19:13 89:18
**1031** 35:7,8 37:7 39:24
45:22 49:11
**1099s** 54:23
**10:28** 46:19
**10:39** 46:20
**11** 103:24,25 115:7
**12:06** 111:13
**12th** 135:21
**13** 148:24
**14** 128:9
**145** 138:4,5

---

**15** 98:22 128:9,11
**15.8977** 29:25 30:6
**15th** 63:12
**16th** 44:24,25 45:7
**180** 9:18
**19** 144:24
**1996** 8:20
**1:05** 111:14
**1st** 82:14,18 127:10,11

---

**2**

**2** 20:19,20 137:25
**20** 18:4 144:24
**200** 26:5
**2014** 24:3,4 25:12,13
57:8,9,10
**2016** 147:17
**2019** 18:5
**2020** 9:4 15:25 18:5,19
27:20,23 135:22 136:9
153:11,16,17
**2021** 44:25 45:8 54:13
61:7 127:10,11,24
**2022** 76:21 80:22,23
82:7 128:21 149:15
**2023** 94:1 154:7
**2024** 29:24 94:5,6
**20th** 94:5
**22** 54:13 57:13 75:23
**23** 51:3 54:13
**235** 149:9,11,14
**236** 150:18,19
**237** 149:9,11 150:16
**238** 149:9,11
**24** 154:2,4
**24th** 80:19
**25** 53:21,24,25 78:7
140:21 154:12
**26** 14:24 78:7
**28** 8:21 17:12 50:11
53:21,25 78:7
**28-year** 65:12
**29** 77:8,9
**2:17** 164:2

---

**3**

**3** 23:5 154:2,3
**3.1** 40:7

---

**3.2** 41:2
**30** 78:19,22,23
**32** 154:13
**340,876** 128:2
**343,103.36** 134:14
**35** 39:20,21 40:12 87:9,
10,11 149:8,10

---

**4**

**4** 154:3
**46** 145:16

---

**5**

**5** 28:12
**50** 43:3 97:6
**500,000** 13:19,20
**53** 46:11
**54** 45:21 46:7,14,16
**54A** 45:20 46:16
**57** 46:5
**59** 14:7
**5th** 29:24 82:18

---

**6**

**6** 31:2 41:10 96:5
**6th** 82:18

---

**7**

**7** 32:8 38:7

---

**8**

**8** 46:24,25 123:10
**8.3** 122:15 123:3
**8.4** 122:15

---

**9**

**9:45** 14:13
**9:46** 14:14

---

**A**

**a.m.** 14:13,14 46:19,20
**ability** 106:4
**accept** 82:4
**accepted** 49:7 76:12
**access** 56:12 68:24
69:19 146:4

---

**accidentally** 45:23
46:14
**accomplish** 12:6
**account** 16:17 43:11,
13 127:22,23
**accountant** 66:19
**accountants** 66:20
**accounting** 66:17
158:23
**accounts** 100:4
**accreditation** 37:23
**accredited** 37:10,17
**accurate** 30:1 130:13
139:11
**ACH** 43:15
**ACM** 72:19 80:17 86:3
103:12
**acquire** 138:9 139:13
**acquired** 8:12 24:17,25
26:21 27:8 57:21 58:5
**acquires** 68:3
**acquisition** 32:12
59:25 105:5
**act** 78:12
**acted** 150:20,21 161:11
**acting** 144:17 146:15
151:11
**action** 42:24 43:5,8
76:22 160:1
**actions** 42:22 150:17,
23 151:2 160:4
**active** 79:16
**actively** 160:25
**actual** 12:8,16 45:12
129:19
**Adam** 162:11
**add** 63:6 108:21
**adding** 76:3
**additional** 9:13,18
**address** 39:3 129:3
**addresses** 74:24
**adequate** 16:24
**adequately** 15:5
**adjacent** 13:24
**adjustment** 100:12
144:22
**adjustments** 144:7,8
145:2,7 146:17,25
**administer** 49:14
**administering** 139:23

---

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.1015    Page 46 of 61

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

2

**administration** 16:6,7 45:1 47:1,17 62:18,19 78:12 140:19 157:21 158:4,9 160:2

**administrator** 54:7 62:15,16 66:3,4 120:11 135:23 149:17 150:3 151:11,20,22 161:4,12

**admits** 149:22

**ADP** 52:18,23 53:9 133:6,25

**Advance** 18:23 70:23 74:12,20 76:23 78:21 79:10 88:17 89:10 104:21 130:24 131:24

**Advanced** 20:24 41:6 70:25 71:2,9,10,12,16 73:12 90:8

**advertised** 34:21 128:6

**advice** 91:13 92:12

**advisors** 24:15,16 26:19,24 27:11

**affairs** 55:5 119:17

**affiliate** 9:22

**affiliated** 61:24 117:19 132:3 156:1

**affiliation** 57:2 153:21

**affirm** 20:15

**afford** 144:19

**afternoon** 156:11

**age** 11:13

**agent** 7:20 9:14,15 32:15,19 60:24 67:19 69:5,7,14 108:17 109:24 118:9 124:8 138:18 139:14 140:18 141:24 142:1,4,19,22 148:1

**agents** 23:9 25:12,13 26:3 27:24 57:14 58:2,3 59:13,14 68:14,19 101:4 118:20 122:3,4,8

**agree** 104:14

**agreed** 55:5 96:8 100:7

**agreement** 27:10 38:12,14,18 39:6,8,12, 19 43:25 45:1,2,5,13 47:1,5,8,17 48:13,14, 17,24 49:13,17 51:20 52:1,7 56:7 62:18 63:20 69:4 71:20 78:11,12 86:1 95:4 96:20 97:6 102:11 116:19 119:7,13

**agreements** 39:13 49:10 84:16

**aha** 18:3

**ahead** 18:12,20 21:6 41:23 44:5 52:11,25 73:4 86:21 96:16 97:10 98:16 109:22 112:21 118:6 120:4,22 143:10 150:8

**air** 74:23

**alcohol** 6:21

**alleges** 150:20

**alternative** 75:10,14

**Amber** 147:24

**amended** 148:22 153:25

**American** 81:7

**amount** 30:8 54:18,20 76:7,15 82:9,10 83:2,3, 5,6,10,11 94:14 95:15 98:11 100:14 103:13,25 110:25 134:13,14,16

**amounts** 35:20 83:12 102:21 127:16

**Andy** 153:1

**announcement** 154:19

**answers** 5:23,24 31:19 153:6

**anymore** 144:3

**apartment** 130:6

**apartments** 14:1

**apologies** 38:9 46:9 113:17

**apologize** 103:5

**apologized** 58:18

**Apparently** 74:8

**appears** 44:23 54:12 81:24 83:14 106:19 146:8

**apples** 110:1

**applied** 105:13 150:4

**apply** 70:15 87:6 105:7

**appraisal** 12:16

**appraised** 13:11,12

**appraiser** 13:8,14

**appraisers** 13:1,8 110:20

**approach** 12:2,3

**approached** 25:15 28:1,6 48:25 49:3 152:12

**approval** 63:18 159:22

**approve** 63:17,18 75:10,14

**April** 44:24 45:7 93:25

**April/may** 94:1

**area** 107:11,20,21 108:4,15,17

**areas** 67:25 106:23 108:3,5 159:9

**Argentinian** 146:10

**arranged** 89:1

**arrive** 105:12

**art** 110:18

**asks** 23:5 28:13 32:9 129:21

**asset** 35:25

**assigned** 139:24

**assist** 36:9 90:10 91:8, 11

**assistant** 26:3 61:23 147:24 155:8,21

**assisted** 31:6,7 32:17 119:12

**assisting** 19:4 91:6

**associate** 7:18 9:8,10 10:1 25:14 27:25 83:25 147:14 148:6 155:22,23

**associates** 19:9

**association** 8:4,5 68:23

**assume** 38:23 40:25 87:6 94:25 118:19 130:10

**assumes** 44:4 45:3 94:16 95:21,22 96:14 98:13 108:23 116:15 123:18 133:23 151:13

**assuming** 39:11

**Atlanta** 7:11

**attach** 42:13,14

**attempted** 90:4,5 124:4

**attempts** 160:8

**attend** 7:8,10

**attention** 124:25

**attorney** 21:23 22:1,7, 10,14,17 30:24 32:5 43:24 44:19 73:11 74:8

**attorney's** 159:18

**attorneys** 73:20 137:1

**audible** 5:23

**August** 135:22

**authorization** 47:10,25 158:1,14 159:2

**authorized** 78:10,12,14 140:18

**authorizes** 47:23

**availables** 106:15

**avenues** 112:23

**average** 113:21

**avoid** 35:6

**aware** 22:10 37:24 59:11 60:4 84:21

**Awesome** 113:6 130:7

---

**B**

**back** 22:20 30:4 31:16, 20 46:21,25 66:2 83:4 96:1 103:11 111:12 116:24 120:25 122:12 131:4 143:20 149:6 151:19

**background** 7:6 66:16, 23 67:2,3 109:12

**backwards** 144:2

**bank** 16:17 100:4 127:22,23

**Banker** 24:6,8,14 25:16 26:17 58:9,16,24

**bankruptcy** 77:14,17, 19,21 93:24 94:4 95:19 96:13 102:14,19,20 162:14,17,20

**based** 12:6 34:18 40:22 42:22 63:23 68:5 105:9 108:14

**Basically** 16:25

**basis** 23:10 54:21 69:21 79:5 108:7 118:1

**Bates** 53:21

**bathroom** 6:19

**begin** 18:8 47:20 84:18 108:2

**beginning** 81:22 87:3 145:22 154:9

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.1016    Page 47 of 61

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

3

**behalf** 47:11,12 49:15 78:13 125:1 137:3 154:14 157:18 158:11
**belief** 23:11
**believed** 23:8
**beneficial** 67:5
**benefit** 36:22
**benefits** 25:18
**betcha** 76:8
**big** 23:20 57:24
**bigger** 35:21 57:22
**bill** 40:24 42:2 43:9 147:23 158:12
**binder** 14:6,10 38:7,8 101:21 154:1
**bit** 18:20 38:3 45:20 96:6 103:7,11 131:2 140:9,25 161:14
**Blake** 62:2 141:15,16
**blank** 61:8
**blanks** 43:22
**board** 68:21,23,24
**Bogden** 24:21
**bond** 20:22,23 21:2,4, 8,11,14,15,16,21 22:1, 7,10,13,19,22,25 32:6 115:1,4,5 131:2,3,25 132:24 133:12 137:7,10 145:18
**bonds** 20:20 136:25
**book** 72:24
**bookkeepers** 66:20
**books** 72:23
**bottom** 87:16 127:9
**bought** 49:13 65:19,25
**boxes** 89:11
**brain** 82:1
**branch** 10:3 24:2 28:8 57:12 58:10,11
**breach** 102:11
**break** 6:9,16 46:18,23 111:11
**Brent** 29:5 46:14,15 60:7,9,10,13 61:16,20 81:1 84:19 89:22 90:1 101:5 125:4,15,25 146:25
**Brent's** 45:22
**briefly** 132:19 156:24 157:1

