# EXHIBIT 10

# TENANCY IN COMMON AGREEMENT

THIS TENANCY IN COMMON AGREEMENT (this "Agreement") is entered into as of the **16th day of April 2021**, by and among the parties that execute this Agreement or a counterpart to this Agreement (the "Owners"). The Owners may be referred to herein individually as a "party" or collectively as the "parties."

## RECITALS

A.   The Owners have jointly purchased certain real property, which is more particularly described on Exhibit A (the "Property").

B.   The Owners hold legal title to the Property as tenants in common.

C.   The Owners desire to enter into this Agreement to govern their relationship with respect to the Property. The Owners intend that their relationship with respect to the Property shall be as tenants in common. The Owners do not intend that any provision of this Agreement shall be construed as establishing a partnership, joint venture, trust, or other business entity. Owners agree not to file a partnership tax return or otherwise hold themselves out as a partnership or other form of entity.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual covenants and promises herein made, and in consideration of the representations and warranties herein contained and for other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, the Owners, intending to become legally bound, hereby agree as follows:

1.   *Nature of Ownership*. The Owners hereby agree that they shall continue to hold title to the Property as tenants in common. The Owners agree that they shall not take any action, or fail to take an action, that would cause the ownership of the Property to be classified as a partnership, joint venture, or other business entity. The Owners shall not file any tax return, statement, form, or other document with any governmental body or agency that would cause the Owners' arrangement to be classified in any manner other than as the co-ownership of real property as tenants in common. The Owners shall not: (a) conduct any business under a common name; (b) execute any agreement or other document identifying any or all of the Owners as partners, shareholders, or members of a business entity; or (c) otherwise hold out their relationship as a partnership or other form of business entity. Notwithstanding any other provision of this Agreement, under no circumstances may the number of Owners exceed 35 (counting husband and wife as a single person).

2.   *Ownership Interests.* The names of the Owners and their percentage share of undivided interests in the Property ("Ownership Percentages") are set forth on Exhibit B.

DEF 000278

3.  *Management of the Property*. The Owners hereby agree that the Property shall be operated and managed subject to the following requirements:

   3.1.  *Expenses.* With the exception of those expenses paid by the tenant as set forth in the lease agreement, any expenses incurred with respect to the Property shall be the Owners' obligation. Each Owner shall pay its share of expenses in amount proportionate to the Owner's Ownership Percentage. Payment must be made within 30 days of receipt by the Owner of a written notice showing the amount needed to cover such Owner's share of the Property's expenses.

   3.2.  *Improvements.* In the event the Owners improve the Property, each Owner shall be obligated for such improvement costs in an amount proportionate to the Owners' Ownership Percentages. The Owners shall have the option to determine whether to assess each Owner for such Owners' proportionate amount of the improvement costs or whether to finance the total improvement costs as a joint debt of the Owners. In the event an assessment is made, payment must be made within 30 days of receipt by the Owner of written notice of the amount needed to cover such Owner's share of improvement costs.

   3.3.  *Mortgage Indebtedness.* The Property, in the future, may be encumbered by one or more blanket construction or blanket permanent loans, which may be secured by a mortgage or trust deed against the Property ("Mortgage Indebtedness") only by a unanimous vote of all owners. The Owners agree that no Mortgage Indebtedness may be obtained from an Owner, a manager, a lessee, or a person related to an Owner, a manager, or a lessee. The Owners agree the Mortgage Indebtedness and the expenses of incurring or complying with the terms thereof will be the responsibility of the Owners in accordance with their Ownership Percentages. Each Owner must pay any principal or interest due on any Mortgage Indebtedness in proportion to their Ownership Percentage. In the event that a Mortgage Indebtedness is refinanced, any proceeds from the refinancing not used to pay Mortgage Indebtedness, costs, or expenses will be distributed to the Owners in accordance with the Owner's Ownership Percentage. Gross receipts from the operation of the Property or from the sale of the Property must be applied by each Owner to pay Mortgage Indebtedness in accordance with the Ownership Percentage. These obligations will exist despite any agreement by the Owners to be jointly and severally liable on any Mortgage Indebtedness and will not affect the relationship between the Owners and the lenders of any Mortgage Indebtedness.