**bring** 9:24 91:2
**bringing** 124:24
**broad** 12:9 15:7,17 33:8 36:12,24 55:10,12 59:3 65:5 70:7 86:10 105:2 112:7 113:10
**broker** 9:8,10,11,22,24 10:2,3,5 24:2,5,16,19, 21 27:2 32:14,18 57:12 58:10,11 60:24 67:17, 20,24 69:17 101:4 104:8,25 107:25 108:16 110:22 116:8 138:18 142:1,3,19,23 147:14 148:4,6,7 150:21 151:2, 3 155:21,22,23
**broker's** 7:19,20 9:12, 20 10:1
**broker/sales** 67:19
**brokerage** 9:21,23 25:19 26:5,14 28:3,4 91:2 117:18 139:14 141:25
**brokerages** 28:10 36:8 105:25
**brokers** 25:10,14 27:25 106:1
**brought** 19:10 60:8 90:17 93:10 154:20
**build** 71:24 72:1,6
**building** 10:23 11:10, 12 13:18,19 23:13 33:15 35:13,16 40:18 71:25 72:11 81:9,15 84:16 88:19,20 89:9,15, 20 90:18 94:2,8,11,20, 21 96:25 97:18,20 110:12,21,23 144:11, 13,20
**buildings** 106:20 108:18 126:14 129:17, 20
**buildout** 97:13
**built** 71:25 72:2,16 110:12
**bullet** 65:6,7 138:7
**bully** 88:6
**bunch** 14:1 33:12 49:23 124:10
**Burge** 30:12,15,19 36:25 37:20 38:12,15 56:23 86:7,16 95:22 96:15 98:13,15 101:9

103:18 104:11 106:24 107:12 108:7,20 109:18 112:8,18 113:12,25 115:22 116:5,13 118:25 119:19 120:2,20 121:25 123:18 124:19 125:8 133:20 136:13 139:7 142:15 147:2 151:4,13 152:24 156:10,12 158:7,17
**business** 27:6 33:15 55:14 56:15 79:3 148:12
**Butera** 81:2,4,5 129:12 130:16
**buy** 35:6,10,15 70:3
**buyer** 69:6,8 70:1
**buyers** 10:12
**buying** 35:13
**buys** 49:8 68:7

---

## C

**C-ARM** 89:14
**calculate** 105:1 163:1
**calculated** 103:17 104:2,3 114:13 115:19
**calculating** 116:1 145:1
**calculation** 115:13
**call** 29:21 30:3 31:3,8 33:16 56:1,5 57:16,18 58:17 94:11,15 95:12, 16,20 96:8,10,19 97:17, 22,24 98:4,8,10,11 100:6,11,19 130:15,22 145:12 161:17
**called** 5:3 10:1 21:15 22:24 24:5 57:22 81:7 89:14 144:7 148:10 152:16
**calling** 121:20 155:7
**calls** 35:1 36:1 61:10 108:10 112:6 113:9 117:11 133:20 151:5
**CAMS** 15:25 16:3,5,14 17:5,7,18 18:1,6,7,8,22 19:4,17 27:22 29:4 44:24 77:25 78:2,17 87:24 140:15 141:1 142:6,9 149:22 153:14, 20 163:21
**cap** 105:7,9,13 114:15,

16
**capacity** 68:6 144:18
**capital** 29:21 30:3 31:2, 8 35:6 94:11,14 95:12, 15,20 96:8,10,19 97:16, 22,24 98:4,8,10,11 100:5,11,19 145:11 161:17
**card** 148:12
**cards** 27:6
**care** 18:23 20:24 35:4 41:6 70:23,25 71:2,9, 10,12,14,16,17 73:12 74:13,20 76:23 78:21 79:10 88:17 89:3,7,10 90:8 93:4 104:21 110:13 130:23,24 131:24 158:10
**career** 65:12 147:18
**cares** 110:14
**case** 6:14 15:1 64:6 72:1 78:5 84:12 103:22 129:6 152:3 161:3,11
**cases** 152:14
**casualty** 129:18 130:1 135:13
**catch** 161:22
**caught** 6:14
**caused** 75:1
**caveat** 41:3
**CBC** 24:15,16 26:19,23 27:10
**cc'd** 79:15
**CCIM** 8:1 65:10
**ceased** 153:9
**center** 35:14 70:10
**centers** 71:17
**CEO** 81:6
**Certificate** 140:11
**certificates** 84:4
**certified** 5:4 8:2
**chain** 143:24
**chance** 132:25
**change** 28:10 85:19 106:5 140:8
**changed** 13:23 27:4,5 69:2
**changing** 38:2
**channels** 120:17 121:4,9,10

characteristic 85:11
characteristics 11:12
characterization 109:18
characterize 158:18 160:17
characterized 88:12
charge 54:10 90:13,15 116:1 161:8
check 46:8 76:17 125:1,25
checked 125:5
checks 43:14
Chicago 107:20,22
child 8:15
circle 49:19
circulate 31:9 41:22 42:5
circumstance 59:10
circumstances 12:7,17 39:19
civil 14:24
claim 20:21 22:13 77:14,16,18 102:9 136:10,16,19,21,24 162:18
claimed 79:6
claims 137:1 150:20
clarification 63:5 87:20 107:17
clarify 46:2 161:16
clauses 91:10
clear 21:3 103:3
clerical-type 158:18
client 16:13 45:13 55:15 68:7
client's 12:6
clients 5:16,20 11:10 50:22 55:23 56:11,16 65:14 66:12 67:8 68:2
clinic 35:23
close 106:1 111:5 126:14
closed 25:20 111:2
closely 29:11
clue 132:2
co-owner 124:6
co-owners 123:13
coincides 82:6
Coldwell 24:6,8,14 25:16 26:16 58:9,16,24

collect 16:19 40:23 43:14 47:11 54:7 77:2
collecting 43:8 145:5 158:20
collection 140:22 145:11
college 7:8
Colliers 9:6,7 23:6,9 24:1,17 25:1 26:22,24 27:8,11,12,14,19 28:1 59:16,17 116:25 117:2,9,15 118:15 138:8 147:8,13 148:3 153:2,10,21 154:7,14,18 155:21
Colliers' 26:14
Colliers-000144 137:15
combining 35:24
comfortable 16:16
commenced 94:3
Commerce 25:15 57:13,19
Commerce/northmarq 58:24
commercial 8:2 9:1 10:15 17:20 18:9,16 19:9 21:22 23:7,8,19 24:6,8,14 25:16 26:17 28:2 36:13 44:7 50:14,17,19,25 51:5 55:6 57:6 58:9,16,25 59:9,11 60:8,14,17 61:2,5 62:11 64:1 65:4,24 67:4,23 68:10,18 69:9,14,17,22,25 70:5 90:16 91:2,3 93:11 100:11 102:14 105:24 106:3 112:16 113:4,19 118:23 119:5,14 135:23 137:3 139:6,13 146:16,18 149:18 153:23 163:8
commiserate 100:14
commission 69:5,7 152:13
commitment 67:8
common 32:23 33:2,16 36:8,10,13,14,18 37:3 91:1
communicate 83:22 84:23 98:3
communicating 83:19 89:4

communication 67:10 81:20 129:12 143:25
communications 83:24
community 23:19
comp 111:7
companies 66:7 148:8
company 16:5 17:23 18:1 22:19,22 24:5 28:8,17 44:12 49:3 57:22 58:5 81:6 113:1 118:11 135:15 150:10
company's 88:21 89:2
comparable 86:4 106:20,22 107:10,11 108:6,15,18,19 110:6
comparables 12:1 106:10
compensated 62:15 63:8 151:20
compensation 125:25
complaint 148:22 149:1 153:25
complete 9:17
completed 126:8
completely 74:6
compound 12:19 123:20
computer 20:4,6,8
concerned 41:12 86:23 148:9
concluded 164:2
conclusion 151:6
conclusions 40:6
conditions 11:25
conducted 157:1
conducting 156:18
conference 58:4 59:17
confused 144:15
confusing 45:22
confusion 51:8 161:15
conscious 66:25
consent 47:19
consideration 13:9,10
considerations 10:23
considered 77:18
Constantin 78:24 83:21 84:8,20 85:15
constitutes 151:2
construction 11:13 80:4,12 81:13 87:18,22

105:5,6 110:3
construction/ acquisition 105:14
consulted 92:22
contacted 24:4
context 79:19 148:24
continually 81:15
continue 63:2 101:14
continued 22:13
continues 43:8 55:7 87:23
contract 85:1,21,24 87:1,2 92:19 102:11 122:19 140:1,3 149:22
contractor 27:16,17 81:11 118:15,17 130:21 153:10
contractors 118:21
contracts 51:23 79:2 91:14 92:16
contractual 63:20 85:17
contradicted 162:4
contributed 76:4
convenience 78:4,17 140:20
conversation 41:22 73:22 79:13 87:15
conversations 85:11
convey 31:20 123:4
conveyed 125:13
cook 124:13
copied 79:18 87:15
copies 20:3 22:15
copy 21:15,21 22:11 47:4,5 56:7 115:1,4 131:25
Cori 73:9,17,18,22 75:9 76:12,25 136:14,24 159:18,25
corporate 114:20
Corporation 8:11
corporations 134:3
correct 25:1,4 50:8,15 51:22 59:6 71:3,5 75:17 93:18 94:12 115:5 132:17 133:8,10 153:12,21,22 154:10,11 155:24,25 160:11 162:8
Correction 145:16

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

5

**correctly** 25:2 26:15
50:5 75:9
**correspondence** 84:15
143:5
**cost** 12:3 105:4,5,8,14
129:20 130:17
**Costar** 105:18,19,20,24
106:4,11,12 110:16
112:24 113:1
**counsel** 39:2 137:5
**counties** 129:2
**country** 66:6 71:18
106:16
**county** 23:20 28:6
68:22,23,24 127:6
128:22,25 129:6 148:11
155:5
**couple** 26:3 46:22 58:3
103:12 141:11 152:21
153:7
**court** 5:4 7:3 77:5,14
102:15,20
**cover** 76:16
**covered** 40:15
**covers** 130:3
**Cozort** 73:9 76:12
136:14 159:19,25
**cracked** 80:10
**create** 42:10,20
**created** 101:22,23
102:3 107:2 117:19
**creating** 105:8 137:22
**creation** 137:21
**credit** 105:11
**creditor** 77:24 78:2
**creditors** 77:15
**creek** 161:23
**critical** 162:2
**curious** 104:1 119:24
**current** 63:22 77:24
**Cushman** 24:2,13
25:15,20 57:13,19
58:23
**custom** 72:14
**czar** 148:10

**D**

**Darlene** 92:21 93:6,12
**data** 69:19 106:11,17
110:16

**database** 106:4,15,16
**date** 43:7 80:19 82:15
128:21 134:16 135:21
136:2,9 153:14,18
**dated** 44:22,24,25
**dates** 127:20
**day** 45:7 57:16 76:5
85:14 135:21
**day-to-day** 119:17
120:6
**days** 82:14
**deal** 79:10 111:1
**dealing** 50:23 60:15
66:24 67:1
**deals** 79:3,7
**Dear** 82:4
**decide** 123:12
**decided** 8:13 24:13
68:16 84:6 147:20
**deciding** 10:24
**decision** 28:9 160:12
**decisions** 70:13
121:11 158:24 159:14
161:1
**declared** 93:24 94:4
95:19 96:13
**dedicated** 69:17
**deed** 55:25 100:13
144:7,8,22 145:2,7
146:16,24
**deep** 64:23
**DEF** 103:15 129:15
**default** 50:24 63:14
73:15 76:4,16,18
102:22 115:1 151:24
160:3
**defaulted** 21:10,20
41:6 62:22 73:13 82:10
90:9 102:16 131:25
149:20,24
**defaults** 73:21 76:14
**defects** 80:4,5 87:17,
19,22
**defendants** 141:12
**define** 72:10,11 107:19
**defines** 72:9 123:1
**degree** 7:14
**delays** 75:2
**demographics** 36:20
**denies** 149:24,25