4.  *Default.* Failure of any Owner to pay such Owner's proportionate share of any amount within 91 days of the date that the Owner acknowledges (verbally, electronically, or by registered mail) it is due under this Agreement Default shall give the other Owners the right to purchase the defaulting Owner's interest in the Property on the terms and conditions provided in Section 8. Alternatively, any other Owner has the option, but not the obligation, during such time as the defaulting Owner is in default, to advance an amount of money equal to the amount of the payment the defaulting Owner was requested to make. Such advance will be considered to be a recourse loan to the defaulting Owner bearing interest at the rate of 15 percent per annum and payable on demand, and in any event within a period not to exceed 31 days from the date of the advance. Until such advance and any accrued and outstanding interest are paid in full, any

DEF 000279

distribution or proceeds payable to a defaulting Owner due to such Owner's interest in the Property are assigned to and will be paid to the advancing Owner (with the understanding that such amounts will be treated as having been paid to the defaulting Owner and thereafter paid by the defaulting Owner to the advancing Owner).

## 5. *Revenue, Expenses, Deductions, and Disbursements*

**5.1.    *Revenue, Expenses, and Deductions.*** The revenues, expenses, and deductions from the operation and any sale of the Property will be shared by the Owners in proportion to their Ownership Percentages.

**5.2.    *Disbursements.*** Proceeds received from any sale or refinancing of the Property, or from the condemnation or destruction of any of the Property, after such Proceeds have been used to pay any (1) encumbrance or Mortgage Indebtedness on the Property, (2) anticipated expenses, and (3) reasonable reserves for contingencies as determined by the Owners, will be disbursed to the Owners in proportion to their respective Ownership Percentages. However, the Owners may determine to use part or all of the proceeds to reduce or repay any Mortgage Indebtedness, contract, or other liability incurred in connection with the Property and to disburse any balance of the proceeds.

## 6. *Owner Activities and Voting*

**6.1.    *Voting.*** Unless otherwise specified, all decisions under this Agreement must be approved by a vote of Owners who own more than 50 percent of the Ownership Percentages in the Property. Notwithstanding the foregoing, for the first two years this Agreement is in force, any sale of all the Property, lease or re-lease of all or any portion of the Property, any negotiation or renegotiation of any mortgage indebtedness, the hiring or firing of any manager, or the negotiation of any management contract (or any extension or renewal of that contract) must be by unanimous approval of the Owners ("<u>Unanimous Period</u>"). After the Unanimous Period, all decisions under this Agreement must be approved by a vote of Owners who own more than 50 percent of the Ownership Percentages. In the event that legal action is initiated by any Owner(s) to enforce the decision-making structure of this Section 6, the prevailing party or parties shall be entitled to recover the costs thereof from the non-prevailing party or parties. An Owner who has consented to an action in conformance with this Section 6 may provide a power of attorney to any person to execute a specific document with respect to that action, but may not provide to any person a global power of attorney to act with respect to the Owner's interest in the Property. When a vote requiring approval by Owners who own more than 50 percent of the Ownership Percentages in the Property, is approved, and an Owner refuses to comply with the vote, the Owner is in default of this Section 6.1 ("<u>Voting Default</u>"). An example of Voting Default, would be the refusal by an Owner to sign a listing agreement or warranty deed at the sale of the Property. During the period an Owner is in Voting Default ("<u>Voting Default Period</u>"), and continues in default for 30 days after receipt of written notice of the Voting Default, the non-defaulting Owners together (or a manager), may (i) withhold defaulting Owners rental income until the default is corrected, and (ii) withhold the defaulting Owner's voting rights hereunder during the term of the Voting Default.