**deny** 150:19
**department** 152:14
**depending** 50:10
**depends** 42:25 124:18
**deposition** 5:11 45:23
46:13,15
**describe** 20:20 23:6
32:9 156:24
**designation** 8:1,3
**designations** 7:24 10:4
**details** 143:12
**determine** 11:8,24
**determines** 105:14
**determining** 11:15
104:22 109:9
**developed** 125:1
**developer** 81:8 105:6
130:20,22
**developer-builder**
81:10
**developing** 125:22
**development** 81:7
115:17
**differ** 12:8 13:13
**difference** 68:10
115:19 148:4
**differences** 69:24 70:5
**differently** 44:23
**difficult** 74:13,21 84:23
101:19 110:4
**dig** 64:22 91:24 133:3
**diligence** 72:19 91:8
**diming** 84:10,12 88:14
**direct** 6:13 43:3 157:25
**direction** 42:7 91:16
157:7,19
**directly** 102:13 111:18
131:10,13 151:21
**directs** 160:3
**disburse** 16:20
**disclose** 118:9,10
**disclosed** 117:23
**disclosing** 17:2
**disclosures** 14:23
**Discovered** 76:1
**discovery** 20:14
145:22,24
**discuss** 42:3 57:2
111:16

**discussed** 88:18 96:6
154:9 157:1 159:17
**discussion** 14:12 20:9
42:9 46:1 72:25 83:15
96:2
**discussions** 44:12
**disposition** 32:12
**dispute** 15:6
**distinguish** 161:25
**distribute** 47:12,24
54:8 112:23
**distributed** 54:19,21
63:13 112:4,11,13,15
**distribution** 54:13
**division** 8:13 117:16
118:8 134:2
**divisions** 71:16
**document** 14:16,20
15:14 20:11 21:21
22:12 38:21 41:8,11
43:17,19,23 44:21
45:18 47:16,20 48:4,16,
20 51:15,17 74:2,4,11
77:10,12 105:17 111:24
115:8 122:24 127:2
128:12 132:20 134:23
135:4,12 137:13,17,22,
25 140:10 148:17 158:4
**documents** 15:14,16
22:15 45:11 48:14
49:10 54:24 55:22
56:12,17,21 102:14
114:22 124:19 131:5
**Dollar** 35:22 120:8
**dollars** 110:21
**door** 126:24
**double** 60:1
**double-check** 103:9
**doubt** 85:1
**Doug** 83:16,17,18,19,
24 84:1,4,6 124:22
**downtown** 107:22
**draft** 43:24
**drama** 68:17
**dramatic** 69:24
**Dreams** 114:19
**drink** 13:6 97:9
**drive** 125:20
**drugs** 6:21
**due** 40:17,19 72:18
75:20 76:24 82:13,15
91:8 138:10

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

6

**duly** 5:3

**duplex** 34:25 35:4,12
36:4

**duties** 142:12,14
155:20 157:23

---

**E**

**e-mail** 22:20 38:4,9
42:10 46:7,16 73:2
75:4,15,24 80:18,19
81:1,2 87:12,18 99:17
126:1 129:15 143:7,18
145:21

**e-mailed** 22:11

**e-mails** 6:11 31:10

**earlier** 50:12 65:9 71:1
82:7 96:6 124:12 133:7
144:9 154:17

**earliest** 153:13

**early** 18:5 76:6,21
149:14 157:8

**easiest** 143:22

**easy** 75:5

**economics** 7:14

**economize** 93:5

**education** 8:8 9:13,18
65:11

**Edwards** 90:22

**effectively** 31:22

**effort** 101:14

**electric** 158:12

**elements** 72:12

**employed** 104:24
146:20 154:7

**employee** 27:13 62:12
83:25 141:23 146:17

**employees** 118:21

**encompass** 67:21

**encountering** 21:8

**end** 54:23 100:21

**enforce** 66:15 67:14
73:14 137:7

**enforcing** 16:8,25
82:16

**engagement** 73:24

**enter** 39:11 122:25
147:5 148:13 160:12

**entered** 45:23,24 46:13
77:4

**entire** 25:13 113:21
127:12,15,17

**entities** 32:4 49:1
152:8

**entity** 26:21 28:17
71:13 77:16 116:20
161:20 162:6,15

**equipment** 80:12 89:9,
13 96:10,12 97:13
129:23

**essential** 72:12

**essentially** 15:2 59:5
91:7 135:13

**establish** 16:16

**estate** 7:19 8:7,17,19
9:2,23 10:15 23:19
25:25 28:2,3 29:1 32:14
34:24 35:9 36:13,15,17
64:1,4,25 65:4,14,18,24
66:14,16,23 67:2,4,24,
25 68:11,14,18,21 69:9,
17,22,25 70:6 72:8
73:20 104:7 105:25
110:22 113:5 117:16
141:25 142:1,19,22
147:21 148:1,8 149:18
150:21 151:2,9 155:1
163:9,11,22

**et al** 77:25

**evaluate** 65:11,13
91:21

**event** 160:3

**eventually** 75:16

**Everett** 5:7 6:12,16
12:13 13:3 14:15 15:10,
15,19,22 18:15 19:19,
24 20:2,7,10 21:19
30:17,20 33:9 36:6,19
37:9,25 38:13,16,20
41:10 44:21 45:6 46:4,
8,12,21 47:18 50:2,3
51:2 52:25 53:18,25
54:1 57:1 61:4,12,19
63:16 64:7,16,22 70:3,
21 73:1 79:23 80:23,25
86:11,13 87:8,21 88:16
94:18,19,24 95:11,25
96:4,16 98:16 99:1,7,
12,14,16 101:11 103:22
104:1,13,25 107:9,24
108:11 109:3,10,23
111:10,15,23 112:14,21
113:17 114:6 115:3,25
116:10,22 117:7,21
118:13,18 119:4,11,24
120:4,22 121:14 122:5,

12 123:21 124:20
125:12 131:1 133:24
135:3,20 136:18 137:9
138:22 139:3,16 141:9
142:18 143:17,22
145:10,15 147:4,7
148:16 150:12 151:10,
16 152:18 162:25

**Everett's** 156:14

**everybody's** 45:15

**evict** 74:20

**evicted** 75:20 88:17
90:9

**evicting** 74:12

**eviction** 76:19 88:18

**evidence** 16:23 116:15

**exact** 76:5 78:6 110:5,7
136:2,9 153:18

**exam** 9:19

**examination** 5:6 153:3
156:9,15 163:19

**examined** 5:5

**exceed** 39:20

**exchange** 35:7,8,9
37:7 48:22 49:11 78:24
85:15 87:12 100:12
144:21 152:13

**exchanges** 39:24
78:20

**excuse** 6:10 10:8 18:11
46:24 52:7 88:12 96:11
97:8 98:9 102:8

**executed** 47:5

**executing** 31:8

**executive** 148:2 154:24

**exhaust** 75:12

**exhibit** 53:21 83:14
139:4

**Exhibit-** 103:8

**Exhibit-1** 149:1,4,5,7
153:24 154:1

**Exhibit-10** 103:9,10
111:21 114:8 115:20
116:23,24

**Exhibit-11** 115:8,21

**Exhibit-12** 126:4

**Exhibit-13** 127:1

**Exhibit-15** 128:9

**Exhibit-16** 132:18

**Exhibit-18** 137:12,14

**Exhibit-25** 105:16

106:19

**Exhibit-27** 124:14

**Exhibit-28** 74:1

**Exhibit-29** 77:7

**Exhibit-31** 79:12

**Exhibit-32** 81:18

**Exhibit-33** 129:11

**Exhibit-34** 135:4

**Exhibit-36** 87:9

**Exhibit-41** 143:2

**Exhibit-43** 101:20

**Exhibit-45** 145:16

**Exhibit-47** 146:6

**Exhibit-52** 140:8

**Exhibit-54** 45:19 51:11

**exhibit-59** 14:11

**Exhibit-6** 72:22

**exhibit-60** 19:15,25
20:1 96:1 131:5

**exhibit-61** 147:5,6
154:18

**exhibit-62** 148:13,15

**exhibit-63** 98:18 99:15

**Exhibit-7** 38:1,3,15,17
44:22,23 122:13,15

**Exhibit-8** 38:10 43:16
46:22 47:3

**exhibits** 14:5 52:8

**existed** 21:9

**expand** 57:10

**expecting** 8:14

**expense** 40:15,20,23
63:15,17,18 144:20
152:10

**expenses** 40:8,9 63:4,9
92:12 93:3 151:25
152:1 158:1,11

**experience** 9:16 36:8
55:19 64:9,17,20,24
73:21 104:8 128:23

**expertise** 10:19,21

**explain** 7:25 34:15 72:7
83:18 99:24 122:21
139:10

**explained** 86:24
125:18 147:12

**explains** 134:24

**explicitly** 159:6

**express** 158:13

**extent** 31:15 93:5

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.1020    Page
51 of 61
GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

7

147:11 163:2
**extra** 20:2 66:1
**extremely** 66:13

---

**F**

**face** 74:19
**faced** 74:21
**facilitate** 41:14,18
157:12
**facilitated** 40:11
**facilitating** 36:9
**facilitator** 31:11 91:23
**fact** 66:25 79:4 85:5
122:2 160:24
**factor** 163:5,10
**facts** 44:4 45:3 94:16,
25 95:21,23 96:14
98:13 108:23 116:15
123:18 133:23 151:13
162:3
**fair** 15:19 64:16
157:11,14 158:17
**fall** 150:24
**false** 154:10,11
**familiar** 37:9,21 105:23
122:18 135:10 141:19
**fast** 30:16 126:23
**faster** 82:1
**fault** 81:3
**feature** 117:24
**featured** 116:25
**February** 127:24
**fee** 62:19 83:8 92:25
105:6 151:25
**feeds** 54:23
**feel** 49:19 158:25
159:13
**fees** 42:6 76:1 84:13
85:3,8 88:13
**FELIX** 70:19 98:24
**felt** 86:24 87:4,5 88:11
157:24
**FF&E** 129:21,22
**fiduciary** 66:12
**figure** 90:3
**file** 62:13 77:15 102:14
136:15
**filed** 102:19,23,24
162:20

**filing** 103:3 162:14,16,
17
**fill** 78:17
**filled** 43:22
**final** 84:15 151:17
**financial** 91:9
**find** 44:2 55:25 56:6
73:18 74:22 75:1,6 90:5
108:18 110:1,4,5,7,9
113:4 127:5 134:3
**finding** 18:23 71:2
90:10,13 157:8
**fine** 10:9 146:14
**finish** 6:3,4 99:1 153:1
**firms** 73:19
**firsthand** 131:9
**five-day** 74:10
**fixtures** 129:23
**flux** 84:16
**flyer** 112:2
**focus** 26:4
**focused** 90:6
**folder** 6:12,13,14 76:8
**folks** 58:15
**follow** 22:12,14 73:15
74:7 153:6
**follow-up** 156:13
**follow-ups** 151:18
**food** 126:23
**foot** 106:21 107:10
**footage** 11:13
**forgot** 120:23 141:10
**form** 17:25 21:5 42:13
55:9 77:13,14 78:17
86:6,7 104:11 113:24
114:24
**format** 14:17
**formation** 15:25
**formed** 16:5 17:18,19,
22 18:6,7,8
**forming** 17:5 44:12
**forum** 157:5
**forward** 143:20
**forwarding** 74:24
**found** 66:6 71:21 75:7
83:23
**foundation** 33:6 34:13
36:24 37:18 52:24
53:11 61:10 86:5,8,17
98:15 101:9,10 103:18,
20 104:9,15 106:24,25

108:9,22 109:13 111:22
112:5,17 113:11,23
114:3 115:22 117:3
118:2,16 119:8 120:3,
19 121:8 123:19 125:7
130:18 139:1 151:4,5
**fourth** 138:7
**free** 30:23
**frog** 13:1
**frustrated** 80:3
**full** 5:9 12:4 30:8 76:16,
25 82:9 83:2
**full-time** 69:17
**fully** 82:5
**fun** 57:17
**fund** 28:13,14,15,18,24
29:3,7,18,24 53:10 57:7
60:19 128:17 135:15,16
137:5 138:8,23,25
139:6,11,12,17,20
140:5 146:21
**funds** 16:17
**furniture** 89:12 90:7
129:23
**future** 55:18