***6.2.    Owners' Right and Obligation to Manage/Management Agreements.*** Owners have the right and obligation to manage the Property. The Owners must participate in all management decisions. The Owners may enter into identical management or brokerage agreements, which must be renewable at least once a year. Any such agreement shall not be with a lessee of the Property. The management agreement may authorize the manager to: (i) maintain a common bank account for the collection and deposit of rents; to (ii) offset expenses associated with the Property against any revenues before disbursing each Owner's share of net revenues; and (iii) to withhold an Owner's disbursements during the Voting Default Period. Except for Voting Default, the management agreement must require the manager to disburse to the Owners their share of net revenues in a timely manner. The management agreement may also authorize the manager to prepare statements for the Owners showing their share of revenue and costs from the Property. In addition, the management agreement may authorize the manager to obtain or modify insurance on the Property, and to negotiate modifications of the terms of any lease or any Mortgage Indebtedness subject to approval of the Owners under Section 6. Any fees to be paid by the Owners to any manager, broker, or other Owner i) may not exceed the fair market value of the services provided, ii) must be comparable to fees paid by unrelated parties for similar services, and iii) may not depend in whole or in part on the income or profits derived from the Property. This requirement will not prevent a management fee that is based on gross receipts.

***6.3.    No Business Activities.*** The Owners may engage only in Property-related activities that are customarily performed in connection with the maintenance and repair of rental real property. See Rev Rule 75-374, 1975-2 CB 261. Activities will be considered customary if they would not prevent an amount received by an organization described in IRC § 511(a)(2) from qualifying as rent under IRC Section 512(b)(3)(A) and the regulations thereunder. Activities of Owners will include activities of their agents and entities controlled by the Owners, but will not include activities of Owners (or the entities they control) who have been Owners for less than six months.

***6.4.    Leases.*** All leases must be bona fide leases for federal tax purposes. Rents paid by a lessee must reflect the fair market value for the Property. The determination of the rent amount must not depend in whole or in part on the income or profits derived by any person from the leased Property (other than fixed income based on a fixed percentage or percentages of receipts or sales), cash flow, increases in equity, or similar arrangements.

***6.5.    No Compensation.*** None of the Owners nor their agents or representatives will be entitled to any compensation for management or other services rendered in connection with the Property unless such compensation is expressly authorized by the unanimous consent of the Owners.

***7.    Liens and Encumbrances.*** Each owner shall have the right to encumber the Owner's undivided interest in the Property except as may be prohibited by the terms of any Mortgage Indebtedness and as further provided in this Section 7. In the event that an Owner separately encumbers the Owner's Ownership Percentage in the Property or suffers an encumbrance against that Ownership Percentage (including without limitation any judicial attachment, any judgment lien, any lien arising out of the order or judgment of any court, any lien

4

in connection with taxes claimed due to any governmental unit, and any lien arising under federal or state bankruptcy or insolvency laws), the Owner does hereby indemnify and hold each of the other Owners harmless from and against any and all claims, costs, demands, and expenses (including reasonable attorney fees) relating to such Owner Encumbrance. No Owner may acquire an Ownership Percentage in the Property utilizing debt financing from another Owner, the manager, or any lessee of the Property.

### 8.   *Transfer or Partition of Ownership Interest*

**8.1.   *Restrictions on Sale.*** An Owner may sell, convey, transfer, or seek a partition of the Owner's undivided interest in the Property during life or upon death or disability only in compliance with the terms of this Section 8. If the Owner is a corporation, limited liability company, partnership, trust, or other business entity (an "Owner Entity"), an interest in such Owner Entity may be sold, conveyed, or transferred only in compliance with the terms of this Section 8. Upon death or disability, the legal representative of the Owner will have authority to act on behalf of the Owner.

**8.2.   *Transfer to Permitted Transferee.*** An Owner may sell, convey, or transfer the Owner's interest in the Property to the Owner's spouse or children, or to an Entity owned only by the Owner or the Owner's spouse or children, without the consent of the other Owners and without compliance with the first-offer provisions of Section 8. An Owner may sell, convey, or transfer the Owner's interest in an Owner Entity to the spouses or children of the Owner without the consent of the other Owners and without compliance with the first-offer provisions of Section 8. In either of the above situations, however, no such transfer, sale or conveyance will be valid if it causes the resulting number of total Owners in the Property to exceed 35, per the terms and provisions of Paragraph 2 herein.