---

**G**

**gains** 35:6
**gave** 22:7 131:6
**gears** 38:2 140:9
**general** 17:22 41:3,21
81:11 89:6 104:7 111:8
130:20 136:5 152:8
155:14 157:20 163:8
**generally** 11:19 33:24
59:2 84:1 103:23
104:25 110:4 157:1
**geographic** 110:11
**geographical** 108:4
**geographies** 110:14
**Georgia** 7:11,12
**Gilson** 20:3 45:24
46:13
**give** 14:8 22:5,6 35:20
57:20 65:6 76:13 92:12
122:15 123:12 148:24
155:15 157:5,6
**giving** 57:23,25 61:8
**glance** 107:4
**glass** 80:8,10,13,16

**goals** 11:5
**good** 8:9 14:4 15:20
33:18 48:5 55:16,19
56:15 66:5 70:12 91:17
94:22 101:3 104:13
124:13 156:11
**Google** 41:19,20 42:11
102:4
**gosh** 124:15
**gotcha** 6:7 75:6 131:1
**grab** 46:17,18
**grade** 27:9
**grand** 18:3
**Grant** 61:6 146:8,24
**grateful** 66:19
**great** 5:8,22 8:6 15:22
21:19 23:23 24:23
25:18 28:11 32:8 36:6
40:25 51:10 53:4 57:20
65:17 127:1 161:21
**greater** 43:4 97:6,15
**gross** 62:20,25 63:22
103:15
**ground** 5:22
**group** 25:13 28:24
59:14 71:14,17 123:3
130:23 162:12
**Grove** 8:25 23:10 28:9
**guarantee** 20:24 21:17
114:20
**guarantees** 21:11
**guess** 12:18 34:10
58:4,8 100:8 101:2
103:25 108:11 127:17
134:9,10,11
**guiding** 85:2
**guys** 78:21 99:3 104:13
111:11

---

**H**

**half** 79:1 100:22 124:21
136:8 153:16,17
**halfway** 137:14
**hallway** 23:12
**hand** 15:1 82:2 98:21
**handful** 152:24
**handled** 48:8
**handling** 66:24
**Hang** 81:25
**happen** 40:8 67:10
94:20 95:6

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

8

**happened** 18:19 21:25
22:1,3,6,9 88:18 89:16
93:22 95:18 96:9,11,23
152:2
**happy** 6:6,17
**head** 5:23 51:9 86:12
88:7
**Health** 71:14 90:22
130:23
**hear** 157:10
**heard** 131:15 155:11
**heavy** 158:23
**helped** 32:13 89:23
102:17 157:12
**helpful** 26:10 79:24
**helps** 65:11
**Hey** 50:1 58:4 75:4
**high** 133:4
**high-rise** 13:25
**higher** 107:22
**HIPAA** 90:2
**hire** 16:14 32:5 78:15
159:25
**hired** 73:12,17 74:8
88:24 147:23
**history** 7:15
**Hm-mm** 115:11 141:5,7
**hold** 6:18 7:18,22 8:1
16:17 41:23
**holds** 9:25
**home** 10:11
**homeless** 68:5
**homes** 67:16 68:1,8,
16,17,25
**honestly** 52:21 61:16
98:1,17
**honesty** 66:9
**honor** 85:16 87:1 97:19
**horn** 66:10
**hostage** 6:18
**hour** 65:6,8 111:12
**hours** 9:18 152:21
**house** 70:10
**houses** 10:13 65:25
**housing** 68:4,5,6
**HSH** 84:1 104:22
129:16
**HSMD** 87:22
**huh-uhs** 5:24

**human** 6:1
**husband** 65:22 147:17
**hypothetical** 108:21

---

**I**

**idea** 8:9 17:25 30:7
35:24 39:20 52:5 72:20
95:17 117:6 127:13
**identical** 39:9 126:14
**identify** 37:6
**Ileana** 61:22 146:9,17
**Illinois** 21:24 22:18
73:11 74:7 90:6 120:8
142:19,22 150:18,21,23
151:3,9,12 163:23
**imagine** 107:21
**impact** 69:22
**implicit** 69:4
**implying** 85:18
**important** 11:14 66:8,
13,16,22 67:8
**impression** 101:16
**improvements** 29:22
41:1 100:7
**in-house** 44:9,13
**included** 95:9 97:8,11
144:10
**includes** 85:3 129:21
**including** 19:18 149:16
**income** 12:2 68:4
**incomplete** 108:21
**incredibly** 73:23
**increment** 92:9
**increments** 92:6
**incurred** 40:9
**independent** 27:16,17
118:17,21 153:10
**indicating** 88:14
**individual** 83:21 88:6
96:21 138:23
**individuals** 120:18
121:5,21
**industry** 8:14 147:19
155:2
**influence** 6:20
**information** 6:8 14:25
15:24 17:3,16 31:11,15,
20 54:22 56:9 57:25
58:15 59:21 60:5 90:4

91:20,22 96:22 114:9
118:10 121:15 130:14,
25 132:5 136:16
140:22,23 157:9
**informed** 70:13 149:16,
23
**initial** 14:23,25
**inside** 130:4
**instance** 43:1 73:15
92:20 103:21 162:22
**instruct** 64:12
**instructed** 84:3
**instructs** 64:10
**insult** 85:5
**insurance** 16:24 84:5
88:22 89:3 129:19
130:2,5 135:13,14
**insured** 114:20,23
129:17 131:10,14,17
132:9 135:17
**insuring** 131:20,23
**integrity** 66:9,11
**intelligence** 59:22
**intend** 82:6,21
**intended** 85:4
**intent** 17:19
**interaction** 24:9,11
**interactions** 61:20 87:4
**interest** 48:15 55:24
56:13 61:6 83:8 84:13
85:3 100:22 123:1,5,6,9
139:24 163:22
**interested** 24:7
**interests** 118:24 154:9,
14
**interior** 89:1
**intermediary** 31:24
32:3
**international** 9:6 23:7
24:17 28:4 105:22
147:13 148:3
**interpret** 92:16
**interpretation** 82:16
**interpreting** 91:10
**interrogatories** 20:14
145:23,24
**interrogatory** 20:19
23:5 28:11 33:11 96:5
**interrupt** 19:17 122:7
**interviewed** 150:10

**inventory** 89:13
**invest** 35:21 37:16,24
**invested** 63:25 65:18,
23 100:15 140:5
**investing** 64:3 65:3,17
**investment** 8:2 28:14,
15,18,24 29:3,7,18 33:4
36:4,10,17 37:8 48:3
49:4 51:21 53:10 57:7
60:3,19 65:12,20 67:18
101:15 105:3 113:14
119:5 128:17 135:15,16
137:4 139:11,20 146:21
**investments** 29:1
33:23 64:14 111:17,20
119:18 120:16 121:3
**investor** 34:24 37:10,
17 52:1 60:20,21 64:17,
25 70:4,8
**investors** 28:24 35:20
37:4,5 64:18,25 72:4
113:8 116:4 132:8
139:12,17
**invoice** 43:6,7 75:25
83:11 85:3 88:13
**invoiced** 83:7
**invoices** 40:21
**involved** 18:22 19:4,18
32:11 34:17 41:4 51:18
55:7 56:9 66:17 67:24
69:20 71:19 81:12,15
89:19 96:19 97:1 101:5
102:17 104:20 111:18
115:12,15 120:5,10
127:19 135:22 137:20,
22 140:1,3 143:11
145:1,4,6,10,17 150:1
160:25
**involvement** 101:14
120:9
**IPX** 45:21
**Irrelevant** 64:5
**IRS** 39:23 48:21
**issue** 74:21 134:16
**issued** 20:20 95:13
131:3 132:24 147:8
**issues** 32:3 35:2 70:22
74:19 93:14
**items** 84:4

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

9

**J**

**January** 24:3 25:13
94:4,5
**Jerseyville** 120:8,13
**Jim** 20:3 45:24 46:12
**John** 61:24 101:24
137:2 145:21
**join** 34:14 36:25 37:1,2,
19,20 56:24 96:15
98:14 107:13,14,15,16
108:9,23 112:6,8,20
113:12,13,25 114:1,2,3
116:6,17 119:9,20
120:21 121:24,25 122:1
133:22 136:13 139:8
142:16 147:2 151:7,14
**joining** 24:1,7 25:24
**joint** 36:18
**Josh** 78:24 79:6,25
80:2 81:3 83:15,18,20
84:7,9,14,20 85:15
86:14 87:16
**judge** 75:9,14
**judgment** 77:1,3,4
**July** 29:24
**jump** 6:1,3 14:5,6,7
18:20 19:14,24 23:24
28:11 31:1 38:1 40:7
45:19 46:21 51:11
70:21 72:21 74:1 78:19
87:8 101:20 103:7,10
111:16 122:12 129:11
131:4 132:18 135:3
137:12
**jumped** 38:9
**jumping** 66:2
**junior** 26:3
**justice** 152:14
**Justin** 81:24

**K**

**Kate** 61:6 146:8,24
**keeping** 67:15
**Keiter** 61:24 101:25
107:14 112:20 114:1
116:17 122:1 123:20
125:7 133:23 137:2
145:21 163:16
**Kevin** 19:8 23:17,18,21
24:4,9,15,18,22 26:8

29:11 46:13 52:22 57:3,
8 58:17 59:1,5,9,13,23
60:8 61:16,21 79:4,6,9
84:19 93:10 100:9
101:4 124:22 125:4,15,
24 131:15 138:9,13,17,
24 140:25 141:1 144:17
146:25 150:12 156:12
157:7
**Kevin's** 24:25
**key** 58:2 70:5
**kidding** 152:22
**kids** 65:25 70:17
**kind** 21:17 24:10 25:3,
24 36:12 57:17 58:7
59:1 65:1 67:20 72:15
74:23 85:10 90:4 93:22
104:7 107:21 113:14
132:5 136:5 163:22
**kinds** 78:13 158:15
**knew** 20:3 24:10 58:16
59:1 61:12 71:22
117:13 132:5 150:17
**knock** 87:17
**knowledge** 15:5 20:16
31:3 52:4 56:20 68:11
71:9 81:17 115:18
118:2 126:10 128:4
131:9 133:10 134:6,8
135:16
**knowledgeable** 73:23

**L**

**lack** 70:24 86:17
156:18
**lacks** 33:6 53:11 61:10
104:9,15 108:22 109:12
111:22 121:7 139:1
**laid** 49:16
**Lake** 28:5 68:23
**land** 10:17,19 11:11
12:8 13:18,19 35:10
86:23
**landlord** 76:14 95:5,8
**landlord's** 74:10
**landlords** 16:9
**language** 97:8,11
122:18
**large** 35:16
**late** 18:4 42:6 75:23,25
76:1,6,20 82:14,19,20
83:8 84:13 85:3,8 88:13

93:25 94:5
**latent** 80:4,5 87:17,19,
21
**law** 73:19 86:25 92:15
150:18
**lawsuit** 145:18
**lawyer** 160:1
**lay** 5:23
**learn** 65:11 127:7
131:22
**learned** 34:20 41:19
70:14
**lease** 16:6,15,16,22,24
17:1 21:1 29:23 35:17
36:1 45:1 46:25 47:13,
16 54:6 62:14,16,17
63:24 66:2,4,15 67:14
71:20,23 72:3 73:13,14
78:11 82:13,16 85:9,19
86:3,15 91:10 92:1,2,7
93:8,9,17,20,23,25
95:4,7 97:5,7,8,11,14,
16,19 100:8 102:18,22
104:16 106:17 108:2
109:9 120:11 135:22
139:22,23,24 140:3,19
142:14 144:10 149:17
150:3 151:11,20,21
157:21 158:4,9 160:2,
12 161:3,11 163:2,5
**leased** 59:25 60:1
106:13
**leases** 16:8 79:2 86:4
92:16 102:16
**leasing** 151:8
**leave** 8:14 24:13 74:15
75:16
**leaving** 58:8,13
**left** 74:17 89:9 99:6
159:9
**legal** 17:4 40:5 91:13
151:6,10 160:1
**legit** 88:15
**letter** 82:5
**letters** 9:17
**level** 133:4
**license** 7:19,20,21
8:17,19 9:1,13,14,20,23
10:1 25:20 26:14 58:23
68:15 117:18 150:22
**licensed** 26:2 92:14
118:20 138:10,14
142:18,22