**8.3.   *Right of First Offer.*** An Owner may not sell, convey, or transfer the Owner's undivided interest in the Property, or seek a partition of the Owner's undivided interest in the Property, unless the Owner (the "Selling Owner") first offers to sell the Selling Owner's undivided interest to the other Owners under the terms of this Section 8.

**8.4.   *Offers to Other Owners.***  The Selling Owner must, in writing, offer the Selling Owner's undivided interest in the Property to each of the other Owners. The means of communicating the offer to the other Owners shall be via written communication from the manager by email or similar means. The other Owners shall have 15 days to submit to the Selling Owner an offer for the interest. If the Selling Owner receives no responses after the 15th day, he/she/they/it shall be free to market the undivided Property interest elsewhere.

**8.5.   *Fair Market Value.*** The accepted interests of the Selling Owner in the Property must be purchased at fair market value.

**8.6.   *Closing.*** The sale of the Selling Owner's interest in the Property must close on the date agreed to by the parties, unless no such date has been agreed to, in which case

DEF 000282

the sale will close 30 days after the later of: (i) the date the parties agreed on the fair market value of the Property; or (ii) the date of the arbitrator's determination. The obligation of the Selling Owner to close is subject to obtaining the consent of the holders of any Mortgage Indebtedness. Any purchasing Owner must pay the purchase price in cash. The Selling Owner must execute a warranty deed conveying the property free and clear of any lien or encumbrance that is exclusive to the interest being sold.  Any transfer taxes must be paid by the Selling Owner. Real property taxes and rents will be prorated to the day of closing. The sale will close in escrow and the Selling Owner must pay one-half of any closing costs, and the purchasing Owner(s) must pay the other half in proportion to the interest in the Property they are purchasing from the Selling Owner.

   **8.7.**  ***Execute Agreement Counterpart.*** Except for a purchaser pursuant to a partition action, the transferee of an Owner's interest (whether all or a portion) in the Property must execute a counterpart to this Agreement acknowledging the transferee's intent to be bound by this Agreement.

   **8.8.**  ***Right to Purchase Following Default.*** In the event of a default by an Owner under Section 4, any non-defaulting Owner may, in a writing sent to all of the Owners, declare that the non-defaulting Owner desires to purchase the interest of the defaulting Owner. In such event, the transaction shall be treated as if the defaulting Owner desired to sell the defaulting Owner's interest in the Property to each of the other Owners under Section 8 and had sent out a notice to all of the Owners under Section 8 which must be subject to the conditions set forth in Section 8.

   **8.9.**  ***Certain Conditions on Lenders.*** No lender, with respect to any debt that encumbers the Property, or with respect to any debt incurred to acquire an undivided interest in the Property, may be an Owner, a person related to an Owner, the manager, or any lessee of the Property. In the event of a lender foreclosure the lender would become an Owner subject to all of the same rights and restrictions as the other Owners under this Agreement.

   **8.10.**  ***Right to Purchase Minority Vote and non-participating Owners.*** In the event an Owner votes with the minority to not take an action requiring a unanimous vote under this Agreement (a "Minority Owner"), and at least a 75 percent interest in the Property voted with the majority, any Owner voting with the majority (a "Majority Owner") may, in a writing that is sent to all of the Owners within 60 days of the non-unanimous vote, declare that the Majority Owner desires to purchase the interest of the Minority Owner(s). Or in the event an owner has repeatedly failed to participate in decisions regarding the property as evidenced by at least four consecutive elections where no vote was cast by the same member (non-participating member), the MillRock Investment Fund , LLC may declare its desire to purchase the interest of the non-participating member. In such events, the transaction shall be treated as if the Minority Owner or Non-Participating Owner desired to sell the their interests in the Property to the Majority Owners or MillRock Investment Fund , LLC in accordance with and subject to the conditions of this Section 8, except that the Owner of the Minority Interest  to be sold pursuant to

DEF 000283

this Paragraph 8.10 or Non-Participating Owner or Non-Participating Owner, may seek Arbitration in accordance with Paragraph 11.