**licenses** 7:17,23,24
**licensing** 138:11
**lightly** 83:22
**like-kind** 35:9
**lines** 157:17
**link** 6:14
**list** 16:10 17:13 68:1,8
106:20
**listed** 115:13 116:20
128:20 140:15
**Listen** 107:6
**listing** 10:22 68:20
69:6,10 106:2 140:21
**listings** 59:20 106:5
**lists** 128:16
**litigation** 137:6 156:13
**live** 85:16 86:22
**living** 27:5
**LLC** 52:18,19 77:25
133:7
**Lloyd's** 23:1,2 114:21,
23 131:4,10,13,17,20,
22 132:1,8
**local** 28:2
**located** 57:15
**location** 8:25 11:15
72:12 81:13 110:3
129:18
**locksmith** 88:24
**logo** 27:12 117:1,2
118:11
**logos** 27:6
**London** 23:1,3 114:21,
23 131:4,10,13,17,20,
22 132:1,8
**long** 9:3 18:7 19:8
23:17,18,21 24:4,15,18
26:9 29:11 52:22 57:3,8
58:17 59:5,10 61:16,21
65:18 93:10 100:9
113:6,16,20 131:15
138:9,13,17,24 141:1
147:18 150:13 156:12
157:7
**Long's** 46:13
**longer** 23:18 24:19
99:5 101:6
**looked** 58:7
**loop** 58:14
**lost** 102:10 136:11
**lot** 11:16 22:3,20 29:14

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.1023    Page 54 of 61

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

10

66:17 67:10 75:2 107:5
120:6 128:24
**lots** 32:4
**low** 68:4
**lunch** 98:23,24 99:7,
10,11,12 103:11 111:11

---

**M**

**made** 20:22 22:10 28:9
59:10 68:17 88:22,23
102:9 136:10,24 137:1
**mailing** 129:3
**maintain** 55:16,22
56:15
**maintains** 56:10
**maintenance** 35:2 36:2
**majority** 42:8 97:15
**make** 11:9 17:13 20:2
21:16 29:1 31:18 70:12
76:11 92:3,7 103:2
121:11 126:18,21
130:15 153:8 162:2
**makes** 25:22 26:10
100:15 125:20 144:25
**making** 11:17 16:22
56:17,20 71:5,6 77:16
78:20 121:20 147:19
155:9 159:14 160:11,25
**manage** 18:18 50:6,9,
21 55:5
**managed** 29:16
**management** 15:25
38:12 58:12 71:14
130:23 157:12 160:18
**manager** 8:11 48:25
49:6 52:23 138:9 155:8
**manager/
administrative** 61:23
**manages** 154:13
**managing** 160:18,19,
24 161:8
**Manny** 81:2,4,5 129:12,
16,21 130:8,16
**March** 8:20 44:25
80:19
**mark** 19:25
**marked** 14:11 20:1
99:15 129:15 147:6
148:15
**market** 13:15 35:15
37:5,7 59:21 64:8 68:25
69:11,20 105:10,25

106:10,14 113:7,21
121:11 125:19,23
127:25 128:5 163:22
**marketed** 51:5 111:20
120:16 121:3
**marketing** 27:7 34:18
35:19 36:21 37:8 48:8
59:14 69:11 111:16
112:2,12,14 115:16
117:17,24 118:23
121:12,13 124:7 128:6
132:10,12,16
**markets** 68:13 106:11,
16 121:17 139:14
**mary** 5:2,10 14:15
19:18 20:11 38:21 79:2
82:4 87:16 99:17
147:23 149:17 153:5
154:1
**master** 45:16
**master's** 7:15
**match** 83:11 110:5
**matches** 110:7
**material** 154:8
**materials** 112:12,14
117:17,24 118:12 128:6
132:11,12,16
**matter** 77:2 78:16 79:4
85:5 140:20 141:12
145:25 153:25
**matter-of-fact** 84:25
**matters** 78:13
**Mcdougal** 62:2 141:15
**meaning** 25:25 162:1
**means** 72:7,9 121:16
141:7 155:10,11,13,19
**meant** 82:17
**medical** 18:23 20:24
35:23 41:6 70:23,25
71:2,10,13,16 73:13
74:13,20 76:23 78:21
79:10 88:17 89:10,11
90:1,8 104:21 130:24
131:24
**meet** 48:9 49:12 60:7,9
95:5,8
**meeting** 42:3 59:19
60:5
**meetings** 41:24 59:15
156:15,21,25 157:4,8,
11
**meets** 72:13

**member** 8:3,4
**members** 68:21
**memory** 17:14 71:11
**mention** 162:14
**mentioned** 12:13 50:4
65:9 154:17 156:14
161:7
**merged** 57:21
**met** 57:8,11 58:21
141:17
**middle** 36:2 37:6
**middleman** 31:22 91:7
**midterm** 92:11
**mil** 130:9
**Millar** 83:17,24 124:22
**Millcreek** 17:19 18:9,16
19:9 21:14,22 23:7,8
31:23 32:5,9,13 33:5,
21,22 44:7,20 49:1
50:14,17,18,25 51:5
52:18,19,23 53:9,10
55:6 56:10 57:6 59:9,11
60:8,13,16 61:1,5 62:11
87:24 90:16 93:10
96:20 98:6 99:19 100:8,
11 102:8,13,19,23
112:15,16 113:18 117:1
118:14,18,22 119:5,13,
16 122:10 125:24 132:7
133:6,25 135:23 136:6
137:3,4 139:6,13
141:24 142:21 144:15,
20 146:16,18 150:10
151:21,23 152:4,6
154:14 156:12 161:15,
17,19 162:14,20,22
**Millcreek's** 34:10
**MILLCREEK_GRANT**
46:5 51:12 52:9
**million** 13:21 110:21
111:4 129:18 130:9,10
**Millrock** 28:13,14,15,
18,23 29:3,7,18 30:5
31:23 32:17 53:10 57:6
60:19 100:18 101:1
102:24 128:16,20
133:12 135:15,16 137:4
138:23,25 139:6,11,17,
20 140:5 142:25 144:15
146:21 152:6 161:15,23
162:6,15,23
**Millrock's** 29:24

**mind** 30:3 46:23 90:23
**mine** 6:4 54:25 124:17
**minimal** 92:25
**minute** 107:3 143:9
154:18
**minutes** 98:22 99:10
152:22
**mix** 45:10
**mixup** 45:20
**MLS** 68:24 69:1,4,19
113:2,4
**Mm-hmm** 11:3 18:15
26:25 39:16 56:4 57:4
78:1 84:24 100:16
120:12 122:17 124:23
130:11 144:25 147:10
148:20
**model** 34:5,6,10 36:23
**models** 36:7
**moment** 6:7 15:8 18:3
79:20 132:4
**money** 28:25 35:20,24
37:23 40:24 43:8,10,13
47:11,12 56:3 66:1,24
67:1 77:17 82:17 92:11
93:4 95:19 97:17 98:9
100:3,6,10,14 111:1
139:12 144:12,23
145:11 147:20
**monies** 67:15
**monitor** 16:20
**month** 56:3 63:12 83:3
**monthly** 54:21 63:11
103:17
**months** 8:16 63:7 83:4
**morally** 84:18 85:23
86:15
**morning** 131:6
**Mountain** 9:1 28:1
149:18 153:22 155:14
156:2
**move** 24:13 25:17
43:16 90:7
**moved** 25:19
**moves** 82:1
**moving** 89:19
**multiple** 68:20 69:10
71:15 73:19 92:23
106:2 143:14

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.1024    Page 55 of 61

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

11

## N

**nail** 153:7
**named** 81:2
**names** 78:9
**Naperville** 17:8 18:22 20:21 31:6,7 38:24,25 39:6 40:17 41:24 47:4 48:10,11 55:24 61:6 62:18 63:11,14 72:1 78:6 80:8,9 81:9 84:11 92:20 93:13 99:20,22 100:19,24 102:3,9 104:17 106:22 107:10, 20 109:9,24 119:22 122:22 123:15,23 124:1 125:6 126:5,8,11,13,15, 21,23,25 127:19,23 128:17 129:17 131:23 138:19 140:17 142:13 149:15,19 150:15 152:3,4,9 157:2 160:8
**narrow** 61:4 113:18
**national** 8:5,10
**nationwide** 105:21
**nature** 6:1 25:7 29:8 34:2 39:15 64:3 65:3 156:25
**necessarily** 12:15 124:7
**needed** 73:13 83:9 94:20 97:5 159:1
**negotiate** 93:8 102:18
**negotiated** 93:17 111:1
**negotiating** 71:20 92:19 108:2
**negotiation** 84:17
**negotiations** 104:21
**nerds** 49:23
**net** 35:17 36:1 59:25 60:1
**Neuragenex** 19:5,10 29:22 41:5 70:23,24 90:11,17,24 93:16 94:19 95:6,19 96:7,12 102:7,9,15,18,19 103:12 104:22 144:10
**Nevada** 137:6
**news** 57:20 147:7
**Nic** 147:24
**nicer** 84:2

**nickel** 84:10,12 88:13
**night** 36:2
**nods** 5:24
**nonprofit** 68:3
**nonrelated** 8:7
**nonutah** 37:22
**Northmarq** 57:22 58:5, 6
**notes** 162:20
**notice** 74:10,16 75:24 82:5,19 128:15
**notices** 129:3
**notifying** 83:16
**Notwithstanding** 39:18
**Novell** 8:12
**November** 76:6,21 127:10
**number** 9:16 14:7 20:18 28:12 30:1 32:8 39:14,19,21 45:24 50:10 78:6,9,19,22,23 96:5 104:2 105:8 108:14 115:7 130:13
**numbered** 53:21

## O

**oath** 7:2
**object** 21:5 34:13 55:9 108:7 109:21 112:5,17 113:23 114:24 116:13 118:1 119:8 130:18 133:20
**objected** 150:25
**objecting** 109:14,16
**objection** 12:22 30:12, 18,19 37:18 56:23 86:5, 7,9,16 95:22 98:13 103:18 106:24 115:23 116:5 117:3,10,11 118:16,25 119:19 120:2,19 121:22 123:18 125:7 139:7 142:15 151:4,13
**objections** 101:7 107:12 108:20 112:18, 19 121:6,7
**obligated** 133:16
**obligation** 40:11 58:12
**obligations** 16:21 85:17 95:8 133:17,18
**obligee** 133:6,11,14,15

**observed** 34:19
**obtain** 8:18 19:5 151:10
**obtained** 159:21
**obtaining** 18:23
**occasionally** 68:2
**occasions** 92:24
**occupancy** 140:11
**occupy** 94:10,20,21 96:7
**occurring** 156:21
**October** 75:23 76:6,21 82:7 127:11 149:15
**offer** 122:23 123:11 150:13
**offered** 25:17 33:23 93:9 111:3
**offering** 33:24 34:3
**offers** 33:21,22 90:19, 21 121:20 123:8
**office** 8:25 23:9 24:2, 12 25:21 28:5,8 29:13 35:13 57:14 58:2,13 61:23 89:12 106:8 155:10
**older** 35:3
**one-twelfth** 92:6,9
**ongoing** 137:8
**open** 9:21 28:8 127:21 159:9
**opened** 127:23
**opening** 71:17
**operated** 23:9
**operations** 120:6
**opine** 109:8
**opinion** 17:4 151:11
**opportunity** 25:17 33:4 35:21 123:13
**option** 90:17
**order** 8:3 16:6,17 43:6 47:9 49:14 63:1 66:14 68:21,24 94:10,19 95:5 97:7,19 102:21 110:15 144:13
**organization** 9:25 68:3
**original** 34:7 43:21
**originally** 44:8
**ornery** 88:6
**outline** 38:11
**outlined** 22:12