   **9. Sale of the Property.** Upon the agreement of the Owners pursuant to Section 6, the Property shall be sold and the net proceeds distributed to the Owners under the terms of this Agreement

   10.  *Termination of Co-tenancy Agreement*

    10.1.  ***Events of Termination.*** The co-tenancy agreement will continue until terminated by the occurrence of one of the following events: (i) the sale of the entire Property; or (ii) the unanimous agreement of the Owners to terminate this Agreement.

    10.2.  ***Effect on Obligations.*** Termination will not affect the rights or obligations of the Owners that arose prior to the termination.

   11.  ***Arbitration.*** The parties hereto agree to submit to binding arbitration any controversy or claim arising out of or related to this Agreement, or any claimed breach of this Agreement. A single arbitrator chosen by mutual consent of the parties will hear the arbitration. The arbitration will be conducted in Salt Lake County Utah, and in accordance with the commercial arbitration rules of the American Arbitration Association then in effect, although another arbitration service may be selected. The arbitrator will conclude the arbitration and issue an award no later than 180 days following service of the demand for arbitration by either of the parties. Judgment upon the arbitrator's award may be entered in any court of competent jurisdiction. The prevailing party will be entitled to an award of all its arbitration fees and costs and attorney fees and costs, including expert witness fees, if so awarded by the arbitrator.

   12.  ***Attorney Fees.*** In the event of suit, action, or arbitration to enforce any of the terms of this Agreement, the prevailing party or parties and costs, including expert witness fees, will be awarded such sum as the court or arbitrator may adjudge reasonable as attorney fees in such suit, action, or arbitration and in any appeal therefrom.

   13.  ***Binding Effect.*** This Agreement will be binding upon and will inure to the benefit of each of the Owners, their respective heirs, executors, administrators, legal representatives, successors, and assigns.

   14.  ***Recordation.*** The parties may record this Agreement, or a memorandum of this Agreement, in the deed records of the county in which the Property is located. In such event, this Agreement will run with the land.

   15.  ***Amendment.*** This Agreement may be amended at any time only by the Owners by a writing executed by all of them.

DEF 000284

***16.***     ***Integration.*** This Agreement contains the entire agreement of the Owners and supersedes all prior and contemporaneous agreements between them with respect to the cotenancy. Except as fully set forth herein, there are no representations, agreements, or understandings, oral or written, among the Owners relating to their relationship as tenants in common. The recitals set forth at the beginning of this Agreement are incorporated in their entirety and made part hereof.

***17.***     ***Counterparts.*** This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument; and any party or signatory hereto may execute this Agreement by signing any counterpart. Executed documents delivered by facsimile, or other electronic means, shall have the same force and effect as original, executed documents.

***18.***     ***Assignment.*** Neither this Agreement, nor any right or interest herein, may be assigned by a party hereto.

***19.***     ***Review by Attorney.*** Each party acknowledges that it has had the opportunity to review this Agreement prior to execution with its own legal counsel.

***20.***     ***Reservations.*** Any rights not expressly granted under this Agreement are reserved by the parties.

***21.***     ***Severability.*** If any term or provision of this Agreement is to any extent invalid or unenforceable, the remainder of this Agreement will not be affected thereby, and each term or provision of this Agreement will be valid and enforceable to the fullest extent permitted by law.

***22.***     ***Governing Law.*** This Agreement will be subject to, and governed by, the laws of the state of Utah.

**OWNERS:**

By:_____
Name:

DEF 000285

**EXHIBIT A**
**Description of the Property**

Lot # 26 – 35,285 SQ FT. +/-

Common Address:

2975 Showplace Dr.
Naperville, IL 60564

Parcel:   07-01-04-410-069-0000

9

DEF 000286