**overly** 12:9 15:7,17 36:24 55:10 70:7 86:9 112:7 113:10
**oversight** 89:6
**owe** 85:6
**owed** 77:18 82:11 83:4 102:21
**owned** 33:1 100:24 101:1
**owner** 11:1,5 29:10 34:22 39:8 40:15 47:3, 19 49:8 54:21 60:19,21 62:11 63:15,18 81:6 92:24 93:1 96:21 100:18 116:8,10,11,16 123:4,7,8,16,22,24 124:9 128:17,21 140:14,15 151:23 152:2,4,9
**owner's** 40:10 123:5,6, 9 129:1 161:18
**owners** 16:20 21:10 29:17 31:12,16,23,25 32:4 33:1,12 34:11 35:25 39:20 40:12,14, 21 42:15,23 43:3 47:8, 21 48:1,9,18,19,20 54:8 55:3,4 57:18 61:1,5,17 63:2,17,20 67:11 73:12 78:3,6,11,18 88:8 89:4, 7 90:17,19 91:6,7,13,16 92:1,4,21 93:13 96:8 97:2,4,6,13,20,23 98:3, 10,12 100:3,9 102:3,9, 22 116:12 122:2,25 123:10,11,15 124:1 125:2,13 133:13 136:15 138:19,21,24 140:16,23 144:12,16,18 145:19 146:3 149:15,23 157:5, 10,13,19 158:11,13 159:1,5,11,22 160:5,14, 20,23 161:7
**owners'** 78:9 145:7 157:25 158:21
**ownership** 29:24 32:24 39:15 40:23 48:22 99:20,22 100:13 101:6 123:2 144:22
**owning** 33:12 34:11

## P

**p.m.** 111:13,14 164:2

Case 2:23-cv-00936-AMA-CMR    Document 119-9    Filed 02/27/25    PageID.1025    Page 56 of 61
GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

12

**pages** 54:4 143:14
**paid** 21:12 30:5,9 42:3 62:21,24 63:11 75:22 76:2 77:20 80:17 82:8, 9,10,25 83:5,7 92:8 103:14 126:3
**painful** 63:1
**papers** 162:15,20
**paperwork** 102:20 132:23
**paragraph** 149:9,14 150:19 154:3,12
**paragraphs** 149:10 154:2
**parameters** 106:6
**parentheses** 123:8
**part** 11:20 21:18 24:14 29:7 48:8 58:6 63:19 65:10 68:19 77:18,23 80:12 122:19 125:23 130:24 152:1
**partial** 82:9,10 83:5
**participant** 79:16
**participate** 31:14 51:22 97:25
**participated** 157:7
**parties'** 158:21
**partition** 123:6
**partner** 84:1 118:14
**partners** 28:7 33:15 81:7
**party** 103:3 123:17 124:2 134:1,7 135:17 162:16
**pass** 9:19 31:11
**past** 29:14 51:1 55:16 69:3 75:20 76:23 90:10
**patience** 67:12
**pay** 16:22 20:25 27:9 40:24 43:2,4,6,7,15 63:3 75:19 80:20 82:6, 21 83:9 85:7 92:5,12 97:20 100:6,10,12 110:24 136:10 137:10 144:19,21 151:21 152:10 158:10,13 161:18
**paying** 35:6 42:5 43:9 75:23 82:20 87:23 93:2 151:25 158:1 161:20 162:9
**payment** 76:7,8,11,13,

20
**payments** 92:9
**penalties** 84:13 85:4
**penalty** 83:8
**pending** 136:22
**Pennock** 92:22
**Pennock's** 93:12
**people** 26:5 28:16 31:9 36:9,14,20 41:20 43:14 52:21 61:18 70:19 88:6 101:15 111:3 139:25 140:21 155:15,16,19
**people's** 66:24 67:1
**percent** 19:13 29:25 30:6 43:3 62:20 63:21 89:18 97:6 100:22 144:24
**percentage** 29:25 40:22 50:16 100:13,24 114:16
**percentages** 51:9
**perfect** 7:5 10:6 28:22 31:24 37:7,25 41:7 45:14 63:9 148:23
**perform** 157:25
**performance** 16:21 20:23 21:2,4,8,16,18 32:6 132:24 133:12
**performing** 63:10 157:18
**permanent** 68:5
**permission** 117:2
**permitted** 11:13 110:3 150:18
**person** 19:3 34:24 45:18 84:25 116:20 133:16
**personal** 64:14,21,23 85:4 133:9 134:8
**personally** 5:20 29:3 53:2 64:1 146:1
**pertain** 39:23
**pertains** 38:23
**pertinent** 64:6
**phone** 5:13 36:1 57:16, 18 62:6 73:22 89:25
**photos** 88:25
**phrase** 27:8 34:23 90:16
**phrases** 92:16
**picture** 12:4

**pictures** 126:7,18
**piece** 11:11 13:18 80:11
**place** 41:13 70:14,16
**plaintiffs** 149:16
**plate** 161:24
**platform** 105:24
**play** 71:1
**plays** 119:16
**Pleasant** 8:25 23:10 28:9
**point** 9:20 24:18 44:11 59:13,23 83:7 84:6 85:20 89:8 138:7 140:22 157:15
**points** 65:6,7
**policy** 129:25 130:3 135:14
**poll** 41:19,21,22 42:5, 10,11,13,15,17,18,19, 23,25 43:3 63:17 97:23 101:21 102:4
**polled** 97:4,13
**polling** 97:2 145:4,6
**polls** 102:3
**pops** 133:7
**portal** 55:22 56:11
**portfolio** 9:16 18:17 49:2,5,7 50:4,5 51:4
**portion** 100:10 144:19 161:18 162:9
**position** 24:20
**possession** 45:17 94:7 95:10
**possibilities** 75:13
**powers** 157:23
**practice** 92:14
**predates** 59:16 136:4
**preference** 92:4,13
**preferred** 130:22
**premises** 74:15,18
**prepare** 54:14,17,24 109:5
**prepared** 43:19,21 54:23 74:11
**presentation** 59:24
**presented** 33:4 91:14
**president** 148:3
**press** 154:19
**pretty** 33:8 110:4

**prevailing** 105:9
**prevents** 87:22
**previous** 100:24
**previously** 45:25 84:3
**price** 10:24 11:8 106:21 114:10,12 115:13
**prices** 11:9
**pricing** 11:17
**primarily** 10:11,19 61:20 67:23
**primary** 27:1 84:22
**principal** 9:10,22,24 24:5,16,19,21 148:4,7
**principle** 85:2 104:7
**printout** 127:5
**prior** 60:10 80:20
**private** 120:17,18 121:4,5,9,20,21
**privileged** 17:2
**problem** 15:10 35:14 38:6 80:7 84:11 87:2
**procedural** 58:22 84:5 157:17
**procedure** 14:24
**procedures** 73:16
**proceedings** 164:2
**process** 41:1 73:17 74:7,12,25 75:5 77:1 104:24 108:13 110:8 111:8 113:16
**produced** 15:14 39:1 117:14
**product** 68:7
**products** 119:6,22,25
**professional** 7:16,23 9:18 37:13 57:2 59:2,4 60:12 142:9
**professionally** 29:4,5,9
**profit** 105:6
**program** 32:10 33:10, 16,20,25 34:3 37:16 59:24
**progress** 44:16
**project** 119:12
**projects** 26:4
**prominent** 117:24
**prominently** 116:25
**promised** 132:7
**proof** 77:13 162:18

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

13

properly 71:7 74:23
properties 11:23 13:24
17:10,12,17 18:17
29:11,15 32:22,25
34:17 35:19 36:14 37:8
39:25 44:15 49:2,7
50:5,9,21 51:4 57:6
59:25 60:1,3,15 65:14,
16 67:18 68:4 69:12
100:21 101:16 102:15
105:25 108:15,19
109:25 110:2,17 112:24
113:20 120:6 121:17
125:1,20 128:24 135:24
136:7,25 138:9,14
139:13,15 153:15,20
property 10:22,23
11:2,17 12:3,16 13:24
16:14,22 17:8 18:22
20:21 30:10 31:7 32:12,
18 33:12 34:11 35:21
37:6 38:23 39:3 40:9,
10,17,19 41:5,24 42:1
43:2,4,12 45:17 47:4,20
48:10,11,22 49:5,14
50:11 55:2,6,7 56:10
62:19 63:10 69:14 70:4
72:2,16 76:2 80:9 83:9
84:11 88:22,25 89:1
91:3 92:5 93:3,4 95:5,9,
13 96:8 99:20,23
100:19 101:2,5 103:16
105:3 107:25 113:7,15,
21 114:9,22 116:3
120:9,11 122:4,22
123:5,7,23 125:6,21
126:1,5,8,11,13 127:8,
12,15,18,20,23 128:18
129:18 130:1 131:11,
14,23 132:9 138:19
140:17 142:13 146:3
149:16,19 151:24 152:2
157:12 158:10,11
160:9,18,21,24 161:8
163:5,6,9
proportionate 40:22
158:21
proposal 73:24 150:11,
14
prospective 132:8
protected 90:1
provide 16:11,23 40:14
47:4,7 101:18
provided 14:25 21:14
29:21 45:11

provider 18:13 149:23
providing 56:17
provision 39:18
provisions 92:2
Provo 25:21 57:15
public 57:24 120:17
121:4,9,15
pulled 58:3
purchase 10:11 32:18
48:2,4,15 49:9,10 51:19
52:1 56:7,10,12 65:16
114:10 115:13 116:19
123:1,13 138:18
purchased 16:14 48:11
61:6 96:12 101:15
138:13,20
purchasers 51:20
purchases 55:24
purchasing 125:22
purpose 35:18 91:12
157:4
purposefully 155:15
purposes 158:3
pursuant 30:9 77:20
pursue 137:6 160:1
pursuing 71:17 76:14,
18
put 13:25 28:25 33:17
88:21 89:2 112:24
117:16,17,23 118:10
130:4 150:10
putting 51:19 69:3
83:22

**Q**

qualification 66:9
qualifications 66:3,8,
21
query 106:4
querying 106:6
question 6:2,5 12:19
19:18 21:1 23:5,24
28:13 30:21 32:6,9 33:8
34:7 48:5 55:1 66:5
82:22 94:17,22 95:2
96:7 105:2 107:6,7
109:15,17,19 120:23
128:11 140:14,24
157:16 158:4 161:21
163:18
questioning 99:2

questions 5:17 7:6
31:16 46:22 53:14 98:5
102:5 103:12 109:4
124:11 133:5 152:18
153:7 156:14 157:6
163:1
quick 5:13 46:10,17
53:23 66:2 96:1 99:2
113:15 128:11
quickly 105:16

**R**

Randy 19:16
rank 155:16
rate 104:23 105:7,13
108:6 109:9 114:15,16
163:5
rates 105:10 163:2
raw 35:10
re-lease 160:8
reach 47:21 84:3,6
129:1
reached 73:19,21
reaching 146:24
read 15:4 39:10,13
73:3 80:1 102:5 120:25
128:8 132:25 135:1
143:16,17,20 149:13
154:6 164:1
reading 48:13 144:2
real 7:19 8:6,17,18 9:1,
23 10:15 23:19 25:25
28:2,3 29:1 32:14 34:24
35:9 36:13,15,17 46:9,
17 53:23 64:1,4,25
65:4,14,18,24 66:2,14,
16,22 67:2,4,23,25
68:11,14,18,21 69:9,17,
22,25 70:6 72:8 73:20
96:1 99:2 104:7 105:25
110:22 113:4 117:16
128:11 141:25 142:1,
19,22 147:21,25 148:7
149:18 150:21 151:2,9
155:1 163:8,11,22
reality 86:23
Realtors 8:5 68:23
Realty 16:3,5 27:22
29:4 44:24 77:25 78:2,
18 140:15 141:2 142:6,
9 149:22 163:21
reason 6:23 27:22 51:8

53:8,12 55:14 78:4
88:1,7,14 117:8,20
126:12 127:14 130:12
131:16 140:4 146:23
rebranded 24:15 26:19
recall 14:17 19:11
21:25 57:8 62:3 74:4
75:21 76:7 78:23 80:7
81:20 83:6,10 87:12
90:21 94:14 95:12,15
99:16,19 114:21 129:12
135:5 136:2,5 154:22
159:24
receive 82:17
received 21:22,23
57:16,18 82:14 97:15
125:25
receiving 74:16 92:8,
10
recognize 13:16 14:15
20:11 38:4 43:17 51:15
54:2 73:1 74:21 115:8
128:12 132:19 140:10
141:18 143:4
recognizes 138:8
recommend 91:13
92:17
recommendation 9:17
12:5
recommendations
11:9,18
record 5:9 14:12,13
15:12 20:9 46:1,19
72:25 96:2 111:13
120:25 128:9 147:5
148:14
recorded 128:25
recorder 5:25
records 89:11 90:1,2
128:23 129:7,8
recover 76:23 102:10
refer 98:6 149:4,5
reference 155:10
referenced 117:22
122:3
references 80:2 85:23
referencing 149:8
referred 33:10
referring 33:19 85:25
104:4 118:4 144:8
148:25 149:6
refers 147:16

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

14

**refused** 51:1
**region** 110:11
**regional** 155:8
**regular** 69:21 79:4
**regularly** 156:22
**regulations** 39:23
48:17,21 90:2
**rekeyed** 88:24
**relate** 33:3
**related** 5:15 16:8 31:2
55:22 70:22 103:12
138:11 142:13 145:18
152:14
**relates** 113:18 119:21,
22 123:14 140:17
160:21
**relation** 11:7
**relationship** 19:10,12
23:6 27:19 29:2,9 49:15
55:13,16 56:2,16 57:3
59:2,4 60:13 139:5,19,
21 140:25 141:1 142:5,
9 160:20
**relative** 104:19
**released** 154:19
**releases** 147:8
**reletting** 90:18
**relevant** 15:1 17:17
**relive** 78:20
**rely** 17:4
**remainder** 100:22
**remember** 15:9 17:11
18:18 22:22 24:20 29:6
34:9 55:19 58:19 59:12
75:11 76:5 78:5,24
79:13 80:9 83:12 85:13,
14 87:13 89:24 98:1,2
124:19 127:21 129:10
135:9 136:9 140:12
143:12 150:15 152:7
153:17 157:19,20 160:4
**remembered** 97:4
**remembering** 75:8
90:23
**remind** 147:11
**remodel** 41:4 95:9,13
96:24 97:18,20 144:13
**remodeled** 96:24
144:11
**remodeling** 144:20
**renamed** 46:15

**renegotiated** 79:3,7,10
84:20
**renovations** 94:3
**rent** 12:3 16:19,20
20:25 21:12 47:24
54:12,20 62:25 63:10,
22,23 75:22,24 76:24
80:17,20 82:9,13,20
83:5,8 87:23 92:10
102:10 103:13,15,17,25
104:2,5,6,20,23 105:1,
15 107:9 108:14 136:11
**rental** 106:21
**rented** 110:17
**renter's** 130:5
**rents** 54:7,8,18 62:20
63:12 75:20 82:6
107:22 108:3 110:15
158:20,22
**repeat** 94:17
**repeatedly** 85:7,9
**rephrase** 6:6 31:5 33:9
59:3 86:14 91:6 107:25
120:15 121:2 138:22
145:5
**replace** 35:11 129:20
130:17
**replaced** 130:9
**replacement** 12:3 36:4
41:5 129:19
**report** 105:18,19
**reporter** 5:4 63:5 87:20
107:17
**represent** 10:10,12
14:22 15:5 64:25 69:6
78:15,18 93:13 102:21
126:10 135:12 138:24
139:25 146:7 156:12
**represented** 132:13,16
136:15
**representing** 11:1
16:8,9 64:18 102:15
**represents** 15:18
134:15
**request** 31:10 63:5
72:17 87:20 91:21
107:17 145:19
**requested** 21:21
131:25
**requesting** 145:23
**requests** 20:15 145:24
**require** 67:12 117:16

157:25
**required** 14:23 16:24
48:20 94:2 117:15
118:3 159:11
**requirement** 37:17
39:23 47:9 48:1 97:12
**requirements** 48:23
72:13 95:4 138:11
**requires** 67:12
**requiring** 16:23
**reread** 79:17
**resale** 60:2
**residential** 36:15 67:4,
25 68:3,10,14,15,19
69:14,25 70:6
**resources** 100:5
**respect** 40:10
**respond** 42:11 100:5
**responded** 20:13 85:9
145:25
**responding** 82:21
**response** 20:18,19,22
23:4 28:12 29:20 31:1
82:5 84:7 96:5 150:19
157:16
**responses** 22:18 42:12
74:24
**responsibilities** 27:3
41:17 123:2 155:20
**responsibility** 27:1
40:20 42:16 66:12
**responsible** 92:7,18
156:17
**restaurant** 126:23
**result** 42:6 102:22
136:19,20
**results** 42:15,17,21
**retail** 35:14 70:10
**retain** 159:22
**retaken** 99:20,22,24
**returned** 98:10,11
**revenue** 35:10,11
**review** 16:15 91:14
93:7 99:7
**reviewing** 91:5,9
**revise** 92:2
**revised** 44:18 92:2
**revising** 92:1
**right-hand** 128:1
**rights** 76:13

**River** 57:15
**Rodger** 156:12
**role** 9:7 54:6 62:10,14
71:1 119:16 147:12
150:4,5
**Romeoville** 129:16
**room** 49:23 58:4 59:17
78:8
**roughly** 50:8 51:3
**rude** 83:24
**Rule** 14:24
**rules** 5:22 14:24 48:17
49:15 69:1 87:5 88:12
117:16,22 118:2,3,8
141:10

**S**

**safe** 67:15
**sale** 10:11,22 11:25
32:18 51:19,23 52:1
56:7 68:1,8 111:17
113:19 116:19 127:12
**sales** 7:20 8:10 9:14,15
23:9 25:12,13 27:24
32:14,18 34:5,6,10
36:7,22 48:8 59:15,19
60:5,24 101:4 115:16
121:19 127:10 142:4
**Salt** 28:5 68:23
**Sandler** 162:11
**satisfactory** 84:7
**scene** 72:3,5
**schedule** 75:22
**SCHULTZ** 6:10,15
12:9,22 15:7,12,17
18:11 19:16,20,23 20:5
21:3 33:6 34:14 36:11,
24 37:19 41:8 44:4 45:3
47:14 50:1,18 52:24
53:11,15,24 55:10 61:3,
10,14 64:5,12,19 65:8
70:2,7,17 79:21 80:22
86:9,21 88:3 94:16
95:1,21 96:14 98:14
99:4 101:10 103:20
104:9,14 106:25 107:6,
16,19 108:9,22 109:1,7,
11,16,20 111:22 112:6,
10,19 113:9,13 114:2,4
116:6 117:5,11 118:5
119:1,9,20 120:21
121:7,24 122:6,11
124:16 125:9 133:22

134:23 135:18 136:12
138:20 139:1,8 141:7
142:16 143:16 145:8,13
147:1 150:7 151:5,14
158:3 163:17,20,25
**science** 110:19
**searched** 66:6
**second-to-last** 52:7
**section** 40:7 41:2,10
114:19 122:14 123:10
**sections** 148:25
**secure** 88:25
**Securities** 152:13
**seek** 123:5
**segregated** 16:16
43:13
**selected** 150:3,11
**self-proclaimed**
149:17,25
**self-representation**
138:12
**self-represented**
138:15
**sell** 10:13,14,24 11:2
12:14 34:16 35:4 36:9
67:16,23 69:14 100:23
113:7,21 119:18,23
120:7 121:21 122:4
123:4,9,12 124:6,8
139:15 163:21
**seller** 52:17
**sellers** 10:12
**selling** 49:3 68:17,25
118:23 123:8,9,16,23
124:2,8 151:8
**sells** 67:18 119:5
**send** 20:5 22:15 40:21
42:10 43:5 73:24 76:6
85:2 88:25 140:22
**sending** 22:16 31:15
56:3 88:13 93:3 158:21
**seniors** 68:4
**sense** 21:17 25:22
26:10 37:3 56:15 66:11
100:15 125:20 144:4,25
**sentence** 15:23 39:17
**separate** 82:22 98:20
129:24 130:3 131:5
**September** 75:22
**serve** 15:25 17:7,10,19
75:2,7,13,15

**served** 31:19 74:23
75:4,24
**servers** 74:25
**service** 16:1 17:22
18:1,13 56:17 68:20
69:10 75:10,14 105:20
106:2 113:2 149:22
**services** 16:7,10 40:13
55:18
**serving** 161:3
**set** 11:9 41:21 69:13,16
**setting** 163:5
**settled** 136:19
**share** 40:22 42:14,17,
20 59:21 60:5 69:5,7
106:11 123:16,24 124:2
151:25 152:11 158:22
**shared** 29:13
**Sheldon** 147:24
**shill** 87:24
**short** 152:21
**show** 103:24,25
**showed** 54:18 132:11
**shows** 127:9 134:13
**side** 128:1
**sift** 126:17
**sifted** 15:15
**sign** 47:8,22 48:3,15
49:13 97:7,14 164:1
**signature** 52:17
**signed** 39:8 45:1,5,13,
18 47:5 53:3,9 71:23
72:3 85:21 87:1,3
93:18,20,23,25 94:2
97:16 139:22
**significant** 28:5
**signing** 48:4
**signs** 27:6 52:2
**similar** 11:24 54:18
102:2,6 110:2,10,15,17
113:1,4 118:24 155:7
**simply** 33:11 56:20
**sincere** 101:16
**single** 116:16
**sit** 9:19 134:9
**situation** 80:3 101:19
**size** 110:2
**skeptical** 131:19
**skill** 69:13,16
**skills** 70:14,15

**slow** 128:25
**small** 59:13 124:15
127:16
**smaller** 35:20
**Smith** 29:5 60:7,9,13
61:17,20 81:1,24 89:22
125:4
**Smith's** 46:14,15
**sneak** 30:16
**software** 105:20
147:18
**sold** 8:13 11:25 29:15
34:25 36:5 51:4 55:3,8
68:16 72:4 106:13,17
111:21 116:3,7,9,11
125:21 138:23 154:10
**solutions** 71:14 101:18
130:23
**somebody's** 80:14
**son-in-law** 147:25
**sort** 58:19 59:22 60:12
83:14 129:3 132:13
142:8 154:19
**sounds** 8:7 146:12
**sources** 50:22
**spaces** 29:13
**spam** 6:14
**speak** 30:13 58:2
105:23
**speaking** 40:16
**speaks** 41:8 134:24
158:4
**specialty** 10:17
**specific** 34:3 36:20
67:3 73:16 103:21,22
132:4 133:3 148:25
157:23 163:9
**specifically** 17:20
18:22 40:16 51:12 80:3
97:24 101:12 103:13,23
104:4 105:22 106:14
108:4 121:16 122:22
123:14 125:6 148:23
159:11
**specifics** 96:25 98:7
104:15
**speculation** 61:11
86:10,16 88:3 101:10
103:19 108:10 112:7
113:9 117:4,12 133:21
135:18 147:1
**spelled** 62:17 159:6

**spells** 159:4
**Spencer** 62:1 141:21,
22 142:10
**spent** 144:12
**sprawling** 107:21
**spreadsheet** 42:13,14
**spreadsheets** 54:22
**square** 11:12 106:21
107:9
**staff** 57:14 121:19
**stands** 8:2 129:22
**stare** 61:9
**start** 5:8 7:6 15:22
20:18 45:21 68:15
70:25 72:21 81:22
109:25 111:21 123:21
**started** 27:21 44:11
59:15 76:3 136:3,6
143:20 147:21 152:5
153:14,19
**starts** 137:14
**startup** 147:19
**state** 5:8 7:11 20:23
25:1 73:16 84:17
163:23
**stated** 23:8 131:8
**statements** 54:14,17
91:9
**states** 16:4 40:9 135:13
138:8,10,14 145:21
146:15 149:14 150:19
154:12
**stating** 87:23
**status** 89:5
**stayed** 96:21
**steps** 22:12
**Steve** 24:21
**sticking** 153:5
**stop** 84:9
**stopped** 50:22
**store** 35:23
**story** 57:17 58:19
**stream** 35:11,12
**street** 5:2,10 21:20
141:19 147:8,16,22,23
149:18 150:17 154:6,20
156:11 163:13
**Street allegedly**
154:13
**Street's** 15:24

strength 105:11,12
stressful 58:20
Strike 30:4
strip 70:10
structure 48:18 130:2,
8
struggling 24:20
Stucco 61:22 146:9,10,
11,12
study 7:13
stuff 59:22 64:21 129:4
132:14
submit 136:16
submitted 22:1,2
150:13
subscriber 106:3
suburb 107:20
suburbs 107:23
successful 123:15,23
124:2 147:18
sufficient 76:16
suggested 92:4
suggestion 92:3
suing 5:16
suit 71:24 72:2,6,15,16
suitable 95:6
summary 15:21 109:16
supplements 15:13
support 57:14 101:15
supportive 68:6
supposed 21:11
supposedly 131:3
surety 21:15
surprise 58:18
surrounding 106:23
107:10,19 108:5
switch 72:23
sworn 5:4

_____

**T**

_____

table 93:10 103:15
104:20
tailor 72:14
takes 41:13 113:7,20
152:8
taking 8:15 13:10
50:22
Talisman 22:24 115:4
132:3,24 135:14 136:10
137:10 145:18,25

talk 5:25 59:20 65:5,8
89:25 131:2
talked 29:14 49:19 62:5
157:22
talking 53:18 104:16
122:8 124:22 152:9
162:19
talks 29:21 41:11 144:6
tally 63:9
target 37:4
targeted 36:21
tasks 157:17,24
158:18,24 160:17,18
taught 41:20
tax 35:7 42:1 128:15
129:3
taxes 16:23 40:17,19
43:2,5 76:2 83:9 92:5
127:8
Taylor 62:2 141:21,22
142:10
team 11:20 23:17 24:25
25:24 26:2,6,9 27:24
48:9 59:14 147:9,16,22,
23 154:20
tech 80:15
telling 109:1
tells 30:24
template 43:21 44:2,6,
14 45:8,12,16
tenancies 70:23
tenancy 32:23 36:18
70:24 102:8 120:14
121:1
tenancy-in-common
32:10,25 33:20,23,25
36:7 37:16 38:14,18
39:7,12 45:2,4 48:2
51:21 111:20 113:19
116:4 118:24 119:6,13,
17 121:17 122:14
tenant 18:24 19:5
20:24 21:9,18,20 29:22
31:25 35:17 40:18 41:6
71:2 72:9,19 73:21
90:10,14 91:2,8,18
92:5,10 105:12 114:19
130:2 149:19,24
tenant's 92:7
tenant-in-common
16:7 32:22 35:19 36:22
39:5,24 48:13,14,16,19,
21,24 49:4,17 60:2

116:12 120:16 121:3
138:24 154:8 159:3
160:20
tenants 16:9,19 33:2,
16 36:14 50:24 62:22
70:22 91:24
tenants' 16:21
tens 45:10
term 37:10 67:20 72:8
156:18
terminate 27:18
terms 16:25 17:1 27:4
37:13 66:15 73:14
82:13 85:25 86:2 93:9
95:7 97:19 104:22
123:10 137:7 140:18
testified 5:5 24:24
50:13 57:7 71:1 82:24
133:7
testify 6:24
testimony 82:8
text 146:8
thereof 70:24
thin 74:23
thing 22:9 27:5 36:17
37:22 38:19 58:19
67:17 74:9 79:21,22,24
88:23 90:3,9 101:18
143:16 158:20 159:13
161:6,16 162:13
things 13:9 18:21
31:17 35:3 41:1 48:6
54:3 70:11 76:3 84:5
85:6 89:6,15,16,19
106:13 110:9 115:17
130:4 148:5 153:7
158:14,15 159:4,17
thinking 78:7 99:9,13
thinks 81:3 88:15
thought 8:16 86:15
99:4 130:24
thousands 15:14,16
45:11
thread 38:4,9 143:7
146:8
throat 13:2
TIC 33:10 34:16 52:1
111:17 138:19,20
149:15 153:15,20
154:13
time 8:10 20:13 21:7
24:9,24 28:4 38:6 41:23
42:6 43:2,5,6 44:14

45:20 58:20 60:9 61:6
67:12 79:3 90:18,24
98:19 105:10 111:4
122:25 135:24 143:13
153:19 157:9,15 161:2,
11,25
timeline 18:21 22:6
93:23 136:6
times 13:7 63:7 69:3
154:8
tired 34:25 93:3
title 29:6 81:6 148:12
152:8 154:23
titles 148:7 155:2,5,15
today 6:24 119:2
124:11,12 153:6 156:5,
6
told 21:4 58:10 74:9
100:8,9 125:10 131:9,
12 144:16,18
toot 66:10
top 9:14 84:15 114:8
116:24
topics 41:25
torn 13:24
total 103:13 105:8
township 127:6
track 31:19 42:12,21
54:20
trained 147:25
transaction 5:18 32:14
transfer 123:4
transferred 43:10,14
transferring 58:23
transition 24:18 25:8
68:18
transitioned 26:13,16,
23 44:15,16
transpired 18:21
Tree 35:23 120:8
triple 35:17,25 60:1
true 20:16 71:4,8
154:15,16
trust 16:18 43:11
truth 5:5 7:2
truthfully 6:24
turkey 124:13
turn 77:7 81:18 83:13
103:14 106:18 114:6,18
126:4 128:10 154:2

GRANT, et al. vs LONG, et al.
MARY STREET - 11/27/2024

17

**turned** 38:18
**turns** 24:12
**type** 11:13 32:23 35:9
    43:11 67:3 68:7 91:11
    139:5 157:24
**types** 10:5 102:2
    158:24
**typically** 105:4 112:3,
    12,15 113:7 130:1

---

**U**

**uh-huhs** 5:24
**ultimately** 92:18 93:17
**umbrella** 26:24 71:14
**unanimous** 47:19
**unclear** 153:8
**uncommon** 36:16
**unconscionable** 84:18
    85:24 86:15
**undergo** 9:13
**undergraduate** 7:14
**underneath** 24:2 71:13
**understand** 6:5 7:1,7
    9:9 10:20 11:5 14:19
    19:20 25:7,9 34:2,8,16
    35:18 50:5 55:2,4 57:5
    64:9,24 66:14 68:9
    69:21 73:10 74:6 88:7
    99:25 100:2 101:3
    103:3 108:12 133:25
    136:23 139:10 143:21,
    24 149:6 150:2,22
    158:25
**understanding** 22:17
    28:20,23 29:23 31:4,21
    32:21 34:21 39:22,25
    40:1,3 51:3 55:13,21
    64:8 67:13 81:3 97:21
    100:17 111:19 137:2
    150:9,23 151:1 162:3
**understood** 71:6
**undivided** 123:5,6,9
**University** 7:11
**unpleasant** 83:21
**unprofessional** 83:23
**unused** 98:11
**unusual** 12:25
**update** 128:25 129:2
**updated** 128:23 129:6,
    9

**updates** 145:18,19,20
    157:10
**upheld** 95:7
**uphold** 47:12
**upload** 46:9
**upset** 83:15,19
**upwards** 154:13
**urgent** 71:17 110:13,14
**Uruguay** 146:12,13
**Utah** 7:19 23:20 28:6
    68:13,19,22,23 69:9
    105:22,24 148:10 155:5
**utilities** 88:21 89:2

---

**V**

**vacant** 88:21
**vague** 15:7 18:11
    30:12,19,21 36:11
    50:18 56:23 70:2 86:7,9
    95:22 104:11,12,14
    108:8 116:5 118:5,25
    119:1,19 120:20 121:22
    125:8,9 139:7 142:15
**values** 163:1
**variables** 69:21
**varies** 50:10
**vast** 50:23
**vehicle** 36:4 106:12
**vehicles** 60:3 69:11
**verbally** 132:13
**versed** 13:15
**versus** 9:10 69:25
    161:15 163:9
**vice** 148:3
**visited** 125:16 126:5
**vocabulary** 37:14
**vote** 42:8 97:15 159:5,6
**votes** 97:3 145:7
**voting** 41:11,13
**voucher** 68:5
**VP** 154:24

---

**W**

**W-2** 27:13 118:20
**wait** 6:2,3 52:10
**waiting** 101:7
**Wakefield** 24:3,13
    25:15,20 57:13,19
    58:23

**Walgreens** 35:22
**walked** 70:18
**wall** 80:14
**wanted** 57:20 85:19
    88:6 93:5 97:14,25
**warehouse** 106:7
**warranty** 55:25
**water** 13:3
**website** 33:22 121:16,
    18 127:7
**week** 59:18
**weekly** 41:23 156:15
**Wesley** 5:10
**West** 9:1 28:1 149:18
    153:22 155:14 156:2
**Whatever's** 143:22
**whatnot** 163:2
**whichever** 161:23
**wife** 70:17
**willingness** 67:9
**WINDHAM** 34:13 37:1,
    18 46:2 55:9 56:24
    86:5,18 107:13 112:5,
    17 113:23 114:24
    115:23 119:8 120:19
    121:6 130:18 151:7
    163:15
**wire** 43:15
**wishful** 99:13
**wondering** 162:21
**Woods** 57:15 147:24
**word** 39:10 141:23
**Wordperfect** 8:11
**words** 71:12 75:12
    81:10
**work** 7:15 8:24 12:25
    13:8 17:12 26:3 28:5
    43:12 47:10,23 48:19
    58:3 60:23 62:1,5,9
    73:12 84:2 86:12 91:11,
    15 109:5 118:11 123:3
    128:24 139:25 140:1,4
**worked** 9:3 23:13
    25:14 27:25 29:11
    55:15 88:8 154:7
**working** 8:12 18:8
    22:17 47:20 63:2 69:23
    92:1 117:15 136:6
    137:2,5 147:19,21
    153:9,14,19
**workload** 50:23

**works** 32:10 67:14
    68:13 102:4 122:21
    146:19
**world** 31:24 63:9 85:16
    106:3 130:15
**worth** 13:19,20 110:21,
    23,25
**Wright** 37:2 46:7,11
    99:5,9 107:15 109:14
    113:11 114:3 117:3,10
    118:1,16 121:22 152:20
    153:1,2,4
**write** 42:18,19 51:23
**wrong** 38:10,17,19
**wrote** 38:10

---

**X**

**x-ray** 80:8,10,15

---

**Y**

**year** 5:14 29:14 54:24
    103:14
**years** 8:21 9:16 20:25
    51:1 65:20
**yes-or-no** 5:24

---

**Z**

**zone** 11:14
**zoning** 13:23
**Zoom** 41:23 42:3
    156:15 157:4,8,11